# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ANTON COLBERT, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>RIO TINTO PLC, RIO TINTO LIMITED, THOMAS ALBANESE, and GUY ROBERT ELLIOTT,<br><br>Defendants. | : : : : : : : : : : : : : : : : : : : : | No.<br><br><br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Anton Colbert ("Plaintiff"), by and through his attorneys, alleges in this Complaint against Rio Tinto plc, Rio Tinto Limited (collectively, "Rio Tinto" or "Rio Tinto Group"), upon personal knowledge as to himself, and upon information and belief as to all other matters, based upon the investigation conducted by and through his attorneys, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission (the "SEC"), conference call transcripts, news reports, press releases issued by Defendants, and other publicly available documents, as follows:

## NATURE AND SUMMARY OF THE ACTION

1.     This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Defendant Rio Tinto plc ("Rio Tinto" or the "Company") securities between October 23, 2012 and February 15, 2013, inclusive (the "Class Period").  This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act

of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

2.      Rio Tinto is incorporated in the United Kingdom ("U.K"), and its American Depositary Receipts ("ADR" or "ADRs") are listed on the New York Stock Exchange ("NYSE").  The Company, a mining and metals company, finds, mines, processes, and markets mineral resources.  It has operations in Australia, North America, Asia, Europe, Africa, and South America.

3.      This action concerns a fraud previously unknown to investors and only recently revealed by the SEC in its complaint filed on October 17, 2017, captioned: _Securities And Exchange Commission V. Rio Tinto Plc, Rio Tinto Limited, Thomas Albanese, and Guy Robert Elliott_ Case No. 1:17-cv-07994 (SDNY). The SEC complaint reveals that Chief Executive Officer Albanese and Chief Financial Officer Elliott lobbied for and obtained board approval of Rio Tinto's August 2011 acquisition of certain of Riversdale Mining Limited ("Riversdale") coal tenements in Mozambique for approximately $3.7 billion (net of cash acquired at acquisition). Within months of the acquisition, Albanese and Elliott knew of material problems adversely affecting this asset's ("RTCM") multi-billion dollar publicly reported valuation.  By early 2012, Albanese and Elliott knew of additional problems with RTCM requiring an impairment analysis and material reduction of its publicly reported value.  Instead, Albanese and Elliott thwarted the required impairment analysis required by the relevant accounting rules and throughout the Class Period continued to promote RTCM's worth to investors.   When, in December 2012, a concerned employee outside the normal financial control function discovered that the true nature and effect of adverse RTCM developments were being hidden from the Company's Board of Directors, he bypassed Albanese and Elliott and went directly to the Chairman of the Board, who

then ordered an investigation into the asset's value.  By January 15, 2013, less than a year and a half after the acquisition, the Board determined the asset was severely impaired and should be written down by billions of dollars to $611 million.  The initial impact of the impairment was disclosed in Rio Tinto's financial report on Form 6-K filed with the SEC on February 15, 2013. It got worse from there.  Before selling RTCM for just $50 million (less than two percent of the original $3.7 billion acquisition price), Rio Tinto recorded hundreds of millions of dollars in additional impairment charges to reduce RTCM's publicly reported valuation.

4.      Defendants' wrongful conduct has inflicted significant damages on Rio Tinto investors.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

6.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  A substantial part of the conduct complained of herein, and the subsequent damages, occurred in this Judicial District, and the Company's ADRs are traded on the NYSE, which is located in this Judicial District.  Moreover, Rio Tinto transacts business in this district through Rio Tinto Finance (USA) Limited, a wholly owned subsidiary of Rio Tinto Limited, and Rio Tinto Finance (USA) plc, an indirect wholly owned subsidiary of Rio Tinto plc.

7.      In connection with the acts, conduct, and other wrongs alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

8.     Rio Tinto plc is a London and NYSE-listed company with a sponsored ADR facility, the underlying shares of which are registered with the SEC and listed on the NYSE. During the relevant period, Rio Tinto plc filed Annual Reports with the SEC on Form 20-F, and furnished other reports to the SEC on Form 6-K.  These submissions were filed with SEC headquarters *via* the SEC's internet-based EDGAR system, as required of all foreign issuers during the relevant period, and were publicly available to United States investors through the SEC's website, https://www.sec.gov.  Rio Tinto plc also regularly held earnings calls, which were attended by United States-based analysts.

9.     Rio Tinto Limited is listed on the Australian Securities Exchange.  During the relevant period, Rio Tinto Limited filed Annual Reports with the SEC on Form 20-F, and furnished other reports to the SEC on Form 6-K.  These submissions were filed with SEC headquarters *via* the SEC's internet-based EDGAR system, as required of all foreign issuers during the relevant period, and were publicly available to United States investors through the SEC's website, https://www.sec.gov.

10.     Collectively, Rio Tinto plc and Rio Tinto Limited comprise an international mining group that is headquartered in the United Kingdom and that does business as "Rio Tinto Group."

11.     Thomas Albanese was the Chief Executive Officer of Rio Tinto from May 2007 until January 2013, when he was forced out in the wake of Rio Tinto's announced impairments. Albanese is a citizen of the United States.

12.     Guy Robert Elliot was the Chief Financial Officer of Rio Tinto plc and Rio Tinto Limited from 2002 to April 18, 2013.  From 1996 to 1999, he served as President of Rio Tinto

Brazil, having joined Rio Tinto's predecessor company in 1980.  He retired from Rio Tinto at the end of 2013.  Elliott is a citizen of the United Kingdom.

<b><u>FACTUAL ALLEGATIONS</u></b>

**A.**    <u>**Governing Accounting Standards and Policies**</u>

13.    Rio Tinto plc and Rio Tinto Limited are subject to the reporting requirements of the Exchange Act applicable to foreign private issuers.  Rio Tinto's financial statements are presented by both Rio Tinto plc and Rio Tinto Limited as consolidated accounts.

14.    During the time period relevant to the allegations herein, Rio Tinto was required to comply with the standards issued by the International Accounting Standards Board in preparing and filing annual and interim financial reports with the SEC.  These standards are referred to as either IAS or IFRS.

15.    IAS 34 sets forth the minimum content of an interim financial report and requires the inclusion of significant events such as recognizing a loss from an impaired asset.  An asset is impaired if its value reported in the company's financial statements exceeds its likely recoverable amount.

16.    Pursuant to IAS 36, companies are required to assess whether an asset or cash generating unit ("CGU") is impaired at the end of each reporting period.  If there is any indication that an asset or CGU may be worth less than its carrying value, IAS 36 requires that the company generate a formal estimate of the recoverable amount.

17.    Upon information and belief, Rio Tinto's Controller's office was responsible for coordinating the impairment review process, and in connection with the process, Rio Tinto business units were responsible for providing valuations of assets and CGUs to the Controller's office.

5

18.     Upon information and belief, in assessing whether an asset or CGU should be tested for impairment, both the Controller's office and business units were required to consider at a minimum the following impairment indicators, which were set out in Rio Tinto's Controller's Manual and largely tracked the language and requirements of IAS 36:

• A significant decline in the market value of the asset—beyond what might be expected as a result of age and normal use;

• Significant changes that are likely to have an adverse effect in the technological, legal or economic environments in which the entity operates, or in the market to which an asset is dedicated;

• An increase in the discount rate which is likely to be material to the relationship between the recoverable amount of an asset and its book value;

• Evidence of significant physical damage or obsolescence;

• Significant changes to the extent or manner of use of the asset that are likely to have an adverse effect on its recoverable value, including restructuring or discontinuation of use;

• Indications that the economic performance of an asset is, or will be, significantly worse than expected; and

• The market capitalization of the asset falls below its carrying amount.

19.     Upon information and belief, Rio Tinto's Controller's Manual provided that three other changes were to be considered, if relevant, in determining whether there was an indication that an asset or CGU was worth less than the carrying value:

• A material change from the prior year in Rio Tinto's long run price assumption for the products of the CGU that is not mitigated by a similar

offsetting change in exchange rates, input prices or other factors;

- A material change from the prior year in the estimates of proven and probable ore reserves and resources included within the current mine plan, other than a reduction through depletion; and

- Any other change that is likely to have a material impact on the value of the CGU including, but not limited to, a significant pit wall failure or a significant reorganization.

20.     Neither Rio Tinto's accounting policies nor any guidance on the applicable accounting standards permitted Rio Tinto to delay or skip any aspect of the impairment review process for any reason if an impairment indicator was identified.

21.     During the time period relevant to the allegations herein, Rio Tinto's Controller reported to Elliott, who had direct oversight of Rio Tinto's process for determining whether an impairment indicator, or "trigger," existed with respect to an asset or CGU.

**B.     Rio Tinto's Acquisition of Riversdale Mining Ltd.**

22.     The acquisition of the Mozambican coal business – Riversdale Mining Limited ("Riversdale") – emanated from Albanese's directive to senior Rio Tinto executives to seek out opportunities for value-accretive growth.  Albanese recognized that mining assets were by nature depleting assets and thus Rio Tinto needed to find new resources in order to sustain its operations.  Albanese believed there would be continued growth in energy, especially in emerging markets, and that a significant coking coal discovery could be of strategic importance on a long-term basis.  Elliott, however, had concerns that Albanese was too inclined towards growth at the expense of value.

23.     Following Rio Tinto's pre-acquisition due diligence, including that of in-house experts who identified a series of significant risks (including risks related to barging other

transport options, and coal quantity and quality), all of which they repeatedly described to Albanese and Elliott, Rio Tinto submitted its proposal for the acquisition of Riversdale on December 20, 2010 and successfully acquired a majority interest on April 8, 2011.  Rio Tinto completed the acquisition in August 2011, paying approximately $3.7 billion (net of cash acquired at acquisition).  The purchase price represented a substantial premium to Riversdale's market capitalization at the time the acquisition was proposed.

24.    Rio Tinto described the acquisition as "[i]n line with [its] strategy of developing large, long-life, low cost assets to build shareholder value" and stated that the acquisition "provide[d it] with one of the world's most prospective tier one coking coal developments."  The acquisition appeared to advance RTE's objective of becoming a major global player in the hard coking coal sector and to satisfy Albanese's directive to seek opportunities for value-accretive growth.

25.    At its annual meeting in April 2011, Rio Tinto announced the transaction to shareholders under the banner, "Growth [is] back on the agenda," and according to Albanese, the acquisition "re-instilled [Rio Tinto's] reputation in the market for M&A" after the Alcan debacle and "positioned [RTCM] to develop one of the last large coking coal basins accessible to sea borne markets."

26.    In August 2011, Albanese publicly hailed Rio Tinto's acquisition of RTCM as an important highlight that transformed RTE's growth portfolio, giving it access to a number of "tier one" coking coal development projects in Mozambique, and claimed that the acquisition was a major achievement and that RTCM was a world class asset that would deliver value to shareholders for years to come.

27.    Approximately one month later, in or around September 20, 2011, Albanese and

Elliott, together with RTE's CEO, addressed analysts in London and New York. The presentation materials used for the meeting highlighted that RTCM had a world-class portfolio of coal assets within the Moatize Basin and that Rio Tinto's strategic objective was to export 25 million tons of hard coking coal per year by 2020.

28.    At the time of the acquisition, Riversdale had publicly disclosed its estimates that the Benga and Zambezi tenements held approximately 13 billion tons of coal reserves and resources, including some of the world's largest deposits of hard coking coal.

**C.    According to the SEC RTCM Faced Immediate Setbacks**

29.    Rio Tinto's acquisition of Riversdale was driven in part by assumptions that by 2020 it could produce over 25 million tons of hard coking coal per year and more than 30 million tons of coal per year in total; that by 2030 it could produce more than 45 million tons of coal per year; that it could barge up to 30 million tons of total coal product per year down the Zambezi River; and that approximately 12 to 15 million tons of coal per year could be transported by existing rail lines to the Beira port, where it could then be shipped to markets. In other words, Rio Tinto's acquisition valuation was based on an assumption that it could cheaply transport 30 million tons of coal per year by barge, that it could transport an additional 10 to 15 million tons of coal per year on existing rail infrastructure, and that 30 million of the 45 million tons would be high-value hard coking coal.  Each of those assumptions quickly proved to be incorrect.

30.    At acquisition, Rio Tinto planned to transport the majority of RTCM's coal from its Riversdale tenements to market by barging it down the Zambezi River to a port on the Indian Ocean.  This was a central assumption to the acquisition.

31.    The SEC has revealed that, within months of the acquisition, the "show stopping"

risks to barging that had been identified by Rio Tinto's in-house experts materialized, and it became clear that constraints on barging volumes would have a measurable and materially negative effect on RTCM's valuation.  By October 2011, RTE's VP of Logistics determined that, based on the best information available, barging capacity was limited to 10 million tons per year—not the 30 million tons per year assumed in the acquisition valuation—due to the hydrogeological properties of the Zambezi River and to ecological constraints impeding the construction of a port at the mouth of the river, the site of an internationally-designated wetland. Moreover, the immutable physical constraints on the river meant that barging was significantly more expensive than had been assumed previously.

32.     Moreover, as a result of the materially adverse developments related to barging, by Fall 2011 Rio Tinto knew that, in contrast to the assumptions underpinning the acquisition valuation and its marketing narrative, barging was neither a high-volume nor a low-cost infrastructure solution.

33.     Further, according to the SEC, downgrading barging from 30 million tons per year to approximately 10 million tons per year had a negative, measureable and immediate effect on RTCM's valuation.  As part of the routine annual planning process in 2011, RTCM generated an updated valuation that reduced its value by approximately $2.1 billion as a result of the loss of barging capacity.

34.     The SEC also revealed that, in late November 2011, officials from the Government of Mozambique notified RTCM that its Zambezi River barging proposal would be rejected, and formally rejected it sometime in December 2011.  Albanese and Elliott reportedly learned of the rejection in December 2011 and January 2012, respectively.  Thus, according to the SEC, within eight months of the acquisition, Defendants knew that the lowest-cost

transportation method was not available and that they had not identified a viable alternative means of transportation that could support the volume assumed at acquisition.  They did not publicly disclosed the full scale of the barging-related issues facing RTCM and their material effect on its valuation.

35.    Despite knowing that barging had been rejected by the Government of Mozambique and, in any event, could never support the type of volume underpinning RTCM's valuation, Rio Tinto did not test RTCM for impairment pursuant to Rio Tinto's accounting policies and the provisions of IAS 36.

36.    Albanese and Elliott signed Rio Tinto's 2011 Annual Report, which did not disclose the adverse developments at RTCM.  The report includes a "Directors' declaration," in which Albanese and Elliott each "confirmed" that the financial statements "give a true and fair view of the assets, liabilities, financial position and profit" of Rio Tinto and have been prepared in accordance with applicable accounting standards.  Albanese and Elliott also "confirmed" that "there is no relevant audit information of which [Rio Tinto] Group's auditors are unaware" and that each of them has taken all the steps necessary "to establish that [Rio Tinto] Group's auditors are aware" of any relevant audit information.

37.    The 2011 Annual Report was incorporated in Rio Tinto's Form 20-F filed with the SEC on or about March 15, 2012.  Both Albanese and Elliott "certified" that the Annual Report did not contain any untrue statement of a material fact or a material omission, and that the financial statements "fairly present" the financial condition, results of operations, and cash flows of Rio Tinto.  Albanese and Elliott knew, were reckless in not knowing, or should have known that these certifications were false because the Annual Report continued to value RTCM at more than $3 billion even though there was no viable plan to transport more than a small fraction of

the coal that would need to be sold to support that valuation.

38.     The Annual Report contained statements about RTCM that were materially misleading, and collectively depicted RTCM in a positive light that was not supported by the best information then known to Defendants and did not disclosure adverse developments at RTCM or the related valuation challenges.

39.     To the contrary, Defendants falsely declared in Rio Tinto's financial statements that the value of RTCM was the amount it paid to acquire Riversdale, *i.e.*, approximately $3.7 billion dollars.  This valuation concealed from the market that Rio Tinto did not test RTCM for impairment despite the presence of several impairment indicators.

40.     Defendants falsely stated that Rio Tinto reviewed intangible assets for impairment knowing that it did not in fact test RTCM for impairment, despite an affirmative obligation to do so, and that there were numerous indicators that RTCM's carrying value might not be recoverable.

41.     In the SEC's view, Defendants minimized the one negative fact that they did disclose.   Rio Tinto described RTCM's write-down of reserves and resources with false assurances that the full extent of the write-down had been anticipated prior to the acquisition of Riversdale, and, therefore, had no effect on RTCM's valuation.   This was in keeping with Elliott's e-mail to Albanese that the "market will not see" Rio Tinto's pre-acquisition assumptions.  In reality, the full-extent of the write-down had not been anticipated and it had a negative effect on RTCM's valuation.

42.     Albanese and Elliott signed the 2011 Annual Report and were therefore responsible for the materially false and misleading statements and/or omissions.

43.     The 2011 Annual Report was subsequently incorporated into the offering

documents for Rio Tinto's March and August NYSE bond offerings, whereby it raised billions of dollars.

**D.    Albanese Continued to Promote RTCM Despite Significant Adverse Developments**

44.    Rio Tinto held its annual shareholders meeting in London on April 19, 2012. During the meeting, Albanese told shareholders that Rio Tinto was growing its coal business, with a target of starting shipments from the newly-acquired hard coking coal assets in Mozambique in the first half of 2012.

45.    Neither Rio Tinto nor Albanese disclosed that the government had rejected RTCM's barging proposal, that RTCM had available to it just a small fraction of the transport infrastructure assumed at acquisition, that Rio Tinto significantly reduced the quantity of RTCM's coal reserves and resources, or that the coal quality and mix between hard coking and thermal coal was not as favorable as initially assumed.

46.    Because of these omissions, Rio Tinto's and Albanese's statements to shareholders gave the misleading impression that RTCM remained on track, and concealed from shareholders the fact that Rio Tinto was in fact on the cusp of another multi-billion dollar impairment under Albanese's leadership.

**E.    The SEC Reveals Albanese and Elliott Knew that RTCM had a Negative Valuation**

47.    During mid-April 2012, Elliott requested an all-hands meeting with Albanese and RTCM representatives to review RTCM's status.  According to the SEC, this meeting was convened on May 11, 2012.

48.    The SEC revealed that during this meeting management provided Albanese and Elliott with the following information:

- Based on the best information available and under the best potential

configuration, RTCM was worth negative $680 million;

- There were formidable physical challenges associated with barging, the Government of Mozambique rejected barging, and the loss of early barging tons resulted in a huge value loss for the business;

- There was a significant negative impact on value stemming from issues related to the coal quality, *e.g.*, a less-favorable split between hard coking and thermal coal;

- There was a negative impact on valuation stemming from increased costs of $20 to $40 per ton, due to the loss of low-cost barging;

- Even RTCM's negative valuation assumed production from Minjova, which was neither part of the Riversdale acquisition nor a component of the RTCM CGU;

- The transportation options considered at the time of the RTCM acquisition were no longer realistic; and

- The only way to deliver the necessary capacity at a competitive cost was to build a new ("greenfield") rail line at a cost of $16 billion—and that even then, the project did not have a positive valuation.

49.     Furthermore, again according to the SEC, Albanese specifically rejected a proposal for Rio Tinto to construct a new, $16 billion ("greenfield") rail line by itself in light of capital constraints.   Instead, Albanese instructed RTCM managers to seek out partners to construct or bring online an existing small rail operation.   However, existing rail infrastructure could not transport the amount of coal underpinning Rio Tinto's estimates and thus could not support RTCM's carrying value of over $3 billion.

14

**F.**     **Defendants Omit Material Information From Rio Tinto's August 9, 2012 Interim Report**

50.     Rio Tinto filed its interim financial report for half-year 2012 as an exhibit to a Form 6-K filed with the SEC on August 9, 2012.   The interim financial report recorded a valuation of more than $3 billion for RTCM, and reported net earnings for Rio Tinto for the period of approximately $5.8 billion.   The RTCM valuation reflected in the interim financial report was materially misleading and resulted in a material overstatement of Rio Tinto's net earnings and assets.   Had Rio Tinto properly impaired RTCM, Rio Tinto's net earnings would have been reduced by more than 50 percent at the half-year 2012.

51.     In addition, in the Form 6-K filed with the SEC on August 9, 2012, which included a press release about RTCM's first shipment of hard coking coal, Rio Tinto failed to disclose the material information known by Albanese and Elliott concerning RTCM's significantly reduced valuation or the significant challenges RTCM faced.

52.     During Rio Tinto's August 8, 2012 North American presentation of its half-year results, which included a question and answer session with Albanese, Albanese materially misrepresented that Rio Tinto was looking at a "greenfield" rail development in Mozambique, and that Benga, Zambezi and the regional area in the Moatize Basin was "more prospective" than he would have said a year earlier.

53.     In a similar exchange with analysts that same day—August 8, 2012—Albanese materially misrepresented to investors that the work RTCM had been doing over the past 12 months indicated that the company probably had even "more potential in total as [it went] forward," and that the Moatize was truly a world-class basin coal deposit.

54.     Elliott participated in the August 8, 2012 session with analysts and he did not

correct Albanese's material misrepresentations regarding RTCM thereby concealing from analysts the true valuation of RTCM and the existence of impairment indicators.

55.     At the time of these statements, Albanese and Elliott knew, were reckless in not knowing, or should have known that the only way to deliver the necessary capacity at a competitive cost was to build a new rail line at a cost of approximately $16 billion, a plan Albanese rejected at the end of the Brisbane Meeting.  They also knew, were reckless in not knowing, or should have known that the best information available indicated that RTCM was worth negative $680 million and that there was a less-favorable split between hard coking and thermal coal than Rio Tinto assumed at acquisition.   These facts completely contradict Albanese's statement that the Moatize Basin represented an opportunity for Rio Tinto to have a "tier one," world-class coking coal operation.

## G.     Defendants Incorporated by Reference Material Misrepresentations and Omissions into August 2012 Bond Offering Materials

56.     Days after filing its false and misleading interim financial reports for half-year 2012, Rio Tinto issued three bonds, raising billions of dollars.

57.     Rio Tinto's offering documents for its August 2012 NYSE bond offering incorporated by reference the material misrepresentations and omissions in Rio Tinto's 2011 Annual Report, which was incorporated in Rio Tinto's Form 20-F filed with the SEC on or about March 15, 2012, and in Rio Tinto's half-year 2012 interim report.  Albanese and Elliott signed the misleading 2011 Annual Report incorporated by reference and used to raise money in the August 2012 bond offerings.

58.     Rio Tinto's offering documents reported "group operating profits," which are defined as including the effect of any impairments, of $6.6 billion for half-year 2012 and $13

billion for year-end 2011.  Due to Rio Tinto's failure to impair RTCM, those operating profits were materially overstated.

59.     Rio Tinto's offering documents for its August 2012 NYSE bond offerings omitted any information concerning rejection by the government of Mozambique of RTCM's barging proposal, that Rio Tinto significantly reduced the value of RTCM's coal reserves and resources, or that the best available models showed RTCM to have a negative value.

**H.     The SEC Sues Defendants Alleging Securities Fraud**

60.     On October 17, 2017, the SEC filed its complaint against Rio Tinto plc, Rio Tinto Limited, Albanese, and Elliott.  In it, the SEC detailed a course of fraud outlined above to conceal the rapid and dramatic decline in value of the acquired RTCM business, and additionally as follows:

61.     In August 2012, Rio Tinto's in-house valuation experts in the Technology & Innovation division initiated a review of RTCM's valuation, concluding that the value ranged from negative $4.9 billion to $300 million.

62.     The Audit Committee was scheduled to review impairments of Rio Tinto's assets, including RTCM, for its 2012 year-end financial statement at a November 26, 2012 meeting. Prior to that meeting, Elliott was on a phone call with the head of T&I and a Rio Tinto geology expert who again informed Elliott that RTCM had little or no commercial value.  On the call, Elliott assured the head of T&I that Elliott would raise the significant valuation challenges confronting RTCM at the upcoming Audit Committee meeting.

63.     In advance of the November 26, 2012 Audit Committee meeting, Rio Tinto's Controller submitted a paper showing the results of an annual review of carrying values of Rio Tinto assets, including RTCM (the "Third Controller's Paper").  The Third Controller's Paper stated that current modelling indicated a recoverable amount for RTCM in the range of $4 billion

to $5 billion and, therefore, no impairment was likely to be required.  Albanese and Elliot knew, were reckless in not knowing, or should have known that the $4 billion to $5 billion RTCM valuation was fundamentally flawed because RTCM had suffered several setbacks and there had been no significant positive developments since the Brisbane Meeting.

64.     Elliott received and edited a draft of the Third Controller's Paper in advance of the November 26, 2012 Audit Committee meeting.  Elliott did not correct any of the materially misleading statements in the Third Controller's Paper, including the $4 billion to $5 billion valuation, even though he knew that RTCM and T&I had generated negative valuations for RTCM.

65.     Albanese, Elliott, and Rio Tinto's independent auditors attended the November 26, 2012 Audit Committee meeting and received final versions of the Third Controller's Paper. The Third Controller's Paper contained the following materially misleading  statements:

- "Current modeling is indicating a recoverable amount in the range of $4 billion to $5 billion and the models are in the process of being finalized.  The recoverable amount [of $4 to $5 billion] has been determined on a [fair value less cost to sell] basis, using the approved Rio Tinto plan process as a foundation.  As such, we do not envisage impairment of the RTCM goodwill."

- "The long-term coal-chain solution required to support the expansion of the business . . . require[s] the construction of a Greenfield rail and port system . . . .  For the purposes of the [fair value less cost to sell] model, conservative capital assumptions have been used which assume Rio Tinto pays for the large proportion of the costs of the rail and port."

- RTCM's valuation is affected by "[e]xternally imposed limitations to the

short to medium term usage of a barge solution and necessary consideration of alternative coal chain solutions."

66.     At the time of the November 26, 2012 Audit Committee meeting, almost a full year had passed since Albanese and Elliott had been apprised of the significant transportation challenges confronting RTCM.  As of November 26, 2012, Albanese and Elliott knew, were reckless in not knowing, or should have known that RTCM had made no formal proposal either to Rio Tinto's Investment Committee or to the Government of Mozambique to build a greenfield railroad.  On the contrary, Albanese had rejected it at the Brisbane Meeting.

67.     At the November 26, 2012 Audit Committee meeting, Albanese and Elliott did not correct any of the materially misleading statements in the Third Controller's Paper, thereby allowing the Audit Committee and Rio Tinto's independent auditors to rely on a $4 billion to $5 billion RTCM valuation, which had no basis in reality.  Albanese and Elliot did not advise the Audit Committee or Rio Tinto's independent auditors that Albanese had rejected the $16 billion greenfield rail and port system six months earlier.  Albanese and Elliott did not advise the Audit Committee and Rio Tinto's independent auditors of the significant adverse developments at RTCM, the lack of any viable transportation option for more than two million tons of coal, or the negative valuations generated by RTCM and T&I.

68.     Contrary to his promise, Elliot did not disclose the significant valuation challenges that T&I had flagged for him in their previous call.  Rather, Elliott merely alluded to the information he had received from T&I as "late breaking" news of a "technical nature."

69.     As a result of the materially misleading statements in the Third Controller's Paper and Elliott's concealment of the information he recently learned from T&I, there was no plan to impair RTCM following the November 26, 2012 Audit Committee meeting.

I.  **Albanese and Elliott Continue to Promote RTCM at Rio Tinto's October and November 2012 Investor Meetings**

70.    Throughout October and November 2012 Albanese and Elliott continued to tout RTCM to the market, thereby concealing that this acquisition under their leadership was significantly impaired.  For example, according to the SEC, during an October 2012 investor meeting, Elliott described Rio Tinto's acquisition of Riversdale as the purchase of a highly prospective, "tier one" coking coal resource with first production in mid-2012 and the objective of 25 million tons of coal production per year by 2020.  Furthermore, according to the SEC, at the time of these statements, Elliott knew, was reckless in not knowing, or should have known that based on the best information available:

- There was only a viable transportation option for approximately 2 million tons of coal per year;

- The only way to deliver the 25 million tons touted by Elliott was to build a new ("greenfield") rail line at a cost of approximately $16 billion, which Albanese rejected;

- RTCM generated a negative $680 million valuation based on the best available information;

- There was a significant negative impact on RTCM's value stemming from issues related to the coal quality, e.g., lower product yield and a less-favorable split between hard coking and thermal coal; and

- There was a significant negative impact on RTCM's valuation stemming from increased costs of $20 to $40 dollars per ton, due to the loss of the low-cost barging solution.

71.     Similarly, according to the SEC, during a November 2012 investor seminar, Albanese was asked if barging was still on "the agenda" to which he responded that the company would need to look at all the transportation options.  This statement was materially misleading because Albanese knew, was reckless in not knowing, or should have known that Rio Tinto was at risk of losing its mining license if it continued to pursue barging, which it did not do, and that he personally rejected building a new rail line at the Brisbane Meeting.  As a result, the only transportation option that was currently on the table was the use of existing rail, which had extremely limited capacity.

72.     And, also according to the SEC, during the same investor seminar, Albanese discussed the long-term optionality in RTE's portfolio, referencing both the first shipment of coal from Mozambique and describing the Moatize Basin as a long-term opportunity with the potential to grow beyond 25 million tons of coal per year.  At the time of these statements, Albanese knew, was reckless in not knowing, or should have known that the ability to transport any coal to market was severely limited because RTCM's barging proposal had been rejected by the Government of Mozambique, Albanese had personally rejected the $16 billion new railroad, and existing rail had extremely limited capacity.  He also knew that RTCM had a lower product yield and a less-favorable split between hard coking and thermal coal than what Rio Tinto assumed at acquisition.  Moreover, Albanese also knew, was reckless in not knowing, or should have known that, as of November 2012—a full year after learning that the Government of Mozambique had rejected RTCM's barging proposal—RTCM had made not submitted a revised barging proposal to the Government.

**J.      The Truth is Revealed and Defendants Finally Impair the Value of RTCM**

73.     According to the SEC, the executive in charge of T&I expected Elliott to share

information about RTCM's valuation challenges with the Audit Committee in November 2012. He expected that high level executives would call him to discuss the valuation challenges after the November 26, 2012 Audit Committee meeting but no one did.  As a result, the week after the meeting, the executive in charge of T&I advised Albanese that RTCM had a negative valuation. Albanese requested verification of the information, and, upon the project's completion in the third week of December 2012, the information was confirmed as correct.

74.     Furthermore, according to the SEC, around the same the T&I executive became increasingly concerned about the extent to which the Board of Directors had been informed of RTCM's negative valuation.  As a result, he bypassed Albanese and Elliot and spoke directly with the Chairman of Rio Tinto's Board about RTCM's negative valuation.

75.     The SEC alleges the Chairman requested an investigation in December 2012 and at a January15, 2013 Board meeting the value of RTCM was revised downward to $611 million. This constituted a write-down of more than 80 percent of RTCM's value within two years of acquisition.    Moreover, at the time, there was considerable discussion with Rio Tinto's independent auditors about whether the write-down should be even larger.

76.     On January 17, 2013, the Company announced in a press release attached to its Form 6-K filed with the SEC that Albanese stepped down that day and would ultimately leave Rio Tinto on July 16, 2013.  He did not receive a bonus for 2012 or 2013.

77.     The Company also announced: "Rio Tinto expects to recognize a non-cash impairment charge of approximately US$14 billion (post tax) in its 2012 full year results.  These impairments include an amount of approximately US$3 billion relating to Rio Tinto Coal Mozambique (RTCM), as well as reductions in the carrying values of Rio Tinto's aluminum assets . . . in the range of US$10-11 billion . . . .  The final figures will be included in Rio Tinto's

full year results on 14 February 2013."

78.     The Company further explained: "In Mozambique, the development of infrastructure to support the coal assets is more challenging than Rio Tinto originally anticipated. Rio Tinto sought to transport coal by barge along the Zambezi River, but this option did not receive formal approvals[]" and "These infrastructure constraints combined with a downward revision to estimates of recoverable coking coal volumes on the RTCM tenements, have led to a reassessment of the overall scale and ramp up schedule of RTCM, and consequently to the impairment announced today."

79.     In the press release, the Chairman stated: "The Rio Tinto Board fully acknowledges that a write-down of this scale in relation to the relatively recent Mozambique acquisition is unacceptable."   Albanese stated: "While I leave the business in good shape in many respects, I fully recognize that accountability for all aspects of the business rests with the CEO."

80.     In response to these partial disclosures, the price of Rio Tinto ADRs fell, damaging investors.

81.     On February 15, 2013, Rio Tinto filed its Form 6-K announcing its financial results for the fiscal year ending on December 31, 2012 and reported a net loss of almost $3 billion – the first loss in its history.  It stated "[a]n impairment charge of $2,860 million post-tax was also recognized relating to Rio Tinto Coal Mozambique[.]"

82.      In response to this news, the price of Rio Tinto ADRs fell, damaging investors.

## K.     Subsequent Credit Downgrade, Management Change, Impairments, and RTCM Sale

83.     On February 25, 2013, a credit agency revised its outlook for Rio Tinto from

"Stable" to "Negative."

84.     Elliott was replaced as the Company's CFO effective April 18, 2013 and he, like

Albanese, did not receive a bonus for 2012 or 2013.

85.     On February 13, 2014, Rio Tinto announced in its Form 6-K filed with the SEC

"[a] post tax impairment charge of US$470 million relating to Rio Tinto Coal Mozambique . . .

has been recognized."

86.     In October 2014, Rio Tinto sold RTCM to International Coal Ventures Private

Limited for $50 million.

## CLASS ACTION ALLEGATIONS

87.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or

otherwise acquired Rio Tinto securities between October 23, 2012 and February 15, 2013

inclusive.  Excluded from the Class are Defendants, directors and officers of the Company, as

well as their families and affiliates.

88.     The members of the Class are so numerous that joinder of all members is

impracticable.  Throughout the Class Period, Rio Tinto securities were actively traded on the

NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can

only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or

thousands of members in the proposed Class.  Record owners and other members of the Class

may be identified from records maintained by Rio Tinto or its transfer agent and may be notified

of the pendency of this action by mail, using the form of notice similar to that customarily used

in securities class actions.

89.     There is a well-defined community of interest in the questions of law and fact

involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

      a.      Whether the Exchange Act was violated by Defendants;

      b.      Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

      c.      Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

      d.      Whether the price of the Company's securities was artificially inflated; and

      e.      The extent of damage sustained by Class members and the appropriate measure of damages.

90.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

91.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

92.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

93.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

94.    Throughout the Class Period, the market price of Rio Tinto securities was inflated by the material omissions and false and misleading statements made by the Company, Albanese, and Elliott, which were widely disseminated to the securities markets, investment analysts, and the investing public.  The false and misleading statements materially misrepresented to the market the Company's financial results and prospects, and caused Rio Tinto securities, including its ADRs, to trade in excess of their true value.

95.    As a result, Plaintiff purchased Rio Tinto ADRs at artificially inflated prices. When the partial truth about Rio Tinto's asset values was revealed to the market, the price of its ADRs declined in response, as the artificial inflation caused by Defendants' misrepresentations and omissions was partially removed from the price of Rio Tinto ADRs, thereby causing substantial damages to Plaintiff and the Class.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET DOCTRINE

96.    At all relevant times, the market for Rio Tinto ADRs was an efficient market for the following reasons:

a.    Rio Tinto ADRs met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

b.    As a regulated issuer, Rio Tinto filed periodic public reports with the SEC and the NYSE;

c.    Rio Tinto regularly communicated with public investors via established

market communication mechanisms, including regular disseminations of press

releases on the national circuits of major newswire services and other wide-

ranging public disclosures, such as communications with the financial press and

other similar reporting services; and

d.      Rio Tinto was followed by several securities analysts employed by major

brokerage firms who wrote reports, which were distributed to the sales force and

certain customers of their respective brokerage firms.  Each of these reports was

publicly available and entered the public marketplace.

97.    As a result of the foregoing, the market for Rio Tinto ADRs promptly digested

current information regarding Rio Tinto from all publicly available sources and reflected such

information in the prices of the ADRs.  Under these circumstances, all purchasers of Rio Tinto

ADRs during the Class Period suffered similar injury through their purchases at artificially

inflated prices and/or purchases of options tied to the artificially inflated price and a presumption

of reliance applies.

## NO SAFE HARBOR

98.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

Many of the specific statements pleaded herein were not identified as "forward-looking

statements" when made.  To the extent there were any forward-looking statements, there were no

meaningful cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements.  Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded

herein, Defendants are liable for those false forward-looking statements because at the time each

of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Rio Tinto who knew that those statements were false when made.

## ADDITIONAL SCIENTER ALLEGATIONS

99.     Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.

100.     Albanese and Elliott acted with scienter with respect to the materially false and misleading statements and omissions of material facts set forth above because they knew, or at the very least recklessly disregarded that those statements were materially false or misleading when made.  As senior executives of Rio Tinto their scienter is imputable to Rio Tinto.

101.     As alleged herein:

a.     Defendants knew that the public documents and statement issued or disseminated in the name of the Company were materially false and misleading;

b.     Defendants knew that such statements or documents would be issued or disseminated to the investing public;

c.     Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws; and

d.     Defendants, by virtue of their receipt of information reflecting the true facts regarding Rio Tinto, their control over, and/or receipt and/or modifications of Rio Tinto's allegedly materially misleading statements and/or their associations with the Company, which made them privy to confidential proprietary

information concerning Rio Tinto, participated in the fraudulent scheme alleged herein.

## CAUSES OF ACTION

## COUNT I

**Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder (Against All Defendants)**

102.    Plaintiff repeats and realleges all paragraphs above as if fully set forth herein.

103.    By reason of the conduct described above, Rio Tinto, Albanese and Elliott, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, directly or indirectly:

a.    Used or employed devices, schemes, or artifices to defraud;

b.    Made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c.    Engaged in acts, practices, or courses of business, which operated or would operate as a fraud or deceit upon other persons, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

104.    While engaging in the conduct described above, Rio Tinto, Albanese and Elliott acted knowingly or recklessly.

105.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Rio Tinto ADRs.  Plaintiff and the Class would not have purchased Rio Tinto ADRs at the prices they paid, or at all, if they had known

that the market prices were artificially and falsely inflated by Defendants' misleading statements.

106.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Rio Tinto ADRs during the Class Period.

## COUNT II

### Violation of § 20(a) of the Exchange Act
### (Against Albanese and Elliott)

107.     Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.

108.     Albanese and Elliott acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein.  By reason of their positions as senior executives and/or directors of Rio Tinto, they had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.  By reason of such conduct, Albanese and Elliott are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in

this action, including counsel fees and expert fees; and

      D.      Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED:  October 23, 2017             Respectfully Submitted,
                                HAGENS BERMAN SOBOL SHAPIRO LLP

                                By     /s/ Jason A. Zweig            
                                       Jason A. Zweig, JZ-8107

                                555 Fifth Avenue, Suite 1700
                                New York, NY 10017
                                Telephone: (212) 752-5455
                                Facsimile:  (917) 210-3980
                                jasonz@hbsslaw.com

                                Steve W. Berman
                                HAGENS BERMAN SOBOL SHAPIRO LLP
                                1918Eighth Avenue, Suite 3300
                                Seattle, WA98101
                                Telephone: (206) 623-7292
                                Facsimile:  (206) 623-0594
                                steve@hbsslaw.com

                                Reed R. Kathrein
                                Peter E. Borkon
                                Danielle Charles
                                HAGENS BERMAN SOBOL SHAPIRO LLP
                                715 Hearst Avenue, Suite 202
                                Berkeley, CA94710
                                Telephone: (510) 725-3000
                                Facsimile:  (510) 725-3001
                                reed@hbsslaw.com
                                peterb@hbsslaw.com
                                daniellec@hbsslaw.com

                                *Counsel for Plaintiff*

CERTIFICATION OF ANTON COLBERT
PURSUANT TO FEDERAL SECURITIES LAW

Anton Colbert ("Plaintiff") declares as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed a complaint alleging securities fraud against Rio Tinto PLC and various of its officers and directors, and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel in order to participate in this private action or any other litigation under the federal securities law.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

| Acquisitions | Date Acquired | No. Shares Acquired | Acquisition Price Per Share |
|---|---|---|---|
| RIO | Feb. 28, 2011 | 200 | 70.969 |
| | Mar. 03, 2011 | 125 | 71.09 |
| | Mar. 28, 2011 | 118 | 68.89 |
| | Jan. 03,2013 | 129 | 58.58 |
| | Sept. 16, 2013 | 50 | 51.079 |
| Sales | Date Sold | No. Shares Sold | Selling Price Per Share |
| RIO | Oct. 18, 2017 | 1015 | 48.01 |
| | | | |
| | | | |
| | | | |
| | | | |

5.      During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in the following actions filed under the federal securities laws except as detailed below: I agree _____.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiffs' pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ___19___ day of ___October___, 2017.

DocuSigned by:

*Anton Colbert*

BC64C54F4392489...                    _____

Anton Colbert