**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                      :

ANTON COLBERT, Individually and on   :
Behalf of All Others Similarly Situated,     :
                      :
           Plaintiff,           :
                      :
        v.                :    Case No. 17 Civ. 8169 (AT) (DCF)
                      :    [rel. No. 1:17-cv-7994 (AT) (DCF)]
RIO TINTO PLC, RIO TINTO LIMITED,  :
THOMAS ALBANESE, and GUY ROBERT  :    CLASS ACTION
ELLIOTT,                   :
                      :    ORAL ARGUMENT REQUESTED
        Defendants.        :
                      :
                      :
                      :
                      :
-------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' CONSOLIDATED MOTION TO DISMISS

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................... 5

    A.    Rio Tinto Acquired Riversdale, an Exploratory Mining Asset, in 2011.................................................................................................. 5

    B.    Allegations Pertaining to Events Outside the Five-Year Repose Period ................................................................................................ 7

    C.    Allegations Pertaining to Events Within the Five-Year Statute of Repose................................................................................................ 15

    D.    Additional Background Regarding Thomas Albanese ........................... 17

    E.    Additional Background Regarding Guy Elliott ..................................... 18

    F.    Plaintiff Initiates This Proceeding More Than Five Years after Most of the Events at Issue. .................................................................. 20

LEGAL STANDARDS ...................................................................................... 20

ARGUMENT ..................................................................................................... 21

    I.    The Entire Complaint Must Be Dismissed Because The Vast Majority Of The Allegations Are Time-Barred And The Remaining Allegations Fail To State A Claim. ........................................................................................ 21

        A.    Alleged Violations That Occurred Prior to October 23, 2012 Are Time-Barred. ....................................................................................... 21

        B.    Plaintiff's Attempts to Circumvent the Statute of Repose Fail as a Matter of Law. ................................................................................... 24

        C.    Alleged Violations That Occurred after October 23, 2012 Are Insufficiently Pleaded. ........................................................................ 28

    II.    Even Considering Alleged Violations That Occurred Before October 23, 2012, The Complaint Must Be Dismissed As To All Defendants. ..................... 34

        A.    The Complaint Fails to Satisfy Rule 9(b)'s Heightened Pleading Requirements. ...................................................................................... 34

        B.    The Complaint Fails Adequately to Plead Numerous Essential Elements of a Section 10(b) Fraud Claim................................................ 35

        C.    The Section 20(a) Claims Must Be Dismissed for Failure to Plead a Primary Violation, Culpable Participation, or Control. ....................... 59

CONCLUSION.................................................................................................. 60

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alpha Capital Anstalt v. New Generation Biofuels, Inc.*,
  2014 WL 6466994 (S.D.N.Y. Nov. 18, 2014)....................................................................23, 26

*In re AOL Time Warner, Inc. Sec. Litig.*,
  503 F. Supp. 2d 666 (S.D.N.Y. 2007)............................................................................57, 58

*Arnold v. KPMG LLP*,
  334 F. App'x 349 (2d Cir. 2009) (summary order) ..............................................................26

*ATSI Commc'ns v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)....................................................................................................40

*In re Barclays Bank PLC Sec. Litig.*,
  2017 WL 4082305 (S.D.N.Y. Sept. 13, 2017)......................................................................42

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)...............................................................................................................42

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...............................................................................................................48

*Boudinot v. Shrader*,
  2012 WL 489215 (S.D.N.Y. Feb. 15, 2012)........................................................................22

*Caiafa v. Sea Containers Ltd.*,
  525 F. Supp. 2d 398 (S.D.N.Y. 2007)...................................................................................34

*Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*,
  137 S. Ct. 2042 (2017)...........................................................................................................26

*Carlucci v. Han*,
  886 F. Supp. 2d 497 (E.D. Va. 2012) ...................................................................................25

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002).....................................................................................................6

*Chill v. Gen. Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996)............................................................................................50, 52

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
  957 F. Supp. 2d 277 (S.D.N.Y. 2013)...................................................................................36

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ...........................................................................................38, 39

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*City of Omaha Civilian Empls. Ret. Sys. v. CBS Corp.*,
   679 F.3d 64 (2d Cir. 2012)................................................................38, 40

*In re Comverse Tech., Inc. Sec. Litig.*,
   543 F. Supp. 2d 134 (E.D.N.Y. 2008) ..................................................25

*de la Fuente v. DCI Telecomms., Inc.*,
   206 F.R.D. 369 (S.D.N.Y. 2002) .........................................................25

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
   2017 WL 4049253 (S.D.N.Y. June 28, 2017) ......................................49

*Dietrich v. Bauer*,
   76 F. Supp. 2d 312 (S.D.N.Y. 1999)....................................................34

*Dupler v. Berson*,
   2010 WL 10827361 (S.D.N.Y. Jan. 29, 2010) ................................23, 24

*In re Dynex Capital Sec. Litig.*,
   2006 WL 314524 (S.D.N.Y. Feb. 10, 2006)........................................26

*ECA v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009).........................................47, 49, 50, 53

*In re Eletrobras Sec. Litig.*,
   245 F. Supp. 3d 450 (S.D.N.Y. 2017)..................................................48

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
   2015 WL 4931357, (S.D.N.Y. Aug. 19, 2015)......................................40

*Fait v. Regions Fin. Corp.*,
   655 F.3d 105 (2d Cir. 2011)........................................32, 37, 38

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*,
   873 F.3d 85 (2d Cir. 2017)..................................................................46

*Fed. Hous. Fin. Agency v. UBS Americas Inc.*,
   712 F.3d 136 (2d Cir. 2013)................................................................22

*Fogel v. Wal-Mart de Mexico SAB de CV*,
   2017 WL 751155 (S.D.N.Y. Feb. 27, 2017)..............................23, 26, 27

*Friedman v. JP Morgan Chase & Co.*,
   2016 WL 2903273 (S.D.N.Y. May 18, 2016) ......................................23

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000)...................................................................................46

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) ...................................................................59

*Halperin v. eBankerUSA.com, Inc.*,
  295 F.3d 352 (2d Cir. 2002)..................................................................32, 42, 43

*Harris v. AmTrust Fin. Servs., Inc.*,
  135 F. Supp. 3d 155 (S.D.N.Y. 2015)....................................................................37

*Harris v. Mills*,
  572 F.3d 66 (2d Cir. 2009)....................................................................................20

*Heat & Frost Insulators Pension Fund v. IBM Corp.*,
  205 F. Supp. 3d 527 (S.D.N.Y. 2016)..............................................................51, 54

*Ho v. Duoyuan Glob. Water, Inc.*,
  887 F. Supp. 2d 547 (S.D.N.Y. 2012)..............................................................33, 46

*Howe v. Scheckin*,
  238 F. Supp. 3d 1046 (N.D. Ill. 2017) ...................................................................25

*IBEW Local Union No. 58 Pension Tr. Fund v. Royal Bank of Scot. Grp.*,
  783 F.3d 383 (2d Cir. 2015)..............................................................32, 47, 48

*Intesa SanPaolo, S.p.A. v. Credit Agricole*,
  924 F. Supp. 2d 528 (S.D.N.Y. 2013)..............................................................27, 28

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
  2018 WL 1449206 (S.D.N.Y. Mar. 23, 2018) .......................................................60

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011)......................................................................33, 43, 44, 45

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)..............................................................................50, 53

*Kleinman v. Elan Corp., PLC*,
  706 F.3d 145 (2d Cir. 2013)..................................................................................42

*Kowal v. IBM Corp.*,
  163 F.3d 102 (2d Cir. 1998)..................................................................................27

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*Kramer v. Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991)...................................................................................6

*Kuwait Inv. Office v. Am. Int'l Grp., Inc.*,
   128 F. Supp. 3d 792 (S.D.N.Y. 2015).......................................22, 23, 24, 25, 26, 29

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)...............................................................35, 55, 56

*Leykin v. AT&T Corp.*,
   423 F. Supp. 2d 229 (S.D.N.Y. 2006)...................................................................58

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
   939 F. Supp. 2d 360 (S.D.N.Y. 2013)...................................................................22

*Marini v. Adamo*,
   995 F. Supp. 2d 155 (E.D.N.Y. 2014) ...................................................................26

*Martin v. Quartermain*,
   732 F. App'x 37 (2d Cir. May 1, 2018) (summary order) .........................................39

*Matusovsky v. Merrill Lynch*,
   186 F. Supp. 2d 397 (S.D.N.Y. 2002)...................................................................20

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
   277 F. Supp. 3d 500 (S.D.N.Y. 2017)..............................................................29, 56

*Merck & Co., Inc. v. Reynolds*,
   559 U.S. 633 (2010)...............................................................................22, 25, 28

*Mills v. Polar Molecular Corp.*,
   12 F.3d 1170 (2d Cir. 1993)................................................................................34

*Moon Joo Yu v. Premiere Power LLC*,
   2018 WL 456244 (S.D.N.Y. Jan. 17, 2018) ...........................................................33

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan &*
   *Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*,
   2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016)..................................................37, 40

*Nadoff v. Duane Reade, Inc.*,
   107 F. App'x 250 (2d Cir. 2004) (summary order) .................................................32

*Nguyen v. New Link Genetics Corp.*,
   297 F. Supp. 3d 472 (S.D.N.Y. 2018).....................................................................59

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Nokia Oyj* (*Nokia Corp.*) *Sec. Litig.*,
    423 F. Supp. 2d 364 (S.D.N.Y. 2006) .......................................................6, 29, 41

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
    54 F.3d 1424 (9th Cir. 1995) ............................................................................54

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)...........................................20, 40, 50, 52, 54

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015)..................................................................38, 39

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)..........................................................58, 59

*In re OSG Sec. Litig.*,
    971 F. Supp. 2d 387 (S.D.N.Y. 2013).................................................52

*Plymouth Cty. Ret. Ass'n v. Schroeder*,
    576 F. Supp. 2d 360 (E.D.N.Y. 2008) ..............................................25, 26

*Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*,
    721 F.3d 95 (2d Cir. 2013).................................................................22

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)...........................................34, 35, 40, 41, 43

*SEC v. First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996)............................................................59

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011)................................................56

*SEC v. Rio Tinto plc, et. al.*,
    No. 1:17-cv-7994 (S.D.N.Y. filed Oct. 17, 2017) ...............................1

*SEC v. Stoker*,
    865 F. Supp. 2d 457 (S.D.N.Y. 2012)................................................55

*In re ShengdaTech, Inc. Sec. Litig.*,
    2014 WL 3928606, (S.D.N.Y. Aug. 12, 2014)...................................60

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
    248 F. Supp. 3d 428 (S.D.N.Y. 2017).................................................55

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Smith Barney Transfer Agent Litig.*,
    884 F. Supp. 2d 152 (S.D.N.Y. 2012)..........................................................43, 56

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*,
    365 F.3d 353 (5th Cir. 2004) .........................................................................54, 55

*Spec. Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*,
    33 F. Supp. 3d 401 (S.D.N.Y. 2014).....................................................................60

*SRM Global Master Fund Ltd. P'ship v. Bear Stearns Cos. LLC*,
    829 F.3d 173 (2d Cir. 2016)...........................................................21, 22, 24, 27, 59

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008).....................................................................................6

*Stoll v. Ardizzone*,
    2007 WL 2982250 (S.D.N.Y. 2007)......................................................................25

*Stoneridge Inv. Partners v. Scientific-Atl.*,
    552 U.S. 148 (2008)...............................................................................................29

*In re SunEdison, Inc. Sec. Litig.*,
    300 F. Supp. 3d 444 (S.D.N.Y. 2018)...................................................................60

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)........................................................56, 57, 58

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008).............................................................................54, 55

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)..........................................................................21, 49, 52, 55

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016).............................................................................38, 39

*In re UBS AG Sec. Litig.*,
    2012 WL 4471265 (S.D.N.Y. Sep. 28, 2012)........................................................51

*United States v. TEVA Pharm. USA, Inc.*,
    2016 WL 750720 (S.D.N.Y. Feb. 22, 2016)..........................................................49

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    299 F. Supp. 3d 1055 (D. Minn. 2018)............................................................24, 25

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*,
   655 F.3d 1039 (9th Cir. 2011) ............................................................55

*In re Xerox Corp. Sec. Litig.*,
   935 F. Supp. 2d 448 (D. Conn. 2013).................................................59

**Statutes**

15 U.S.C. § 78u-4 ........................................................................21, 49

28 U.S.C. § 1658............................................................3, 5, 21, 24

**Rules**

Fed. R. Civ. P. 9(b) ..........................................................................20

**Regulations**

17 C.F.R. § 240.10b-5.................................................................24, 43

17 C.F.R. § 240.13a-16...................................................................44

**Other Authorities**

Basis for Conclusions on IFRS 6
   (International Accounting Standards Board 2005) ................................10

Compl., *SEC v. Rio Tinto plc, et. al.*,
   No. 1:17-cv-7994 (Oct. 17, 2017)...............................................5, 17, 18

IAS 36 ("Impairment of Assets") ......................................10, 11, 12

IFRS 6 ("Exploration for and Evaluation of Mineral Resources").........10

Restatement (Third) of Agency § 5.03 (2006).............................55

U.S. Bureau of Mines and the U.S. Geological Survey, Circular 831,
   *Principles of a Resource/Reserve Classification for Minerals* (1980),
   available at https://pubs.usgs.gov/circ/1980/0831/report.pdf ...................6

Defendants Rio Tinto PLC and Rio Tinto Limited (collectively, "Rio Tinto") and Thomas Albanese and Guy Elliott (together, "Individual Defendants") respectfully move to dismiss this private securities action brought by Plaintiff Anton Colbert.

## INTRODUCTION

Seeking to capitalize on the Securities and Exchange Commission's ("SEC's") allegations of fraud against the Defendants in *SEC v. Rio Tinto plc, et al.*, No. 1:17-cv-7994 (S.D.N.Y. filed Oct. 17, 2017) (AT) (DCF) ("SEC Action"), Plaintiff Colbert filed this putative securities-fraud class action concerning Rio Tinto's acquisition in 2011 and eventual impairment in early 2013 of an exploratory coal mining asset in Mozambique.  The vast majority of his claims, however, are untimely under the applicable five-year statute of repose.  Plaintiff filed this action on October 23, 2017, yet alleges virtually no fraudulent statements or actions within five years of that date (October 23, 2012).  And all of Plaintiff's allegations—timely or not—fail to comply with the heightened pleading standards of the Private Securities Litigation Reform Act, in addition to suffering from the same pleading deficiencies that warrant dismissal of the SEC Action. The entire Complaint, therefore, must be dismissed.

In 2011, Rio Tinto sought to capitalize on booming prices for hard coking coal, a scarce and valuable type of coal, by paying $3.7 billion in a hotly contested public sales process for a publicly traded Australian company called Riversdale Mining Limited (later renamed Rio Tinto Coal Mozambique or "RTCM").  Riversdale owned rights to explore what was believed to be one of the world's largest undeveloped coking coal sites—an area in Mozambique over 40 times the size of Manhattan.  RTCM faced significant challenges at acquisition:  the coal was still underground, the amount and quality of mineable coal were not known with any certainty, and there was little physical infrastructure then in place for transporting the coal to market.  There

were also inherent uncertainties in developing business plans for as-yet unproven properties ex-
pected to produce coal for 50 years.

Believing that it had invested for the long term and could overcome these challenges, Rio
Tinto conducted a complex series of infrastructure and resource feasibility studies through 2012,
including extensive drilling, exploring, and testing of the ore-body, and investigating a series of
options for transporting the coal to market by barge or rail.  Rio Tinto encountered setbacks—
chiefly, the coal quality was not as valuable as expected, and barging (the cheapest transportation
option) became unfeasible for the foreseeable future.  At the same time, projected coal prices in-
creased significantly, strategic transportation options evolved, and internal valuations—including
many exceeding RTCM's $3.7 billion acquisition price—varied widely as a result.  By the end of
2012, however, and after receiving late-breaking ore-body test results, Rio Tinto determined that
infrastructure and resource challenges would be economically insurmountable.  It then promptly
impaired RTCM's value, publicly announcing the impairment on January 17, 2013.

Plaintiff does not challenge here the *amount* of that impairment—only its timing.  Yet the
impairment came a mere 17 months after Rio Tinto had gained full control of its asset—a re-
markably quick impairment of a 50-year project given that even resource feasibility tests can
take years.  Plaintiff nevertheless alleges that the correctly-calculated impairment should have
been taken earlier, within just 5 months (or at most 11 months) of the acquisition date (the Com-
plaint is not clear on this point), and that Rio Tinto's failure to take an impairment earlier
amounted to fraud.  Plaintiff all but ignores the extraordinarily complex scientific, infrastruc-
tural, geographic, and political environment surrounding the planned 50-year project, including
that projected coal prices were rising, resource studies were ongoing, and transportation options
were evolving.  While Plaintiff may not grasp the extraordinary challenges that Defendants

faced, the market and credit-ratings agencies certainly did—and they were indifferent to the write-down of RTCM's value. Indeed, Rio Tinto had already cautioned investors that RTCM's value was provisional and under review, that estimates of coal quality could change significantly (estimates based on geological data can be imprecise), and that there were potential barriers to infrastructure access. In the context of a company with total assets of about $120 billion, the market thus saw a $3 billion impairment to a still-exploratory mining asset as immaterial.

The Complaint must be dismissed for several reasons. As a threshold matter, the vast majority of Plaintiff's allegations are time-barred. The applicable statute of repose bars alleged violations that occurred "more than . . . 5 years" before the filing of the Complaint. 28 U.S.C. § 1658(b)–(b)(2). Because Plaintiff filed this action on October 23, 2017, all alleged violations occurring before October 23, 2012 must be dismissed—including Rio Tinto's impairment determinations in 2012 and any alleged misstatements or omissions during that period. The remaining handful of allegations pertaining to the actionable period after October 23, 2012 and before January 17, 2013 all manifestly fail to state a claim for fraud.

Even if this Court were to consider the pre-October 23, 2012 alleged violations, it still must dismiss the Complaint in its entirety. Plaintiff treats Rio Tinto's impairment determinations as rote calculations, when in fact they entailed complex judgments based on available and evolving information. Those opinions are entitled to significant weight, which forecloses any claim that Rio Tinto fraudulently overstated RTCM's value. In fact, Rio Tinto has never restated the relevant financial statements, nor have its independent auditors withdrawn their unqualified opinions or modified their conclusions on those statements. Plaintiff also ignores *why* the market was indifferent to the impairment: RTCM's challenges were well-known and publicly disclosed; and

RTCM itself was a minor asset that was still undeveloped, unproven, and under extensive study. Plaintiff's claims against Rio Tinto thus fail as a matter of law.

The claims against the Individual Defendants fail as well. Tom Albanese was the CEO of Rio Tinto during the relevant period. As CEO, Mr. Albanese had wide-ranging responsibilities for more than 65,000 employees, projects and operations on six continents, and products including aluminum, copper, gold, silver, diamonds, borates, titanium, coal, uranium, iron ore, and salt. The claims at issue here address a single coking-coal project in Mozambique. In the face of significant uncertainty and complexity regarding this project, Mr. Albanese—a mining engineer, not an accountant, by trade—relied on Rio Tinto's robust impairment-review process and internal and external experts whose job it was to conduct valuation analyses and make accounting determinations. These procedures and personnel, including professional auditors and company accountants, had worked effectively in the past, and resulted in sizable impairments on Rio Tinto assets when warranted. Mr. Albanese justifiably—and correctly—relied on them to do so with RTCM. There are no allegations that Mr. Albanese sought to enrich himself as a result of the timing of the RTCM impairment, nor that he received a bonus or sold any stock.

Nor does Guy Elliott, Rio Tinto's former CFO, belong in this case. As CFO, Mr. Elliott did not sponsor or advocate for the RTCM acquisition, and he had no role in the day-to-day operations at RTCM. No one at RTCM reported to him. Not surprisingly, in the actionable time period after October 23, 2012, Plaintiff does not allege that Mr. Elliott made a *single* public misstatement or omission. Even in the repose period prior to October 23, 2012, the only public statements about RTCM that could possibly be attributed to Mr. Elliott are those in Rio Tinto's 2011 Annual Report; but in addition to being time-barred, those statements were not false or ma-

terial, and the Complaint falls well short of pleading that Mr. Elliott acted with any motive to defraud.  To be clear, Mr. Elliott had no such motive:  he had been planning his retirement from Rio Tinto before the alleged fraud is even alleged to have occurred, and he publicly announced in July 2012 that he would retire in the following year.  There are no allegations that he sold any Rio Tinto stock during the 17-month period between the acquisition of RTCM and this impairment, and the only allegation about Mr. Elliott's compensation in the Complaint is that he *did not* receive a bonus for 2012 or 2013.

The Court should dismiss the entire Complaint with prejudice.

## STATEMENT OF FACTS

This case concerns the valuation of an exploratory mining asset that Rio Tinto acquired in August 2011 and impaired in January 2013.  Because the Complaint was not filed until October 23, 2017, the vast majority of the alleged violations fall outside the applicable statute of repose, which bars all claims filed "later than . . . 5 years after [the alleged] violation."  28 U.S.C. § 1658(b)–(b)(2).[1]  For the sake of completeness, the Statement sets forth the relevant allegations occurring before, and after, the applicable repose cutoff date of October 23, 2012.

### A.    Rio Tinto Acquired Riversdale, an Exploratory Mining Asset, in 2011.

Rio Tinto is a world leader in exploring and developing new metal and mineral resources. ¶ 2; 2011 AR at 3 (Ex. 2).[2]  During the relevant period, Rio Tinto's assets totaled roughly $120

---

[1]  Defendants have not moved to dismiss the SEC Action on this ground because the SEC obtained tolling agreements with each Defendant before the statute of repose had run.  Compl. ¶ 176, *SEC v. Rio Tinto plc, et. al.*, No. 1:17-cv-7994 (Oct. 17, 2017) ("SEC Compl.").

[2]  Citations to the Complaint (Ex. 1) are styled as "¶ [paragraph number]."  Rio Tinto's annual and interim reports were incorporated into, respectively, its Form 20-F and Form 6-K SEC filings.  For convenience, citations to Rio Tinto's annual reports are styled as "[year] AR," and citations to its interim reports are styled as "[year] 6-K."  Citations to "Ex. __" are to the exhibits attached to the Declaration of Caitlin J. Halligan, submitted herewith; these include excerpted

billion and included exploratory mining operations in about 20 countries.  *See* 2012 AR at 32, 142 (Ex. 3); 2012 6-K at F-5 (Ex. 4); 2011 AR at 30, 134.

As Rio Tinto publicly disclosed, the value of *all* of its exploratory assets reflected several substantial risks.  *First*, because geological analyses take time to develop, there were "numerous uncertainties inherent in estimating ore reserves"—such as interpreting available geologic data, selecting an appropriate mining method, and establishing an extraction schedule—that could cause estimates of the quantity and quality of the available ore-body to "change significantly with new information."  2011 AR at 11, 148.[3]  *Second*, potential "[l]imitations to . . . infrastruc-ture access"—such as government restrictions on the use of waterways, or limited rail capacity— could inhibit Rio Tinto's ability to transport its ore efficiently to market.  *Id.* at 10.  *Third*, "vola-tility in commodity prices" could affect the value of ore that reached the market.  *Id.*  Given these risks, Rio Tinto needed to "thoroughly stud[y]" each of its exploratory mining assets "to identify the optimal configuration" for mining and transporting the ore-body to market.  *Id.* at 7.  Feasi-bility studies could take "ten to 20 years" and cost hundreds of millions of dollars.  *Id.* at 30.  Rio Tinto also cautioned that its exploratory assets "might be unsuccessful."  *Id.* at 11.

---

copies of all cited SEC filings.  On this motion, the Court may consider documents referenced in the Complaint and matters of which judicial notice may be taken, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002), including public SEC filings, *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991), investor conference transcripts, *In re Nokia Oyj* (*Nokia Corp.*) *Sec. Litig.*, 423 F. Supp. 2d 364, 371–74 nn. 3–5 (S.D.N.Y. 2006), and media reports "of-fered to show that certain things were said in the press," *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).  All submitted documents fall within these categories.

[3]  "Resource" refers to the amount of coal that drilling and other test results show to a sufficient level of certainty is in the ground; "reserve" refers to the amount expected to be economically mineable.  *See* U.S. Bureau of Mines and the U.S. Geological Survey, Circular 831, *Principles of a Resource/Reserve Classification for Minerals* 1–2 (1980), *available at* https://pubs.usgs.gov/ circ/1980/0831/report.pdf.  Coal "quality" refers to the relative percentage of high-value coal in the reserves.  *See id.* at 3.

In 2011, Rio Tinto acquired Riversdale, ¶ 23, which owned the rights to exploratory and early-development coal assets covering 965 square miles in Mozambique, ¶ 28; Ex. 5, at 5. The Moatize Basin, where Riversdale was located, was believed to contain some of the world's largest deposits of hard coking coal, ¶ 28, an especially "high-value" coal resource, ¶ 29. Prior to the acquisition, Rio Tinto identified certain infrastructure and resource risks, including risks relating to barging and other transport options, and coal quantity and quality. ¶ 23. Although a key investment assumption relied on barging coal down the Zambezi river to port, it was only a concept at acquisition, and other options, by rail, were believed to be viable. *See* ¶¶ 29–30.

After acquiring a majority interest in Riversdale on April 8, 2011, Rio Tinto completed the acquisition in August 2011, paying approximately $3.7 billion. ¶ 23. It is axiomatic that an acquisition involving such a public, arms-length transaction provides the "best evidence" of a company's fair value. 2011 AR at 143. Although the demand for coking coal was thought to be booming, Ex. 6, at 2–3; Ex. 7, at 3, and Riversdale had "some of the world's largest deposits of hard coking coal," ¶ 28, analysts also understood that the ore-body was untested and that there were challenges to transporting coking coal through Mozambique, *see* Ex. 8, at 2–3.

### B. Allegations Pertaining to Events Outside the Five-Year Repose Period

#### 1. Throughout 2011 and 2012, Rio Tinto Undertook Extensive Testing and Feasibility Studies, and the Business Case for RTCM Evolved.

From acquisition through 2012, Rio Tinto conducted "[a]n extensive exploration campaign and multiple 'Order-of-Magnitude' project studies," Ex. 9, at 18, including "further review" of the acquisition value, 2011 AR at 190, separate "feasibility studies into infrastructure solutions," *id.* at 27, and at least two rounds of testing to evaluate the quantity and quality of available coal, *see* ¶¶ 41, 78.

As is common in early-stage development projects, 2011 AR at 10–12, this ongoing analysis of complex mine-study data, revised assumptions, and evolving business planning generated wide-ranging valuations.  During its 2011 annual planning process, for example, RTCM determined that, although the diminished barging and rail capacity had impacted its value by about $2 billion, its overall value had *increased* by roughly $1.2 billion due largely to rising projected prices for scarce coking coal.  Ex. 10, at 2, 5; ¶ 33.  Another valuation exercise yielded a potential valuation range of $4.9 billion, *see* ¶ 61, and still another yielded a recoverable value of $4 billion to $5 billion, ¶ 63.  As new information became available, RTCM's long-term business planning evolved, and Rio Tinto updated its internal valuations of RTCM throughout 2012.  ¶¶ 33, 48, 61, 63.

### a.       Options for Barging and Rail Transportation

After acquiring RTCM, Rio Tinto studied the feasibility of three main transportation options—barging, relying on existing rail, and constructing a new "greenfield" railway—and various combinations thereof.  *See* ¶¶ 29, 48; *see also* Ex. 9, at 18.  Rio Tinto's in-house experts initially estimated that 30 million tons of coal could be barged down the Zambezi river per year, ¶ 29; but in October 2011, its Energy Product Group revised that estimate down to 10 million tons per year, ¶ 31.  Rio Tinto also assumed that approximately 12 to 15 million tons of coal per year could be transported by existing rail, ¶ 29, but later learned that "existing rail . . . had extremely limited capacity," ¶ 71.  When RTCM analyzed these developments during its routine annual planning process in 2011, it "assumed" a rail option—instead of barging—"as the primary long terms [sic] coal chain option," and concluded that any limitations nevertheless were "offset by" a potential "[g]reenfield" railway solution, which involved the construction of a new railway.  Ex. 10, at 2, 6.

In December 2011, the Government of Mozambique rejected Rio Tinto's proposal for barging coal along the Zambezi river. ¶ 34. For months afterwards, the Government of Mozambique publicly stated that the company was welcome to resubmit a new barging proposal that addressed its concerns. Ex. 11, at 2. At some point thereafter—the Complaint does not specify when—the Government of Mozambique indicated that barging would be unavailable for "the short to medium term," Ex. 9, at 18–19; there is no allegation that the Government of Mozambique had ruled out barging for the long term.

Rio Tinto shifted its focus to other transportation options, including a greenfield railway solution that "offset" the limitations in barging capacity. Ex. 10, at 2. In May 2012, Mr. Albanese challenged a proposal for Rio Tinto to fully fund and construct its own greenfield railway due to capital constraints, but "instructed RTCM managers to seek out partners" for joint construction of a railway. ¶ 49. There is no allegation that, prior to 2013, Defendants ever doubted they could find such partners; indeed, internal analyses performed into November 2012 assumed partner funding, *see* Ex. 9, at 18.

Meanwhile, investors knew about the barging rejection from contemporaneous news and analyst reports. Ex. 11; Ex. 12, at 67–68. Investors also knew about rail capacity issues due to public reports that "[c]urrent rail infrastructure" was limited to 6 million tons and that miners in that area of Mozambique generally "lack[ed] options for getting their product to the port." Ex. 11, at 2.

### b.    Coal Resource Estimates

To understand the quality and quantity of coal available in such a large asset, Rio Tinto undertook time-intensive, extensive drilling and testing of the ore-body. *See* 2012 AR at 32. The results were publicly disclosed. *See* 2011 AR at 30. Prior to acquisition, Rio Tinto inter-

nally estimated the available coal resource, *id.* at 26, and in its 2011 Annual Report Rio Tinto accurately disclosed its revised reserves and resources figures made after additional testing, *id.* at 49, 52.  The Complaint conclusorily alleges that "the full-extent of the write-down had not been anticipated," ¶ 41, but does not dispute that Rio Tinto had anticipated a significant write-down of Riversdale's estimates of the available coal resources, that the reserves and resources figures in the 2011 Annual Report were reasonable estimates at the time, or that those estimates were sufficient to meet the mine plan Rio Tinto had developed during due diligence, *see* 2011 AR at 26.

Rio Tinto continued to test the ore-body, and those post-acquisition tests—which were not "confirmed as correct" until late 2012, ¶ 73—ultimately resulted in further "downward revision" of the quality of available coal, 2012 AR at 29; ¶ 78.

### 2.   As the Business Planning for RTCM Evolved, Rio Tinto Made Appropriate Impairment Decisions.

While Rio Tinto was conducting its post-acquisition studies, RTCM's "technical feasibility and commercial viability" were not yet "demonstrable"; as a result, RTCM was an "exploration and evaluation" asset, IFRS 6.3–5 ("Exploration for and Evaluation of Mineral Resources"), which "need not be assessed for impairment," Basis for Conclusions on IFRS 6, at 39 (International Accounting Standards Board 2005).  Nevertheless, Rio Tinto made impairment determinations pursuant to otherwise applicable International Accounting Standards Board standards.  *See* IAS 36 ("Impairment of Assets"); ¶ 16.  Those standards, and Rio Tinto's internal accounting policies, prescribed two distinct impairment-review processes relevant here.  At each *half-year* ("HY") period, Rio Tinto assessed whether there was any indication that an asset was impaired, *see* ¶ 18; a formal impairment test was required only if there was such an impairment indicator, IAS 36.9; ¶ 16.  At each *year-end* ("YE") period, Rio Tinto undertook a formal impairment test for assets with goodwill—even if there was no impairment indicator.  IAS 36.6, 36.10, 36.19–20.

When formal impairment testing was conducted at either reporting period, Rio Tinto determined whether the asset's carrying value exceeded its recoverable value; if it did not, the asset was not impaired.  IAS 36.19.  Both review processes required inherent business judgments and are assessed for reasonableness.  *See* IAS 36.

The impairment review process generally began with the business unit (in this case RTCM) and the product group (in this case Rio Tinto Energy ("RTE")), which were responsible for valuing their assets and determining whether there was an impairment indicator.  ¶¶ 17–18. Business unit executives on the ground in Mozambique best understood the challenges facing RTCM.  Business units, in turn, provided information to "Rio Tinto's Controller's office," ¶ 17, and certified the accuracy of that information, *see* Ex. 13.  Rio Tinto's Controller's office, in turn, "was responsible for coordinating the impairment review process."  ¶ 17.  The Controller's office applied its accounting expertise to the information reported by the business units and worked closely with Rio Tinto's independent auditors at PricewaterhouseCoopers ("PwC") to ensure that Rio Tinto complied with financial reporting requirements, including IAS standards. PwC played a critical role by independently evaluating impairment-trigger and valuation decisions.  ¶ 67.  Together, the Controller's office and PwC drafted recommendations to Rio Tinto's Audit Committee; these entities collectively determined whether impairment triggers existed and appropriate next steps.  *See* ¶¶ 63, 69.

Rio Tinto employed this impairment review process consistently in the years during and before the events at issue in this case, and it recognized impairments to the carrying value of assets in each of 2009, 2010, 2011, and 2012.  2011 AR at 33–34, 133; 2012 6-K at 21.  These included a series of impairments to Alcan Inc., an aluminum producer acquired by Rio Tinto in

2007.  2011 AR at 34, 161.  There is no allegation that Mr. Albanese, Mr. Elliott, or anyone else interfered with the impairment process for Alcan (or any other asset) in any way.

At the culmination of the impairment process with respect to RTCM, the Individual Defendants and others in Rio Tinto's senior management reasonably agreed with the business unit, their supervisors, the highly trained accountants in the Controller's group, and the independent auditors at PwC, that RTCM was not impaired at YE 2011, and that no impairment indicator existed at HY 2012, as described below.

### a.   At YE 2011, Rio Tinto Reasonably Relied on the Acquisition Value as the Fair Value and Disclosed RTCM's Setbacks.

Because part of RTCM's value was recorded as goodwill, 2011 AR at 190, Rio Tinto reviewed RTCM for impairment at YE 2011.  Rio Tinto has never restated its YE 2011 financial statements, nor has PwC ever withdrawn its unqualified opinion on those statements.  The Complaint alleges that Rio Tinto "did not test RTCM for impairment" at YE 2011, ¶ 35, but ignores that Rio Tinto did, in fact, assess a "provisional" fair value "based on fair values at the acquisition date," 2011 AR at 162, 190.  This process was consistent with IAS 36, which permits use of "the most recent detailed calculation made in the preceding period of the recoverable amount" provided that the assets "have not changed significantly," the most recent recoverable amount "exceeded the carrying amount by a substantial margin," and there is only a "remote" likelihood that impairment is required.  IAS 36.99.  The most recent recoverable amount—which factored in adverse developments—exceeded the acquisition value by $1.2 billion due to rising coal prices.  Ex. 10, at 2.

In its 2011 Annual Report, Rio Tinto explained that RTCM was an "exploration and early development stage project[]" with ongoing post-acquisition "feasibility studies into infrastructure solutions," and that the fair values of the RTCM assets at acquisition were "provisional" and

12

"subject to further review" in 2012.  2011 AR at 27, 190.  Rio Tinto also cautioned investors that "saleable production w[ould] initially be constrained by existing rail and port infrastructure," listed "[r]oad and rail" (not barging) as the forms of "[a]ccess" to RTCM, and accurately reported the most current resources and reserves figures.  *Id.* at 26, 27, 49, 52, 60.  Mr. Albanese and Mr. Elliott signed and certified the 2011 Annual Report.  ¶¶ 36–37.[4]

### b.  In May 2012, the Individual Defendants Received an Update on RTCM.

Rio Tinto continued to pursue exploration and feasibility studies concerning RTCM, and in April 2012, Mr. Elliott requested an update from the RTCM business unit.  ¶ 47.  In May 2012, RTCM's director met with Mr. Albanese, Mr. Elliott, and others.  *Id.*  At this meeting, officials from RTCM and management discussed the status of RTCM.  ¶¶ 47–48.  In the Complaint's telling, Mr. Albanese and Mr. Elliott allegedly were provided information about the challenges facing RTCM, including that "[b]ased on the best information available and under the best potential configuration, RTCM was worth negative $680 million."  ¶ 48.  In response to transportation issues, Mr. Albanese noted capital constraints on pursuing a greenfield railway independently and "instructed RTCM managers to seek out partners" for joint construction.  ¶ 49.

### c.  At HY 2012, Rio Tinto's Robust Impairment Process Determined That There Were No Impairment Indicators.

At HY 2012, Rio Tinto "recorded a valuation of more than $3 billion for RTCM."  ¶ 50.  Although the Complaint conclusorily alleges that this valuation "was materially misleading," *id.*, the Complaint does not allege what RTCM's valuation should have been, let alone on what basis Rio Tinto should have taken an impairment on RTCM at such an early stage in the exploration

---

[4]  Rio Tinto incorporated the 2011 Annual Report into both its Form 20-F filed with the SEC on March 15, 2012, and its offering documents for bond offerings on the New York Stock Exchange ("NYSE") in March 2012 and August 2012.  ¶¶ 37, 43, 57.

and feasibility studies.  There are no allegations that the independent auditors or Audit Committee failed to consider certain information at HY 2012—such as the alleged adverse developments—nor does the Complaint allege any explanation of why the accountants' and auditors' expert conclusion that no impairment was required was purportedly erroneous.  As with its YE 2011 statements, Rio Tinto has never had to restate any amounts from its HY 2012 interim report, nor has PwC ever modified its conclusion about that report.

### 3.    Statements to Investors Were Consistent with Impairment Determinations.

Throughout this period, Defendants appropriately provided investors with balanced information about RTCM's value and engaged in strategic planning to maximize that value consistent with company-wide strategic priorities and capital constraints.  In April 2012, Mr. Albanese told shareholders that Rio Tinto was "growing its coal business," with "a target" of starting shipments from some assets in the first half of 2012, ¶ 44—and, in fact, RTCM's Benga mine "officially opened in May 2012 with first coal exported in June 2012," 2012 AR at 29.

In August 2012, Mr. Albanese told investors that Rio Tinto was "looking at a 'greenfield' rail development," ¶ 52; he also told analysts that RTCM "probably had even 'more potential in total as [it went] forward,' and that the Moatize was truly a world-class basin coal deposit," ¶ 53 (alteration in original).  These optimistic projections were consistent with the infrastructure solutions then under review, ¶ 49, and were also tempered by notes of caution.  For example, the Complaint omits that Mr. Albanese warned the investors that "it's realistic and likely that we'll take longer to develop this infrastructure than previously planned due both to the timing of some of the approvals but also internal constraints on capital."  Ex. 14, at 3.

Plaintiff alleges that Mr. Elliott discussed RTCM at an October 9, 2012 investor presentation, ¶ 70, but the publicly available transcript shows he did not, *see* Ex. 15.

C.      **Allegations Pertaining to Events Within the Five-Year Statute of Repose**

Plaintiff does not allege any false or misleading statement in any Rio Tinto public SEC filing that falls within the applicable statute of repose (*i.e.*, after October 23, 2012).  Rather, within the actionable period, the Complaint alleges just three public misrepresentations at an investor seminar in November 2012, as well as non-public misstatements and omissions allegedly made internally to Rio Tinto employees during the YE 2012 impairment review process.

1.      **Public Statements to Investors Were Consistent with Impairment Determinations.**

In November 2012, Mr. Albanese told investors that the Moatize Basin was "a long-term opportunity with the potential to grow beyond 25 million tons of coal per year," ¶ 72, and that Rio Tinto would look at "all" transportation options in response to a question whether barging was still on "'the agenda,'" ¶ 71—a statement consistent with the "[m]ultiple options," including long-term partial barging options, then under review, Ex. 9, at 18.  He also warned investors about "constrained capital."  Ex. 16, at 15.  Indeed, investors recognized that "obviously the small-scale operations [are] starting up and it is going to be some years before you do the big infrastructure thing."  *Id.* at 9; *see* ¶ 71.[5]

2.      **At YE 2012, Rio Tinto Reasonably Concluded That Impairment Was Required in Light of New Information.**

Rio Tinto's post-acquisition feasibility studies had not been completed by the start of the YE 2012 impairment review process.  *See* Ex. 9, at 18.  On November 26, 2012, the Controller presented a paper to the Audit Committee indicating that "[t]he proposed range" of RTCM's fair value had "increased from the acquisition valuation" due to "several key changes":  chiefly, despite "[e]xternally imposed limitations to the short to medium term usage of a barge solution and

---

[5]   The Complaint does not allege any misstatements by Mr. Elliott at this investor conference.

necessary consideration of alternative coal chain solutions" and a "restatement and reduction of Riversdale's previously stated . . . resources and reserves assumptions," there had been "[m]aterial increases to PEG coal price assumptions," including a "20% and 23% increase in the long-term thermal coal and coking coal prices from those used [at acquisition]."  Ex. 9, at 18–19. There remained, however, "considerable uncertainty . . . around the logistics assumptions to be used" because "[m]ultiple options for the size, routing, and ownership structure [of a Greenfield rail] are being developed and assessed."  *Id.* at 18.

At that meeting, Mr. Elliott relayed that there was "late breaking" news "recently learned from" Rio Tinto's in-house experts in the Technology and Innovation Division regarding RTCM. ¶¶ 68–69.  Soon after Rio Tinto completed its investigation and verification of this information, ¶¶ 73, 75, the Board approved an impairment of RTCM's value in January 2013, resulting in a revised carrying value of $611 million, ¶ 75.  This impairment, announced January 17, 2013, ¶ 76, was taken because there had been further "downward revision to estimates of recoverable coking coal volumes," and infrastructure development had been "more challenging than . . . anticipated," 2012 AR at 29.  There is no allegation that, had the Board learned of the "late breaking" news sooner, it would have taken an impairment without first verifying that information.

On January 17, 2013, Rio Tinto announced an "approximately US$3 billion" impairment to RTCM and also a "US$10–11 billion" impairment to its aluminum mining asset Alcan. ¶¶ 76–77.  As a result of these business setbacks, Mr. Albanese stepped down as CEO, ¶ 76, and was thanked for his integrity and years of service, Ex. 17, at 1.

### 3.    Market Reaction to the Announced Impairment Confirms Its Immateriality.

In commenting on the RTCM impairment, investors declared the Riversdale acquisition a "poorly timed mining deal" that had occurred when "coal prices were rocketing."  Ex. 18, at 2;

*see also* Ex. 19.  The Complaint does not allege any credit downgrade at the time of the impairment; in fact, the day after the announcement, Moody's stated that the impairment would "not affect the company's ratings."  Ex. 20, at 1.  Such impairments are common among mining exploration companies.  *See*, *e.g.*, Ex. 21, at 58 ($1.73 billion in 2013) (Alcoa Corp.); Ex. 22, at 84 ($4.02 billion in 2012) (Vale, S.A.); Ex. 23, at 85 ($3.62 billion in 2012) (BHP Billiton, Ltd.).  Although the Complaint does allege a drop in the price of Rio Tinto ADRs on the day of the impairment announcement, ¶ 80, and in February 2013 when Rio Tinto announced its financial results for the 2012 fiscal year, ¶¶ 81–82, the announcements on both days included the substantially larger Alcan impairment, ¶ 77.

### D.      Additional Background Regarding Thomas Albanese

Mr. Albanese began working for Rio Tinto in 1993, and continued to do so for two decades.  He became chief executive of the Industrial Minerals group in 2000, and chief executive of the copper group and head of exploration in 2004.  2011 AR at 77.  In 2007, he was selected to serve as Rio Tinto's CEO and assumed responsibility for day-to-day management of the business.  ¶ 11.  There is no allegation that he sold any stock, received any bonus, or personally enriched himself from the timing of the RTCM impairment.

After the Riversdale acquisition, Mr. Albanese, an engineer by training, worked to support the project and to adapt to constant developments, positive and negative.  As these developments arose, Mr. Albanese reasonably relied on Rio Tinto's robust process for valuing assets and determining whether impairments were necessary.  Among other points, Plaintiff's selective quotation of the SEC's Complaint ignores that the process leading to the HY 2012 impairment determination involved multiple technical papers drafted or reviewed by RTCM, internal experts from Rio Tinto's Controller's office, and external experts from PwC.  *See* ¶ 63; SEC Compl. ¶¶ 123, 130, 134.  These papers noted positive developments, but also reported on challenges, such as

transportation issues and decreased resource and reserve estimates. *See* SEC Compl. ¶¶ 124–27. Considering all the factors, the internal and external experts agreed that no impairment indicator was present. Mr. Albanese had no reason not to rely on that assessment and no basis to reject it.

When discussing RTCM with investors, Mr. Albanese expressed an appropriate mixture of optimism and caution. For example, in one investor call, Mr. Albanese explained that RTCM "probably had even 'more potential in total as [it went] forward' and that the Moatize was truly a world-class basin coal deposit," ¶ 53 (alteration in original), but he warned that "it's realistic and likely that we'll take longer to develop this infrastructure than previously planned due both to the timing of some of the approvals but also internal constraints on capital," Ex. 14, at 3. Investors understood, as one put it in asking a question, that "obviously there are a lot of challenges there." *Id.* at 8. In short, the Complaint and documents properly considered at this stage demonstrate that Mr. Albanese forthrightly and appropriately acknowledged RTCM's challenges both within the company and to the public.

### E.   Additional Background Regarding Guy Elliott

Mr. Elliott began his career at Rio Tinto in 1980 and worked there for over 33 years. ¶ 12. Through hard work and diligence, he rose through the ranks, eventually becoming CFO in 2002. *Id.* A citizen of the United Kingdom, he is now retired and lives in London. *Id.* He has never until this matter been the subject of a regulatory inquiry or lawsuit.

Mr. Elliott did not sponsor or advocate for the acquisition of RTCM. He had been planning his retirement from Rio Tinto before the alleged fraud occurred, and publicly announced in July 2012 that he would retire from Rio Tinto in 2013. When the RTCM impairment was announced in January 2013, it did not impact Mr. Elliott's retirement plans or standing within Rio Tinto, as the Riversdale acquisition was not his deal. As planned, Mr. Elliott stepped down as CFO later in 2013, but remained on the Board of Rio Tinto until the end of the year.

During Mr. Elliott's tenure as CFO, Rio Tinto took several impairments, often at much higher dollar values than the eventual RTCM impairment in January 2013.  This included the Alcan impairments that overlapped with the RTCM impairment.  *See* ¶¶ 25, 77.  Mr. Elliott reasonably relied on Rio Tinto's extensive and robust process to evaluate potential impairments—including certifications from the business unit and product groups, and tests and verification by the controllers and independent auditors at PwC—to accurately report Rio Tinto's financial position.

The Complaint fails to allege any misstatements or omissions by Mr. Elliott that fall within the actionable repose period beginning on October 23, 2012.  Plaintiff has contended that Mr. Elliott's statements at the "October 2012 investor meeting," ¶ 70, occurred within the actionable time period, but the publicly available transcript of that meeting confirms that the meeting occurred on October 9, 2012, and that Mr. Elliott never mentioned RTCM in his remarks, *see* Ex. 15.  The Complaint does not allege any other misstatement or omission by Mr. Elliott at the November 2012 investor conference or at any point thereafter.  The Complaint also alleges that Mr. Elliott allegedly reviewed and failed to correct a draft of the Third Controller's Paper, ¶¶ 63–64, or failed to convey certain information to the Audit Committee with sufficient emphasis or specificity, ¶ 68.  But the Complaint does not allege that any of these purported misstatements was ever publicly disclosed or relied on by investors in any way.

Even for the time-barred period before October 23, 2012, the Complaint contains few allegations regarding Mr. Elliott's conduct.  Although he is alleged to have committed fraud in certifying the 2011 Annual Report on March 15, 2012, the Complaint mentions only one specific piece of information Mr. Elliott supposedly knew at that time:  namely, that in January 2012 he "reportedly learned" of the Government of Mozambique's preliminary rejection of RTCM's

barging proposal.  ¶ 34.  The Complaint also quotes an undated email from Mr. Elliott to Mr. Albanese discussing Rio Tinto's publicly disclosed reserves and resources write-down, but alleges only that "Defendants minimized the one negative fact that they did disclose."  ¶ 41.  The Complaint asserts other claims against Mr. Elliott as well, but fails to allege that he was the "maker" of any of the alleged misstatements or omissions.  Notably, there are no allegations that he signed, certified, or reviewed the HY 2012 report or the bond offering documents.

> **F.**     **Plaintiff Initiates This Proceeding More Than Five Years after Most of the Events at Issue.**

On October 23, 2017—more than five years after most of the events alleged in the Complaint—Plaintiff filed this putative class action on behalf of persons and entities who acquired Rio Tinto securities between October 23, 2012 and February 15, 2013.  ¶ 87.  Plaintiff claims that all Defendants violated Section 10(b) of the Exchange Act, and that the Individual Defendants violated Section 20(a) of the Exchange Act.

## LEGAL STANDARDS

Under Rule 12(b)(6), the Complaint's allegations are accepted as true, but "'[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements,'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citation omitted and alteration in original), and allegations "contradicted" by documents referenced in the Complaint "are insufficient to defeat a motion to dismiss," *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002).

Under Rule 9(b), the Complaint must "state with particularity the circumstances constituting" the alleged fraud, Fed. R. Civ. P. 9(b), meaning it must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (internal quotation marks omitted).

Under the Private Securities Litigation Reform Act ("PSLRA"), the Complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  That means that an inference of fraud must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

## ARGUMENT

The entire Complaint must be dismissed for two independent reasons.  Nearly all of the allegations are time-barred, and those that are timely fail to state a claim.  And even if the untimely allegations are considered, the Complaint fails to satisfy the applicable pleading requirements and fails adequately to plead numerous essential elements of Plaintiff's claims.

**I.      The Entire Complaint Must Be Dismissed Because The Vast Majority Of The Allegations Are Time-Barred And The Remaining Allegations Fail To State A Claim.**

Plaintiff was required to file his Complaint "not later than . . . 5 years after [the alleged] violation[s]."  28 U.S.C. § 1658(b)(2).  With respect to the vast majority of the alleged violations, he did not do so.  Thus, alleged violations of Sections 10(b) and 20(a) that occurred prior to October 23, 2012—five years before the Complaint was filed—must be dismissed as untimely.  Plaintiff's attempts to circumvent this statutory command fail as a matter of law.  And because the remaining handful of allegations fail to state a claim, they all must be dismissed too.

**A.      Alleged Violations That Occurred Prior to October 23, 2012 Are Time-Barred.**

Because Section 1658(b)(2) "creates a substantive right in defendants to be free from liability after five years," *SRM Global Master Fund Ltd. P'ship v. Bear Stearns Cos. LLC* ("*Bear Stearns*"), 829 F.3d 173, 177 (2d Cir. 2016), it requires the Court to dismiss as untimely all al-

leged violations of Sections 10(b) or 20(a) occurring prior to October 23, 2012.  This result follows directly from the Second Circuit's holding that Section 1658(b)(2) is not subject to judicial tolling because it "is not a statute of limitations"—"[i]t is a statute of repose."  *Id.* at 176.

In the context of an analogous statute of repose under Section 13 of the Securities Act, the Second Circuit explained in *IndyMac* that there is a "conceptual distinction" between statutes of limitations and repose, and that "distinction carries significant practical consequences."  *Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 106 (2d Cir. 2013). Whereas "[s]tatutes of limitations limit the availability of remedies" and thus "may be subject to equitable considerations, such as tolling, or a discovery rule," a statute of repose "'*extinguishes* a plaintiff's cause of action after the passage of a fixed period of time,'" and "'may bar a claim *even before the plaintiff suffers injury*, leaving her without any remedy.'"  *Id.* (emphases in original) (quoting *Fed. Hous. Fin. Agency v. UBS Americas Inc.*, 712 F.3d 136, 140 (2d Cir. 2013)). A statute of repose thus "'run[s] without interruption once the necessary triggering event has occurred, even if equitable considerations would warrant tolling or even if the plaintiff has not yet, or could not yet have, discovered that she has a cause of action.'"  *Id.* at 107 (citation omitted). In other words, Section 1658(b)(2) is an "unqualified bar" that "giv[es] defendants total repose after five years."  *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 650 (2010).

With few exceptions discussed *infra* I.B, courts in this District have "consistently stated that the five-year period begins to run from the time that the allegedly fraudulent representations were made."  *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 378 (S.D.N.Y. 2013) (alterations in original) (quoting *Boudinot v. Shrader*, 2012 WL 489215, at *4 (S.D.N.Y. Feb. 15, 2012)); *see also, e.g.*, *Kuwait Inv. Office v. Am. Int'l Grp., Inc.*, 128 F. Supp. 3d 792, 807 (S.D.N.Y. 2015) ("[T]he statute of repose runs from the date of each relevant misstatement

22

or omission . . . ."); *Alpha Capital Anstalt v. New Generation Biofuels, Inc.*, 2014 WL 6466994, at *12 (S.D.N.Y. Nov. 18, 2014) ("The statute of repose runs from the time the allegedly fraudulent misrepresentations were actually made . . . ."); *Dupler v. Berson*, 2010 WL 10827361, at *6 (S.D.N.Y. Jan. 29, 2010) ("[T]he applicable five-year period of repose begins to run on the date of the alleged *misrepresentation* . . . .").

In *Kuwait*, for example, the Court dismissed "entirely or in part" all Section 10(b) and 20(a) claims in a consolidated series of actions brought between 2011 and 2015 by investors who had opted out of a class action concerning AIG's well-publicized bailout in 2008.  128 F. Supp. 3d at 796–97, 807.  As here, the *Kuwait* plaintiffs sought to avoid the statute of repose by characterizing the alleged violations as a "series of misstatements and omissions made as part of a scheme," but the Court rejected that approach as conflicting with the text of Section 1658(b)(2) and with *IndyMac*.  *Id.* at 808.  "[B]ecause the statute of repose runs from the date of each relevant misstatement or omission," the Court dismissed the Exchange Act claims in one action in their "entirety" and in the remaining actions "to the extent" they were "based on misstatements or omissions made more than five years before the respective filing dates."  *Id.* at 807.

Courts in this Circuit likewise have routinely dismissed Section 10(b) and 20(a) claims to the extent they are "premised on alleged material misrepresentations made prior to [the repose cutoff]."  *Fogel v. Wal-Mart de Mexico SAB de CV*, 2017 WL 751155, at *9 (S.D.N.Y. Feb. 27, 2017); *see also*, *e.g.*, *Friedman v. JP Morgan Chase & Co.*, 2016 WL 2903273, at *7 (S.D.N.Y. May 18, 2016) ("[P]laintiffs' argument that the Section 20(a) claim is not subject to the five-year statute of repose in 28 U.S.C. § 1658(b)(2) has no merit."), *aff'd*, 689 F. App'x 39 (2d Cir. 2017); *Alpha Capital*, 2014 WL 6466994, at *13 (striking as untimely "all allegations that are based solely on misrepresentations or omissions contained in [an SEC filing] filed more than five

years prior to the filing of the Complaint"); *Dupler*, 2010 WL 10827361, at *6 (dismissing as un-

timely "affirmative misrepresentations [that] were made prior to the deadline imposed by the

statute of repose"); *accord Bear Stearns*, 829 F.3d at 177 (dismissing Section 10(b) and Section

20(a) claims "[b]ecause the complaint fails to allege that the defendants made any misrepresenta-

tions within five years of the filing of [plaintiff's] complaint").

Because Plaintiff did not file his Complaint until October 23, 2017, all alleged violations

that occurred prior to October 23, 2012 are therefore time-barred and must be dismissed.

### B.   Plaintiff's Attempts to Circumvent the Statute of Repose Fail as a Matter of Law.

In his pre-motion letter, Plaintiff made several inconsistent arguments as to why this

Court should nevertheless sustain claims relating to alleged violations made prior to October 23,

2012.  *See* Dkt. #41 at 1–2 (July 26, 2018).  None of these arguments holds water, however, be-

cause they all ignore the statutory text and controlling precedent.

*First*, Plaintiff asserted that the statute of repose "runs from the date of the last alleged

misrepresentation regarding related subject matter."  Dkt. #41 at 1.  Although the Second Circuit

has not directly ruled on the viability of this so-called "continuing violations" theory, that theory

"is unsupported by the plain language of the statute" and would undermine the very purpose of

the statute of repose.  *Kuwait*, 128 F. Supp. 3d at 808 (discussing Section 1658(b)(2)).  Section

1658 requires filing within five years of the alleged "violation," 28 U.S.C. § 1658(b)(2), and

Rule 10b-5 makes unlawful a single misleading "statement," "omission," or deceptive "act,"

17 C.F.R. § 240.10b-5(b)–(c).  Because "even one misstatement can give rise to a 'violation' for

the purposes of the Exchange Act," *each* alleged misrepresentation (or omission or deceptive act)

is a separate "violation" triggering the statute of repose.  *Kuwait*, 128 F. Supp. 3d at 808; *see also*

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 299 F. Supp. 3d 1055, (D. Minn.

2018) ("The plain and ordinary meaning requires the violation of Section 10(b)—the inde-

pendently actionable breach of the Exchange Act—to have occurred within the repose period.").[6]

Because Section 1658(b)(2) was designed to "giv[e] defendants total repose after five

years," *Merck*, 559 U.S. at 650, "expansion of [the statutory term] 'violation' to include a series

of misstatements and omissions"—or to extend an alleged "scheme" beyond the five-year repose

period—"would almost certainly require the operation of equitable considerations . . . foreclosed

by the reasoning in *IndyMac*." *Kuwait*, 128 F. Supp. 3d at 808; *see also Carlucci v. Han*, 886 F.

Supp. 2d 497, 515 (E.D. Va. 2012) (rejecting a continuing-violations theory because "the statute

of repose is an unqualified bar that may not be equitably tolled"). A "majority of courts across

circuits" thus have concluded that Plaintiff's theory "would unjustifiably qualify the repose pe-

riod and permit stale claims." *Howe*, 238 F. Supp. 3d at 1050–51.

Even before *IndyMac* confirmed that statutes of repose are not subject to equitable toll-

ing, the "weight of authority in this circuit" had rejected a continuing-violations theory as incom-

patible with statutes of repose in the securities context. *In re Comverse Tech., Inc. Sec. Litig.*,

543 F. Supp. 2d 134, 155 (E.D.N.Y. 2008); *see also*, *e.g.*, *Stoll v. Ardizzone*, 2007 WL 2982250,

at *2 (S.D.N.Y. 2007) ("[T]here is no 'continuing violations' exception to the absolute bar of the

statutory limitations period."); *de la Fuente v. DCI Telecomms., Inc.*, 206 F.R.D. 369, 385

(S.D.N.Y. 2002) (citing cases indicating "[i]t is not at all clear that the continuing fraud doctrine

applies in securities fraud cases"). Although some pre-*IndyMac* cases in this Circuit had ac-

cepted a continuing-violations theory, *see Plymouth Cty. Ret. Ass'n v. Schroeder*, 576 F. Supp.

---

[6]  Plaintiff cannot repackage his untimely misrepresentations or omissions claims as a fraudu-
lent "scheme" because any such scheme-liability claim would fail as a matter of law, *infra* II.B.5,
and "[t]he plain language" of the statute bars scheme-liability claims to the extent they are based
on untimely conduct, *W. Va. Pipe Trades*, 299 F. Supp. 3d at 1064; *Howe v. Scheckin*, 238 F.
Supp. 3d 1046, 1050–51 (N.D. Ill. 2017) (rejecting a "continuing fraudulent scheme theory").

2d 360, 378 (E.D.N.Y. 2008); *In re Dynex Capital Sec. Litig.*, 2006 WL 314524, at *5 (S.D.N.Y. Feb. 10, 2006), those cases were "thin on analysis," *Kuwait*, 128 F. Supp. 3d at 808, and even they recognized that the law was "somewhat unresolved," *Plymouth*, 576 F. Supp. 2d at 378.

Ever since *IndyMac*'s "strict construction and application of the statute of repose," *Kuwait*, 128 F. Supp. 3d at 807, courts in this Circuit have been *unanimous* in rejecting a continuing-violations theory in this context. *See id.* (holding that the theory is "inconsistent with the substantive right to repose after five years"); *Marini v. Adamo*, 995 F. Supp. 2d 155, 184 (E.D.N.Y. 2014) ("agree[ing] with the persuasive analysis of a majority of district courts throughout the country that have rejected the continuing violations doctrine in this context"); *see also Fogel*, 2017 WL 751155, at *9 (implicitly rejecting continuing-violations theory); *Alpha Capital*, 2014 WL 6466994, at *13 (same).[7] This Court should do the same.

*Second*, Plaintiff undercuts his own "continuing violations" theory by suggesting that the repose period is triggered, instead, each time a putative class plaintiff purchased stock. *See* Dkt. #41 at 2 ("a violation . . . occurs at each <u>transaction</u>"). Plaintiff's "transaction date" rule, however, derives from an unpublished Second Circuit decision that is not binding on this Court, *see Arnold v. KPMG LLP*, 334 F. App'x 349, 351 (2d Cir. 2009) (summary order), and is in any event incompatible with the Second Circuit's subsequent decision in *Bear Stearns*, which dismissed a complaint as untimely for failure to allege "any *misrepresentations* within five years of

---

[7]  Plaintiff's pre-motion letters cited no post-*IndyMac* case in this Circuit applying a "continuing violations" theory—and Defendants have found none.  The sole post-*IndyMac* authority Plaintiff cited did not involve Section 1658(b)(2), and, as relevant here, it determined only *that* the statute governing the timeliness of certain securities claims is a statute of repose—not *when* that statute of repose actually begins.  *See Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2049 (2017) (holding that because the "[t]he statute . . . runs from the defendant's last culpable act (the offering of the securities)" rather than "the accrual of the claim," it was a "close to a dispositive indication that the statute is one of repose").  That case therefore provides no authority for creating an exception to Section 1658(b)(2) that Congress has not authorized.

the filing of [plaintiff's] complaint," 829 F.3d at 177 (emphasis added).  As courts in this District

has recognized, "in the years since *Arnold*," the Second Circuit thus has "made plain its belief

that it is the date of the misrepresentation, not the transaction, that matters for purposes of the . . .

statute of repose."  *Fogel*, 2017 WL 751155, at *8 n.11.

     In any event, Plaintiff's suggested "transaction date" rule would have no application here

"'because [*Arnold*] addresses a scenario where the alleged misrepresentation was made *after* the

purchase.'"  *Fogel*, 2017 WL 751155, at *8 n.11 (emphasis added) (citations omitted).  Here, the

first alleged stock purchase of any class member for purposes of this action occurred no earlier

than the start of the purported class period on October 23, 2012.  ¶ 87.  Therefore, even under *Ar-*

*nold,* any alleged misstatements made before that date would be time-barred.

     *Finally*, Plaintiff's pre-motion letter contended that his omissions claims would be timely

because the Defendants' alleged "failure to correct the misstatements" allowed the statements to

"'remain alive' in the minds of investors" into the class period.  Dkt. #41 at 2 (quoting *Kowal v.*

*IBM Corp.*, 163 F.3d 102, 110 (2d Cir. 1998)).  *Kowal* is inapposite, however, because it pertains

to a duty to *update*—which applies only where "a statement, reasonable at the time it is made,

becomes misleading because of a subsequent event."  163 F.3d at 110.  Plaintiff does not allege

that Defendants violated a duty to update, only that their statements were false when made.

More fundamentally, *Kowal* did not involve a statute of repose.  Plaintiff has cited no authority

permitting tolling of Section 1658(b)(2) under such a "continuing omissions" theory—and "it

does not appear that any such opinion exists."  *Intesa SanPaolo, S.p.A. v. Credit Agricole*, 924 F.

Supp. 2d 528, 537 (S.D.N.Y. 2013).  Under such a theory, "the five-year deadline *would not*

*have even begun running on the claim*" until the Defendants affirmatively corrected the alleged

misstatements (which Plaintiff has not alleged).  *Id.*  That absurd result is incompatible with the "unqualified bar" provided by Section 1658(b)(2).  *Merck*, 559 U.S. at 650.

Because Plaintiff does not—and cannot—offer any lawful basis for creating an exception to the applicable statute of repose, the Court must dismiss all alleged violations occurring before October 23, 2012.  That includes the allegedly fraudulent YE 2011 and HY 2012 impairment determinations and all alleged misrepresentations and omissions outside the repose period—that is, the misstatements, omissions, and false certifications alleged in the 2011 Annual Report and March bond offering, ¶¶ 36–43; alleged misstatements to investors in April 2012, ¶ 44–46; misstatements and omissions alleged in SEC filings and bond offerings from August 2012, ¶¶ 50–51, 57–59; and alleged misstatements and omissions at investor seminars in August 2012, ¶¶ 52–55, and on October 9, 2012, ¶ 70.

### C.  Alleged Violations That Occurred after October 23, 2012 Are Insufficiently Pleaded.

Once Plaintiff's untimely allegations are dismissed, the Court can readily dismiss the remaining handful of allegations for multiple reasons.  Notably, Plaintiff does not dispute that the amount of the RTCM impairment was appropriate, or that RTCM was impaired at the earliest reporting period after further examination of new developments learned at the end of November 2012.  *See* ¶ 68.  Instead, Plaintiff alleges just two sets of misstatements after October 23, 2012: (1) internal statements made to Rio Tinto employees in November 2012, *see* ¶¶ 73–75; and (2) public statements made to investors at a November 2012 investor seminar, *see* ¶¶ 71–72.[8]  Plaintiff alleges no other statements between October 23, 2012 and the end of the Class Period on

---

[8]  Although the Complaint references additional statements allegedly made at an October 2012 investor seminar, ¶ 70, the Court can take judicial notice of the transcript of that seminar, *see*

February 15, 2013.  In addition to failing to plead fraud with particularity and failing adequately
to plead materiality, scienter, loss causation, and scheme liability, *see infra* II.A–B, these allega-
tions suffer from numerous pleading deficiencies.[9]

### 1.   The Complaint Fails Adequately to Plead Reliance and Falsity with Respect to the Internal Statements.

The Complaint first alleges several internal statements made at an Audit Committee
meeting on November 26, 2012:  that Mr. Albanese and Mr. Elliott allegedly "did not correct"
several "misleading statements" in the Third Controller's Paper, ¶¶ 65, 67, and that Mr. Elliott
allegedly concealed from the Audit Committee the "late breaking" information he had "recently
learned" from Rio Tinto's Technology & Innovation experts, ¶¶ 68–69.  Among other deficien-
cies, the Complaint fails adequately to plead reliance and falsity with respect to these actions.

Plaintiff has attempted to plead reliance using the fraud-on-the-market doctrine, *see*
¶¶ 96–97, under which "reliance is presumed when the statements at issue become public," *Ston-
eridge Inv. Partners v. Scientific-Atl.*, 552 U.S. 148, 159 (2008).  But there are no allegations that
any of the above actions became public at any point in the next five years until October 2017,
when the SEC filed its action against the Defendants.  Because "[n]o member of the investing
public had knowledge, either actual or presumed, of [Defendants' allegedly] deceptive acts dur-
ing the relevant times," Plaintiff "cannot show reliance upon any of [Defendants'] actions."  *Id.*;
*see also*, *e.g.*, *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 518–19

---

*Nokia*, 423 F. Supp. 2d at 371–76 nn. 3–5—including that the seminar occurred outside the re-
pose period on October 9, 2012.  *See* Ex. 15, at 1.  Alleged misstatements at that seminar thus
must be dismissed as untimely.

[9]  Because the Section 10(b) claims must be dismissed as untimely and for failure to state a
claim, the Section 20(a) claims must be dismissed "for lack of a primary violation."  *Kuwait*, 128
F. Supp. 3d at 809.

(S.D.N.Y. 2017) (dismissing fraud claim for "fail[ure] to allege that investors knew of, or relied upon, [defendant's] attempt to cover up his alleged self-dealing").

Plaintiff fares no better with attempting to plead falsity.  The Complaint alleges that statements cherry-picked from the Third Controller's Paper were misleading for not factoring in "the significant adverse developments at RTCM," "the lack of any viable transportation option," or the "negative valuations" that had been modeled.  ¶ 67.  In fact, that paper directly factored in the revised resources and reserves estimates, as well as "[e]xternally imposed limitations to the short to medium term usage of a barge solution."  Ex. 9, at 18.  The paper further observed that, given limitations to a barging solution, it had been "necessary" to "consider[] . . . alternative coal chain solutions," and that "[m]ultiple options for the size, routing, and ownership structure [of a Greenfield rail and port system] [we]re being developed and assessed by the Product Group."  *Id.*  There are no allegations that Rio Tinto had come to rest on the viability of transportation options by the time of the Audit Committee's November 26, 2012 meeting:  although Mr. Albanese had challenged solo construction of a greenfield railway, for example, Rio Tinto had continued to look into partnership options for construction, ¶ 49.  Finally, as the Third Controller's Paper explained—and the Complaint omits—"[t]he proposed range" of RTCM's fair value had "increased from the acquisition value" due to "several key changes":  chiefly, there had been "[m]aterial increases to PEG coal price assumptions," including a "20% and 23% increase in the long-term thermal coal and coking coal prices from those used [at acquisition]."  Ex. 9, at 18–19.  In short, the paper plainly was not misleading in context because it clearly cabined its valuation by detailing the "considerable uncertainty" that still surrounded RTCM's infrastructure challenges.  *Id.* at 18.

### 2. The Public Statements Are Inactionable as a Matter of Law.

The Complaint identifies only three public statements made after October 23, 2012, within the applicable period of repose.  *See* ¶¶ 71–72.  None of these statements is actionable against any Defendant; furthermore, none was made by Mr. Elliott.

*First*, Plaintiff asserts that the reference to looking at "all the transportation options" was misleading because "the only transportation option that was currently on the table was the use of existing rail."  ¶ 71.  But Mr. Albanese's statement, properly read in context, is not misleading as a matter of law.  According to the transcript of the investor seminar, Mr. Albanese stated:  "I think what we would need to look at would be all the transportation options, but realistically continued upgrades of the Beira [railway] line . . . but again I think we need to keep in mind that any of the options should always be looked at, at different times."  Ex. 16, at 9.  In other words, Mr. Albanese simply made a general statement that a company should "always" "look at" "all the . . . options," but then qualified that general statement by adding: "but realistically continued upgrades of [an existing railway] line"—focusing on the very option that Plaintiff claims was the "only" option left.  ¶ 71.  A defendant does not commit securities fraud by uttering the platitude that companies should always look at all the options—particularly when he then qualifies that statement by acknowledging that only one option is "realistic[]."

In all events, even accepting Plaintiff's view that Mr. Albanese focused on multiple options, not just one option, the statement would still fall short of being false or misleading.  When Mr. Albanese made this statement, Rio Tinto was still reviewing multiple options for rail transport, including both upgrading existing rail and jointly building a new greenfield railway.  *Supra* 7–9, 16.  The Third Controller's Paper references the breadth of those options when it states:  "Multiple options for the size, *routing* and ownership structure are being developed and assessed . . . [C]onsiderable uncertainty remains around the logistics assumptions to be used.  A

31

central case view is thus still under development." Ex. 9, at 18 (emphasis added).  Because "multiple options" remained in play with respect to transportation solutions, Mr. Albanese's statement was not false or misleading as a matter of law.

*Second*, Mr. Albanese's reference to "the first shipment of coal from Mozambique," ¶ 72, likewise was not misleading as a matter of law.  The Company's 2012 Annual Report confirms that—notwithstanding Plaintiff's protestations about the limits on Rio Tinto's "ability to transport any coal to market"—Rio Tinto *had* made an initial shipment of coal in 2012.  The Report states that the Benga mine had "officially opened in May 2012 *with first coal exported in June 2012*," with "commercial production in 2012 [of] 460 thousand tonnes."  2012 AR at 29 (emphasis added).  A defendant does not mislead investors by "referencing . . . the first shipment of coal," when such a first shipment did in fact occur.

*Third*, Mr. Albanese's description of "the Moatize Basin as a long-term opportunity with the potential to grow beyond 25 million tons of coal per year," ¶ 72, is not actionable and was not misleading as a matter of law.  As an initial matter, "expressions of optimism" and "projections of future performance" ordinarily are "not actionable" under the securities laws.  *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 112 (2d Cir. 2011); *see also IBEW Local Union No. 58 Pension Tr. Fund v. Royal Bank of Scot. Grp.*, 783 F.3d 383, 392 (2d Cir. 2015) ("Statements of general corporate optimism . . . do not give rise to securities violations.").  "This is especially true where . . . the allegedly fraudulent statements about future performance . . . are not stated as guarantees."  *Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250, 252 (2d Cir. 2004) (summary order) (quoting *Halperin v. eBankerUSA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002)).  Mr. Albanese's reference to RTCM's "potential to grow" amounts to both an "expression of optimism" and a

32

"projection of future performance," and even Plaintiff does not claim that the statement was worded as a guarantee. It is therefore not actionable.

In addition, the statement was not misleading as a matter of law. The transcript of the relevant investor seminar shows that, during the public question-and-answer session, investors recognized that "obviously the small-scale operations [are] starting up and it is going to be some years before you do the big infrastructure thing." Ex. 16, at 9. This public statement demonstrates that investors understood that, while the Moatize Basin may have had long-term potential, Rio Tinto had to address challenges for "some years" before it could realize that potential. *Id.* In other words, investors fully understood that Mr. Albanese was not making a guarantee. They were not misled.

Even assuming that these statements were actionable, they still would need to be dismissed as to Mr. Elliott because he did not "make" any of them. Under the Supreme Court's decision in *Janus*, an individual can be liable under Section 10(b) only if he or she has "ultimate authority" or "control" over a statement in order to "make" it. *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). While written statements can have multiple authors, *Moon Joo Yu v. Premiere Power LLC*, 2018 WL 456244, at *10 (S.D.N.Y. Jan. 17, 2018), verbal statements cannot, *see Janus*, 564 U.S. at 143 ("[T]he content [of an oral statement] is entirely within the control of the person who delivers it."); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 572 n.13 (S.D.N.Y. 2012) (one cannot be liable "for the allegedly false statements made by [another]" because he "fail[ed] to correct or clarify" those statements). Under *Janus*, "it is the speaker who takes credit—or blame—for what is ultimately said," 564 U.S. at 143. Because the Complaint does not allege that Mr. Elliott "made" any statements at the November 2012 investor conference, Mr. Elliott cannot be liable for those statements.

33

II.   **Even Considering Alleged Violations That Occurred Before October 23, 2012, The Complaint Must Be Dismissed As To All Defendants.**

Even if the Court were to consider alleged violations that occurred before October 23, 2012 (and it should not), the Complaint still must be dismissed in its entirety because it fails to satisfy Rule 9(b)'s heightened pleading standards and fails adequately to plead numerous elements of a Section 10(b) private fraud claim.  The Section 20(a) claims also must be dismissed, not least for failure adequately to allege a primary violation or culpable participation.

A.   **The Complaint Fails to Satisfy Rule 9(b)'s Heightened Pleading Requirements.**

By piggy-backing on the SEC's Complaint, Plaintiff repeats and even compounds the SEC's failure to satisfy Rule 9(b)'s heightened standard as to any Defendant.  Like the SEC, for example, Plaintiff omits critical facts—such as *what* impairment determinations Rio Tinto actually made at YE 2011 and HY 2012, *e.g.* ¶¶ 35, 39–40, or *when* or *by how much* an impairment should have been taken (in Plaintiff's hindsight view of this case), ¶¶ 37, 50, 58, 63.  *See*, *e.g.*, *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 411 & n.10 (S.D.N.Y. 2007) (dismissing allegations of fraudulently overstated assets for failure "to specify the amount by which the [assets] were overvalued, and at what times").  The allegations are particularly sparse with regard to the HY 2012 interim report, which Plaintiff alleges was "materially misleading," ¶ 50, without even attempting to "explain *why*" or how it was misleading, *Rombach v. Chang*, 355 F.3d 164, 175 (2d Cir. 2004) (emphasis added).

Like the SEC, Plaintiff also groups Defendants together, contending that "*Defendants* falsely declared," ¶ 39 (emphasis added), "falsely stated," ¶ 40, and "minimized," ¶ 41, certain "information then known to Defendants," ¶ 38.  But where, as here, there are multiple defendants, Rule 9(b) "is not satisfied" when "'defendants are clumped together in vague allegations.'"  *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 329 (S.D.N.Y. 1999) (citation omitted); *see also Mills v.*

*Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'").  Because these are the exact sort of "'improvident charges of wrongdoing'" that Rule 9(b) was designed to prevent, *Rombach*, 355 F.3d at 171 (citation omitted), the Complaint must be dismissed.

**B.**     **The Complaint Fails Adequately to Plead Numerous Essential Elements of a Section 10(b) Fraud Claim.**

To state a claim for fraud under Section 10(b), Plaintiff must allege, as relevant here, that Defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiff[] relied; and (5) that plaintiff['s] reliance was the proximate cause of their injury." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).  Nearly all of these elements are insufficiently pleaded here. Plaintiff's bald attempt to repackage his inadequate misrepresentations and omissions claims as a claim for scheme liability also fails as a matter of law.

**1.**     **The Complaint Fails to Plead Falsity as a Matter of Law.**

The Complaint alleges three types of misstatements and omissions:  (1) statements concerning RTCM's value, net earnings, and profits; (2) statements concerning RTCM's prospects; and (3) the concealment of various developments.  None of these allegations sufficiently pleads falsity because the Complaint ignores that investors and Rio Tinto's independent auditors were well aware that RTCM was a highly exploratory and extremely complex operation that faced significant infrastructure and resource challenges.

**a.**     **Statements Regarding RTCM's Valuation Were Objectively Reasonable, and in Any Event Are Non-Actionable Opinions.**

The Complaint first alleges misleading statements regarding RTCM's fair value, profits, and impairment determinations.  *See*, *e.g.*, ¶¶ 37–40, 50, 58, 63–65.  These statements are not

misleading even if treated as statements of *fact*, and certainly cannot satisfy the more stringent standard for *opinion* liability.

To begin, the Complaint does not adequately allege that RTCM's value was overstated. Plaintiff asserts that Rio Tinto should have taken an impairment on RTCM within just 5 months (or at most 11 months) of the acquisition date. But the reality is that Rio Tinto's post-acquisition feasibility studies were extraordinarily expensive and complex—involving extensive drilling and testing of the ore-body material for a large geographical area, repeated lobbying of the Government of Mozambique for approval of a barging option, and identifying and reaching out to potential partners to develop other transportation solutions. *See, e.g.*, 2011 AR at 27, 41, 78, 190; Ex. 9, at 18. Rio Tinto's extensive and continued studies belie the claim that it thought RTCM had no value so soon after acquisition; if that were true, Rio Tinto would not have spent millions of dollars evaluating the project and hiring staff through 2012. *See* 2012 AR at 221. While these studies were ongoing, moreover, Rio Tinto made reasonable impairment determinations that satisfied all relevant accounting standards. *See supra* 10–13. That Rio Tinto has never restated its YE 2011 or HY 2012 financial statements, nor has its auditor since modified its conclusions on those statements, confirms that RTCM's valuations were not misleading as a matter of law.

The conclusory allegations in the Complaint rely on snippets taken entirely out of context. For example, Plaintiff alleges that Rio Tinto "falsely stated that [it] reviewed intangible assets for impairment" at YE 2011, ¶ 40, but omits that the Annual Report accurately disclosed that Rio Tinto had assessed a "provisional" fair value based on the acquisition value, 2011 AR at 162. Plaintiff likewise ignores that Rio Tinto's public statements were replete with informative caveats that "meaningfully warned investors that there were potential contingencies, including geologic ones, that could retard development of the mine." *City of Austin Police Ret. Sys. v. Kinross*

*Gold Corp.*, 957 F. Supp. 2d 277, 302–03 (S.D.N.Y. 2013).  Specifically, Rio Tinto affirmatively disclosed that RTCM was an "undeveloped" resource that offered only a "long term" development opportunity, 2011 AR at 27; RTCM's acquisition value was "provisional" and "subject to further review," *id.* at 190; and post-acquisition "feasibility studies" were ongoing, *id.* at 27.  Rio Tinto also repeatedly cautioned investors in SEC filings and at investor seminars that political conditions could result in "[l]imitations to . . . infrastructure access"; "numerous uncertainties inherent in estimating ore reserves" could cause previously valid assumptions to "change significantly with new information"; Rio Tinto's "ability to produce and transport products profitably" could "materially" affect performance; and Rio Tinto "may be unable to find willing and suitable joint venture partners" for large projects.  2011 AR at Introduction, 10–11; Ex. 24, at 4, S-3, S-8, S-10; Ex. 25, at 4, S-8, S-10; *see also* Ex. 15, at 2.  This surrounding text clearly informed investors that RTCM's valuation reflected a synthesis of provisional and evolving information.

For similar reasons, the Complaint fails to satisfy the more stringent requirements for *opinion* liability.  It is "well-settled in the Second Circuit" that a company's impairment determinations are statements of opinion, not fact.  *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at *10 (S.D.N.Y. Sept. 30, 2016) (citing cases), *appeal dismissed*, 2017 WL 5201904 (2d Cir. Feb. 22, 2017).  Because "estimate[s] of the fair value of . . . assets will vary depending on the particular methodology and assumptions used," "'[t]here may be a range of prices with reasonable claims to being fair market value.'"  *Fait*, 655 F.3d at 110–11 (citation omitted).  Here, RTCM's valuation reflected Rio Tinto's judgments about the future viability of infrastructure options and the quantity and quality of available coal—both of which were still under review.  Because such "actuarial or accounting assumptions . . . are, by definition, not statements of fact," *Harris v.*

*AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 173 (S.D.N.Y. 2015), statements about RTCM's valuation could be actionable, if at all, only as statements of opinion.

As the Supreme Court recently clarified, opinion statements are actionable in only three limited circumstances: (1) if "the speaker did not hold the belief she professed," (2) if "the supporting fact she supplied were untrue," or (3) if the speaker omits information that makes the statement misleading to a reasonable investor. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1327–29 (2015).[10] Plaintiff does not allege that Defendants supplied untrue supporting facts or that any Rio Tinto employee subjectively believed that impairment was required earlier. And his allegations (at ¶¶ 37, 41, 55, 63, 66, 70–72) that "defendants were aware of facts that *should* have led them to [act differently]" are insufficient to establish that their opinion was not honestly held. *City of Omaha Civilian Empls. Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 68–69 (2d Cir. 2012) (per curiam); *see also Fait*, 655 F.3d at 110–12 ("clear indications that impairment testing was necessary" were insufficient to establish that "defendants did not believe the statements regarding goodwill"); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616–17 (9th Cir. 2017) (finding "no allegations of subjective falsity" where there were "no allegations" that the defendant believed that the asset was impaired, or that required impairment testing had not been performed).

That leaves *Omnicare*'s third category of opinion liability, which it is "no small task" to plead. 135 S. Ct. at 1332. Because reasonable investors "do[] not expect that *every* fact known to an issuer supports its opinion statement," a court must examine the statement "in light of all its surrounding text," and ask whether, in context, there is a reasonable basis for the statement such

---

[10] *Omnicare* fully applies to Section 10(b) claims. *See Tongue v. Sanofi*, 816 F.3d 199, 209–12 (2d Cir. 2016).

that it "fairly aligns with the information in the issuer's possession at the time." *Id.* at 1329.
Where, as here, Plaintiff "fail[s] to allege the actual assumptions that Defendants relied upon . . .
it cannot be plausibly inferred that Defendants intentionally disregarded" the events, circum-
stances, or challenges relating to the asset. *Dearborn Heights*, 856 F.3d at 618.

In a recent summary order, the Second Circuit dismissed virtually identical allegations,
holding that a mining company's failure to disclose a consultant's pessimistic assessment of a
gold mine's viability was not misleading as a matter of law when properly viewed in "the context
of an investment in a gold mine." *Martin v. Quartermain*, 732 F. App'x 37, 41–42 (2d Cir. May
1, 2018) (summary order). "[G]old mining is a volatile industry," the Court reasoned, and its in-
herent risks are "enhanced where, as here, the mine is still under development, the physical infra-
structure is not fully in place, and the mine's developers do not yet have complete information
about its economic viability." *Id.* at 42. Coal mining is also volatile and risky, and most of
RTCM's mines had not even reached the development stage in 2012, as potential options for
transporting the coal to market were still under review, and tests of RTCM's economic viability
were not yet complete. Especially because Rio Tinto "emphasized the preliminary nature" of
RTCM by qualifying its figures as "'estimates'" that "'may ultimately prove to be inaccurate,'"
*id.*, the alleged statements about RTCM must be dismissed. *See* 2011 AR at 10–11 (ore-body es-
timates could "change significantly with new information," and exploratory assets "might be un-
successful"), 190 (RTCM's value was "provisional" and "subject to further review").

Plaintiff's core fallacy is to suggest that the securities laws impose liability "merely be-
cause an issuer failed to disclose information that ran counter to an opinion expressed." *Tongue*,
816 F.3d at 212. But an opinion statement is not necessarily misleading simply because "the is-
suer knows, but fails to disclose some fact cutting the other way." *Omnicare*, 135 S. Ct. at 1329.

Courts thus have dismissed claims of overstated assets even in egregious circumstances. *See*, *e.g.*, *City of Omaha*, 679 F.3d at 68–69 (impairment testing not required under *Fait* despite company's "general financial deterioration"); *N. Collier Fire Control*, 2016 WL 5794774, at *1, *3, *10–11 (asset not overstated under *Omnicare* even though subsidiary had "effectively ceased operations" and was "poorly performing or defunct"); *In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *18–20 (S.D.N.Y. Aug. 19, 2015) (R. & R.) (statement that asset was "well positioned for growth" not misleading under *Omnicare* even though "generally poor infrastructure and lack of investment in improvement" had rendered stated projections "impossible"), *adopted*, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015). Under these standards, none of the statements pertaining to RTCM's valuation or the impairment process is actionable.

> **b.   Other Alleged Misstatements Were Not False or Misleading in Context.**

The Complaint next alleges misleading statements made in public filings, in bond offerings, and to investors about RTCM's prospects and operations. *See* ¶¶ 36–41, 45, 51–53, 59, 67, 70–72. These statements are not actionable or are not false as a matter of law.

Statements in Rio Tinto's public filings and bond offerings (¶¶ 36–41, 51, 59) all must be dismissed because Plaintiff fails to "*specify* the statements that [it] contends were fraudulent." *Novak*, 216 F.3d at 306 (emphasis added). For example, the Complaint alleges that Rio Tinto falsely certified that the 2011 Annual Report provided a "true and fair view of the assets," ¶ 36, "fairly present[ed]" RTCM's financial condition, ¶ 37, and "contained statements about RTCM that were materially misleading," ¶ 38. But Plaintiff fails to allege *what* the underlying statements were and "explain *why*" they were misleading. *Rombach*, 355 F.3d at 175 (emphasis added); *see also ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 103–04 (2d Cir. 2007) (dis-

missing under Rule 9(b) a claim based solely on "speculative inferences").[11]   Similarly, the Complaint alleges that the 2011 Annual Report provided "false assurances that the full extent of the write-down [of reserves and resources] had been anticipated prior to the acquisition" and "had no effect on RTCM's valuation."  ¶ 41.  But the Complaint fails to allege what the anticipated figures actually were, and does not allege that the revised figures were inaccurate.

Mr. Albanese's statements to investors (¶¶ 44–46, 50–55, 70–72) likewise were inactionable puffery and were not misleading as a matter of law.  For example, statements to shareholders in April 2012 that Rio Tinto was "growing its coal business," with "a target" of starting shipments from some of the assets in the first half of 2012, ¶ 44, clearly were not misleading because the Benga mine "officially opened in May 2012 with first coal exported in June 2012," 2012 AR at 29.  And Mr. Albanese's statements on August 8, 2012 that RTCM was "more prospective," ¶ 52, had "more potential," ¶ 53, and that the Moatize "was truly a world-class basin coal deposit," ¶ 53, were the sort of general "financial projections and statements of guarded optimism" that are inactionable puffery.  *Rombach*, 355 F.3d at 175; *see also Nokia Corp.*, 423 F. Supp. 2d at 399–400; *supra* 32.  Moreover, the Complaint fails to include the cautionary language from that same presentation:  Mr. Albanese warned the investors that "it's realistic and likely that we'll take longer to develop this infrastructure than previously planned due both to the timing of some of the approvals but also internal constraints on capital."  Ex. 14, at 3.[12]

Thus, *none* of the alleged statements about RTCM's prospects or operations is actionable.

---

[11]  To the extent these allegations are predicated on the 2011 Annual Report's statements of RTCM's valuation, they must be dismissed for the additional reasons provided *supra* II.B.1.a.

[12]  The Complaint also incorrectly alleges that on October 9, 2012, Elliott addressed investors about RTCM.  ¶ 70.  The transcript from that presentation plainly shows that he did not.  Ex. 15.

### c.       No Risks or Adverse Developments Were Concealed.

Plaintiff alleges that Defendants concealed various risks and adverse developments in public filings, statements to investors, and in the Third Controller's Paper.  *See* ¶¶ 34, 36, 38, 45, 51, 59, 67.  Unlike with the omissions discussed above, Plaintiff does not allege that these particular omissions rendered any statement misleading.  Yet these allegations, too, fail to state a claim—not least because investors were well aware of the key risks that RTCM faced.

"Silence, absent a duty to disclose," is not actionable fraud.  *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).  Because there are no allegations that Defendants were required to disclose the allegedly concealed risks or adverse developments—whether to render a statement not misleading or to satisfy another disclosure duty—the alleged omissions are not actionable. *See Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 153 (2d Cir. 2013) (the securities laws "'do not create an affirmative duty to disclose any and all material information'" (citation omitted)); *see also In re Barclays Bank PLC Sec. Litig.*, 2017 WL 4082305, at *12–13 (S.D.N.Y. Sept. 13, 2017) (granting summary judgment with respect to omissions that rendered no statement misleading and violated no disclosure duty), *appeal filed* (2d Cir. Oct. 16, 2017).

Regardless, the alleged omissions cannot be *misleading* because no "reasonable investor could have been misled into thinking that the [omitted] risk[s] . . . did not actually exist." *Halperin*, 295 F.3d at 359.  It was well known and specifically disclosed that RTCM was a large and complex operation, with only provisional value subject to further review, and that there were significant infrastructure and resource risks in Mozambique that could cause previously valid assumptions to "change significantly with new information."  2011 AR at 11; *see also* Ex. 6; Ex. 8. Investors were well aware that Rio Tinto's barging proposal had been rejected, that "current rail infrastructure" was limited to 6 million tons, and that miners generally "lack[ed] options for getting their product to the port."  Ex. 11, at 2.  In these circumstances, *no* reasonable investor

would have thought that RTCM's infrastructure and resource risks "did not actually exist." *Halperin*, 295 F.3d at 359; *see Rombach*, 355 F.3d at 175–76 (holding that falsity was not established where cautionary statements provided a sufficiently "sobering picture" of the issuer's financial condition).

Because the Complaint thus fails to allege any actionable misstatement or omission, the Section 10(b) claim must be dismissed in its entirety.

### 2. Most Alleged Misstatements Were Not "Made" by Mr. Albanese or Mr. Elliott.

Rule 10b-5 forbids "any person . . . [t]o *make* any untrue statement of a material fact" in connection with the purchase or sale of securities.  17 C.F.R. § 240.10b-5 (emphasis added).  In *Janus*, the Supreme Court held that "[t]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  564 U.S. at 142.  One who assists, publishes, crafts, or even is "significantly involved in preparing" the statement does not thereby "make" the statement, for "[w]ithout control, a person or entity can merely suggest what to say, not 'make' a statement in its own right."  *Id.* at 142–43, 148.  Further, "in the ordinary case attribution within a statement . . . is strong evidence that a statement was made by—and only by—the party to whom it is attributed."  *Id.* at 143.  As a result, in the context of public company filings, "only those officers whose signatures appear on misleading statements may be liable as the 'makers' of those statements."  *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 165 (S.D.N.Y. 2012).

Plaintiff alleges that Mr. Albanese and Mr. Elliott made two categories of misrepresentations: (1) written statements in Rio Tinto's interim financial report for half-year 2012, ¶¶ 50–51, and in the March 2012 and August 2012 bond-offering documents, ¶¶ 56–59; and (2) oral representations at the November 2012 investor seminar, ¶¶ 70–72.  Claims relating to the written

statements must be dismissed because Mr. Albanese and Mr. Elliott did not "make" those statements under *Janus*. And claims relating to the oral statements were not "made" by Mr. Elliott, and fail for separate reasons, as explained above, *supra* 31–33.

> **a.    Neither Individual Defendant "Made" Any Statements in the 2012 Half-Year Report or the Bond-Offering Documents.**

The Complaint fails to allege that Mr. Albanese or Mr. Elliott "made" any statements in Rio Tinto's HY 2012 report. Mr. Albanese and Mr. Elliott did not sign that report. *See* 2012 6-K. The SEC's regulations did not require them to sign the report. *See* 17 C.F.R. § 240.13a-16. And the Complaint does not allege that they signed or were required to sign the report. *See* ¶¶ 50–51. Indeed, the paragraphs of the Complaint that discuss the report do not even mention Mr. Albanese and Mr. Elliott. *Id.* The Court should therefore dismiss the claims that Mr. Albanese and Mr. Elliott are liable as makers of statements in the report.

The Complaint likewise fails to allege that Mr. Albanese or Mr. Elliott "made" the statements in Rio Tinto's March 2012 and August 2012 bond-offering documents. The Complaint nowhere alleges that Mr. Albanese or Mr. Elliott had control over the contents of these documents. Nor does the Complaint allege that these defendants signed the documents, or that the documents were attributed to Mr. Albanese or Mr. Elliott. *See* ¶¶ 56–59.

Plaintiff instead seeks to hold Mr. Albanese and Mr. Elliott liable on the ground that the bond documents state that they incorporate the 2011 Annual Report by reference, and "Albanese and Elliott signed the . . . 2011 Annual Report." ¶ 57. Plaintiff's theory of liability flatly contradicts *Janus*, in which the Supreme Court held that a statement is "made" "*only by*" the "person or entity" to whom it is attributed and who has "control" over its contents. 564 U.S. at 142 (emphasis added). The Court specifically rejected the theory that "a person who 'provides the false or misleading information that another person then puts into the statement'" is the maker of the

statement, reasoning that such conduct "is merely an . . . act preceding the decision of an inde-

pendent entity to make a public statement." *Id.* at 145 (citation omitted).  In this case, Plaintiff

never alleges that Mr. Albanese or Mr. Elliott had control over the contents of the bond-offering

documents, or that these documents were attributed to them.  Instead, he alleges at most that Mr.

Albanese and Elliott "provide[d] the [allegedly] false or misleading information" (the 2011 An-

nual Report) that was then "pu[t] into the statement" (the bond-offering documents).  *Id.* at 145.

To accept that allegation as sufficient is to contradict *Janus*.

As in *Janus*, Plaintiff's theory of liability also contradicts the ordinary "meaning" of the

word "make" "when 'make' is . . . directed at an object expressing the action of a verb."  564

U.S. at 144.  As a matter of ordinary English, *A* does not "make" the statements in a document

authored by *B*, simply because *B* has chosen to refer to something that *A* had previously written.

For example, this brief refers to (and even quotes) opinions from the Second Circuit.  Yet all

would agree that the "makers" of the statements in this brief are the lawyers who wrote the

brief—not the judges who wrote the opinions to which those lawyers chose to refer.  The Court

should dismiss the claims that Mr. Albanese and Mr. Elliott are liable as makers of statements in

the bond offerings.

> ### b.   Mr. Elliott Did Not "Make" Any Misrepresentations at Inves-
> tor Conferences.

The Complaint alleges that the Individual Defendants made oral misrepresentations at in-

vestor conferences in August, October, and November 2012.  ¶¶ 52–55, 70–72.  These claims

fail as to all Defendants for reasons discussed *supra* I.C.2, II.B.1.b, and they fail as to Mr. Elliott

for the additional reason that they do not satisfy *Janus*.

As for the August conference, the Complaint alleges only that Mr. Elliott "participated"

in that conference and "did not correct [Mr.] Albanese's [alleged] material misrepresentations

regarding RTCM." ¶ 55.  But Mr. Elliott cannot be liable for failure to correct someone else's alleged misstatements.  Indeed, in a case almost exactly on point, a court in this District explained that "holding [the CFO] liable for [the CEO's] alleged false statements [during a conference call] based on a failure to correct, or omission, would be in tension with the Supreme Court's [*Janus*] decision."  *Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d at 572 n.13.

As for the October conference, the Complaint alleges that Mr. "Elliott described Rio Tinto's acquisition of Riversdale as the purchase of a highly prospective, 'tier one' coking coal resource with first production in mid-2012 and the objective of 25 million tons of coal production per year by 2020." ¶ 70.  Yet the actual transcript of that conference shows that Mr. Elliott did not make this statement or any statement about Riversdale or RTCM.  *See* Ex. 15.  Mr. Elliott cannot be liable for alleged misstatements he never made.

Finally, the Complaint does not allege any misstatement or omission by Mr. Elliott at the November 2012 investor conference.

### 3.     The Alleged Misstatements and Omissions Were Immaterial as a Matter of Law.

The Section 10(b) claims also must be dismissed because Plaintiff has failed to plead materiality as a matter of law.  A statement or omission is material if "'a reasonable investor would view it as significantly altering the "total mix" of information made available.'"  *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 146 (2d Cir. 2017) (brackets and citation omitted).  Courts conduct this "objective" inquiry, *id.*, by considering "both quantitative factors and qualitative factors," *id.* at 147.  Those factors demonstrate that the alleged misstatements and omissions here were "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

46

To begin, the alleged misstatements "carr[y] the preliminary assumption of immaterial-ity" because they "relate[] to less than 5% of a financial statement." *IBEW*, 783 F.3d at 390.[13] Rio Tinto owned dozens of other exploratory assets, 2011 AR at 30, and RTCM was a relatively minor asset, amounting to less than 3% of Rio Tinto's total assets, *see* 2012 AR at 142 ($118 bil-lion in total assets); 2012 6-K at F-5 ($121 billion); 2011 AR at 134 ($120 billion), and not even 25% of the $14 billion impairment announced in January 2013, ¶ 77.  Even when a number "may sound staggering, the number must be placed in context"—and in this context, $3 billion was presumptively immaterial.  *ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009).

Qualitative factors cannot overcome this presumption here because *none* of the relevant factors supports a finding of materiality.  *See IBEW*, 783 F.3d at 390–91 (listing qualitative fac-tors considered).  Many factors simply are not present:  none of the alleged misrepresentations changed "a loss into income or vice versa" or involved the "concealment of an unlawful transac-tion" or "a change in earnings or other trends"; and there are no allegations that the purported misstatements "hid[] a failure to meet analysts' consensus expectations."  *Id.* at 391.

There also was no "negative market reaction" to the announcement of the impairment, *IBEW*, 783 F.3d at 391, presumably because mining companies frequently take impairments on exploratory assets, *see supra* 17.  In fact, the day after the impairment announcement, Moody's stated that the impairment would "not affect the company's ratings."  Ex. 20, at 1.  The only al-leged credit-*outlook* downgrade occurred well over a month after the impairment announcement, just after Rio Tinto had announced its first loss ever.  ¶ 83.  And although the Complaint conclu-sorily alleges a stock drop "[i]n response to" the impairment announcement, ¶ 80, that cannot

---

[13]  The Second Circuit has established that "items in issue should be compared to like items on the corporate financial statement."  *Ganino*, 228 F.3d at 165.  Because the value of an asset is at issue here, the relevant comparison is to the value of Rio Tinto's other assets.

overcome the presumption here, for the "obvious alternative explanation" for that alleged drop given the allegations in the Complaint, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007), was the outsized $11 billion Alcan impairment taken the same day, ¶¶ 77, 80.

Further, there are no allegations that RTCM's value was an "item capable of precise measurement." *IBEW*, 783 F.3d at 391. Nor could there be: because RTCM involved "exploration and early development stage projects," its value could only be "provisionally estimated" before YE 2012. 2011 AR at 190; *see In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 466 (S.D.N.Y. 2017) (finding that certain payments were incapable of precise measurement because relevant "annual reports emphasize the uncertain nature of the amounts of illicit payments"). Indeed, the Complaint alleges *nine* different valuations, ranging from $5 billion to -$9 billion, *see* ¶¶ 23, 33, 48, 50, 61, 63, 75, 86—and even some of those estimates were unable to narrow RTCM's value to within a $5 billion range, *see* ¶ 61.

Finally, RTCM did not "play[] a significant role in [Rio Tinto's] operations or profitability," *IBEW*, 783 F.3d at 391, but was instead an undeveloped and unproven asset—as investors were well aware. *See* 2011 AR, 27, 190; *see also* ¶ 23. In fact, RTCM did not even begin to contribute to Rio Tinto's revenue until June 2012. *See* 2012 AR at 29 (noting first coal shipment from Benga mine in June 2012). In these circumstances, and especially in light of the ongoing studies, RTCM did not *yet* play any significant role in Rio Tinto's operations and profitability.

Because the alleged statements and omissions were presumptively immaterial, and qualitative factors cannot overcome that presumption, the Section 10(b) claims must be dismissed.

### 4. The Complaint Fails Adequately to Allege Facts Giving Rise to a Strong Inference of Scienter.

All of Plaintiff's Section 10(b) claims must be dismissed for the additional, independent reason that the Complaint fails to allege with particularity facts giving rise to a "strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2).  "The PSLRA requires plaintiffs to '*with respect to each act or omission* alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at *8 (S.D.N.Y. June 28, 2017) (Torres, J.) (emphasis in original) (quoting 15 U.S.C. § 78u-4(b)(2)), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018) (summary order).  "For Section 10(b) and Rule 10b-5 actions, the required state of mind is 'scienter,' that is, an intent 'to deceive, manipulate, or defraud.'"  *Id.* (quoting *Tellabs*, 551 U.S. at 313).  "To qualify as 'strong' within the intendment of [the PSLRA] . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314 (citation omitted).

To meet his heavy burden under the PSLRA to allege a "strong inference" of scienter, Plaintiff must plead either "(1) . . . motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA*, 553 F.3d at 198.  "Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."  *United States v. TEVA Pharm. USA, Inc.,* 2016 WL 750720, at *12 (S.D.N.Y. Feb. 22, 2016).  Plaintiff has failed to satisfy this heavy burden as to each Defendant.

a.   **The Complaint Fails Adequately to Allege Facts Giving Rise to a Strong Inference of Scienter as to Mr. Albanese.**

The Complaint fails to allege that Mr. Albanese had a "motive . . . to commit fraud." The Complaint never alleges that the purported fraud would have enriched Mr. Albanese or even that it benefited him in any "concrete and personal way." *Novak*, 216 F.3d at 307.

Plaintiff's pre-motion letter instead hypothesizes that Mr. Albanese and Mr. Elliott were "motivated to suppress bad news" about RTCM because "further impairments on the heels of Alcan would reflect a pattern of evaluation failure or performance failure" and harm Defendants' reputations. Dkt. #43 at 4. That theory does not suffice. It is well established that "the motive to maintain the appearance of corporate profitability, or of the success of an investment, . . . does not" raise a strong inference of scienter. *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996). Every corporation "naturally" has an interest in maintaining an image of success; "if scienter could be pleaded on that basis alone, virtually every company in the United States . . . could be forced to defend securities fraud actions." *Id.*; *cf. Novak*, 216 F.3d at 307 (holding that an allegation of a corporate officer's "desire to maintain a high stock price . . . to . . . prolong the benefits of holding corporate office" is insufficient to raise a strong inference of scienter). The allegation that Mr. Albanese and Mr. Elliott sought to "maintain the appearance of corporate profitability, or of the success of [the RTCM] investment," thus does not satisfy Plaintiff's burden. *Chill*, 101 F.3d at 268.

In the absence of a sufficient allegation of motive, Plaintiff must allege "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. Where, as here, "motive is not apparent," "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001). That is particularly true with respect to the Complaint's core allegation: that statements regarding the accounting

treatment and carrying value of RTCM were false or misleading.  Where "all that is involved is a dispute about the timing of the writeoff[,] the inquiry is framed by the recklessness standard— that is, whether the failure to take a write-down amounted to highly unreasonable conduct which represents an extreme departure from the standards of ordinary care." *Heat & Frost Insulators Pension Fund v. IBM Corp.*, 205 F. Supp. 3d 527, 535–36 (S.D.N.Y. 2016).

Plaintiff's burden is even higher still here because his own allegations and other documents properly considered at this stage *undercut* any inference of scienter.  These allegations and documents establish the following.  *First*, Rio Tinto was a massive and complex organization, *see* ¶¶ 8–10, making it difficult for Mr. Albanese or anyone in his position to control the details of each operation.  *Second*, Mr. Albanese was not an accountant, and the responsibility for valuation and impairment lay with others in the company.  *See* ¶ 17.  *Third*, Rio Tinto consistently took impairments throughout the relevant period, including much larger impairments on other assets.  *See* ¶ 77.  *Fourth*, constantly changing circumstances in the time following the acquisition made it infeasible to value RTCM with precision.  *See* ¶¶ 22–34.  *Fifth*, there are no allegations that Rio Tinto's independent auditors have ever withdrawn or restated any relevant opinions.  Taken together, these factors defeat any suggestion that Mr. Albanese acted with scienter.

Plaintiff's efforts to overcome these hurdles fail.  Plaintiff alleges that Mr. Albanese stepped down in July 2013 at the same time the impairment was announced.  ¶¶ 76–77.  Yet courts have "made clear" that, in the absence of "additional factual allegations linking the executives' resignation to the alleged fraud," "such allegations are insufficient to raise a strong inference of scienter." *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *18 (S.D.N.Y. Sep. 28, 2012). The Complaint includes no such "additional allegations."  Quite the opposite, in the press release that the Complaint quotes, ¶ 76–77, Mr. Albanese was praised for his integrity. Ex. 17, at 1.  Far

from supporting an inference of scienter, the circumstances surrounding Mr. Albanese's departure contradict it.

Plaintiff also suggests that Rio Tinto's history of impairments on other assets—particularly Alcan—caused Mr. Albanese to hide bad news on RTCM. Dkt. #43 at 4. But Plaintiff fails to justify his counterintuitive theory that investors or the Board would be outraged by losses on RTCM (an investment initially valued at $3.7 billion) while accepting significant impairments on Alcan (an investment worth almost $38 billion). The inference that Mr. Albanese plotted to conceal the smaller impairment while accepting the ordinary process for the larger investment is neither "cogent" nor "compelling." *Tellabs*, 551 U.S. at 324.

### b. The Complaint Fails Adequately to Allege Facts Giving Rise to a Strong Inference of Scienter as to Mr. Elliott.

Plaintiff has failed under the PSLRA to plead that Mr. Elliott had any motive to commit fraud. In fact, he did not stand to gain *anything* of value as a result of the alleged fraud, let alone to "benefit[] in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307–08. The only allegations relating to his finances are that he did *not* receive bonuses for 2012 or 2013. ¶ 84. Indeed, Mr. Elliott had begun planning his retirement before the alleged fraud began, *see* Ex. 19, he was not removed from his position as a result of the impairment, and he retired as planned at the end of 2013, *see* ¶ 12. Plaintiff's suggestions that Mr. Elliott committed fraud because he wanted Rio Tinto to remain profitable and RTCM to succeed, and that he wanted to maintain his reputation, are vague and generic. *See* ¶ 3. The Second Circuit has made clear that such allegations are insufficient to plead scienter as a matter of law where every company "naturally" has an interest in success. *Chill*, 101 F.3d at 268; *see also In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 407 (S.D.N.Y. 2013).

The Complaint also fails to allege particularized facts showing "strong circumstantial evidence of conscious misbehavior or recklessness" by Mr. Elliott.  *ECA*, 553 F.3d at 198.  Where, as here, there is no legally sufficient allegation of motive, the strength of the recklessness allegations "'must be correspondingly greater.'"  *Kalnit*, 264 F.3d at 142 (citation omitted).  Yet those allegations are lacking here and, indeed, the stronger inference to be drawn is that Mr. Elliott did not act with scienter.  *First*, he was not responsible for running RTCM as a business and no one at RTCM reported to him, *see* ¶¶ 12, 21.  *Second*, Rio Tinto regularly took impairments to other assets when necessary, including impairments far larger than the one for RTCM, *see* ¶ 77.  *Third*, the highly fluid circumstances in Mozambique meant that internal valuations for RTCM were widely variable and unreliable, *see, e.g.*, ¶¶ 22, 31–34, 48, 61.  *Finally*, Mr. Elliott—who is not trained as an accountant—reasonably relied on the business unit, product group, Controller's office, and independent auditors at PwC, which has never withdrawn its opinions, *see* ¶¶ 12, 17.

The Complaint includes only a handful of allegations to suggest that Mr. Elliott had any knowledge of falsity or intent to commit fraud, and none of them survives scrutiny:

- The Complaint alleges that Mr. Elliott learned about the Government of Mozambique's rejection of barging, ¶¶ 30–34, but that development was public, and therefore irrelevant as a matter of law, *see supra* 9.

- The Complaint alleges that Mr. Elliott was aware that RTCM's "reserves and resources" had been reduced, ¶¶ 41–42, but that allegation in no way suggests that Mr. Elliott knew or should have known that Rio Tinto's financials were misstated. It is undisputed that the revised and accurate "reserves and resources" numbers were fully disclosed in the 2011 Annual Report, ¶ 41; 2011 AR at 49, 52, and that what remained after the write-down was still a sufficient amount of coking coal to support RTCM's valuation modeling.

- Mr. Elliott's alleged comment that "the market" would not see Rio Tinto's internal assumptions about the magnitude of the reduction in resources, ¶ 41, does not suggest fraudulent intent.  Mr. Elliott merely stated the fact that Rio Tinto, like other mining companies, did not disclose previous internal forecasts.  Rio Tinto disclosed its resource estimates, and they were not misleading.  *See supra* 10.

Even accepting the Complaint's allegations as true, by far the most plausible inference is that the 2011 Annual Report was "consistent with" the information "reasonably available" to Mr. Elliott at the time. *Novak*, 216 F.3d at 309.

In sum, the Complaint does not allege a "strong inference" of conscious misbehavior, or that Mr. Elliott acted recklessly with respect to RTCM's carrying value. The more cogent inference from the facts alleged in the Complaint is that Mr. Elliott knew of certain adverse developments, but did not have reason to believe that they would result in severe reduction of RTCM's value at the time and, in good faith, relied on Rio Tinto's internal controls to investigate the impact of these events. Ultimately, "'all that is involved is a dispute about the timing of the writeoff,'" and the Complaint has failed to support the inference "'that the failure to take an impairment charge earlier was an error so grievous that it exceeded differences over accounting principles and rose to the level of fraud.'" *Heat & Frost Insulators*, 205 F. Supp. 3d at 535–36 (alterations and citations omitted).

> ### c. The Complaint Fails Adequately to Allege Facts Giving Rise to a Strong Inference of Scienter as to Rio Tinto.

The Complaint fails adequately to plead Rio Tinto's corporate scienter, too. To do so, Plaintiff must allege "that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to" Rio Tinto. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008). Plaintiff cannot mix-and-match the knowledge of some employees with statements made by others. Rather, scienter can be imputed to Rio Tinto "only if the individual corporate officer *making* the statement has the requisite level of scienter." *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) (emphasis added) (citation omitted); *see also Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th Cir. 1995) ("[T]here is no case

law supporting an independent 'collective scienter' theory."); Restatement (Third) of Agency
§ 5.03 cmt. d(2) (2006) (corporations are not liable for fraud "if one agent makes a statement, be-
lieving it to be true, while another agent knows facts that falsify the other agent's statements").

Here, Rio Tinto's alleged scienter can be based only on the scienter of Mr. Albanese or
Mr. Elliott because they are the only employees alleged to have made misleading statements or
omissions with fraudulent intent.  Indeed, the Complaint alleges that the Controller's office, the
Audit Committee, and the independent auditors were not aware of "the significant adverse devel-
opments at RTCM."  ¶¶ 65, 67.  And there are no "'dramatic'" allegations from which a jury
could reasonably *infer* that the alleged misrepresentations must have been approved by other
"'corporate officials sufficiently knowledgeable'" to know that the statements were misleading.
*Teamsters*, 531 F.3d at 196 (citation omitted); *see id.* at 195–96 (discussing hypothetical where
General Motors claimed to have sold one million SUVs, but actually sold none).  To the extent
that neither Individual Defendant *made* a particular statement or omission, *see supra* II.B.2, Rio
Tinto thus cannot be liable either.  *See Teamsters*, 531 F.3d at 195; *Southland*, 365 F.3d at 366.
And even with respect to statements or omissions plausibly made by an Individual Defendant,
Rio Tinto cannot be liable because—as explained *supra* II.B.4.a–b—the Complaint fails to plead
a "strong inference" that either Individual Defendant acted with fraudulent intent.  *Tellabs*, 551
U.S. at 324; *see also Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 440
(S.D.N.Y. 2017).

<strong>5.      The Complaint Fails to Plead Scheme Liability as a Matter of Law.</strong>

Plaintiff's attempt to allege scheme liability fails because "alleged misrepresentations or
omissions" cannot be the "sole basis" for scheme liability.  *Lentell*, 396 F.3d at 177; *see also*,
*e.g.*, *WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011)
(scheme liability must "encompass[] conduct beyond . . . misrepresentations or omissions"); *SEC*

55

*v. Stoker*, 865 F. Supp. 2d 457, 467 (S.D.N.Y. 2012) (scheme liability requires "'a deceptive scheme . . . beyond the misrepresentations'" (citation omitted)).  Courts in this District thus have been careful to "scrutinize pleadings to ensure that misrepresentation or omission claims do not proceed under the scheme liability rubric." *In re Smith Barney*, 884 F. Supp. 2d at 161; *see also Menaldi*, 277 F. Supp. 3d at 519–20 ("deceptive cover-up" of misrepresentations that merely "re-package[d] the misrepresentations allegations" was insufficient for scheme liability).  Otherwise, virtually any misrepresentations or omissions claim would state a claim for scheme liability.

Here, Plaintiff has merely "repackage[d] the misrepresentations allegations" as an alleged deceptive scheme. *Menaldi*, 277 F. Supp. 3d at 520.  To the extent the Complaint alleges decep-tive actions, that alleged conduct was part-and-parcel of—not distinct from—Defendants' al-leged misrepresentations and omissions.  Accordingly, any claim of scheme liability must be dis-missed. *See*, *e.g.*, *SEC v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011) (dismissing a scheme-liability claim where the alleged misrepresentations were the "primary purpose and ef-fect" of the allegedly deceptive conduct).

### 6.    The Complaint Fails Adequately to Allege Loss Causation.

Plaintiff also does not adequately allege loss causation, which "'is the causal link be-tween the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" *Len-tell*, 396 F.3d at 172 (citation omitted).  "[T]o establish loss causation, 'a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' . . . *i.e.*, that the misstatement or omission concealed something from the market that, when dis-closed, negatively affected the value of the security." *Id.* at 173 (citation omitted).  Thus, "a par-ticular disclosure constitutes a sufficient foundation for loss causation allegations only if it some-how reveals to the market that a defendant's prior statements were not entirely true or accurate." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008).

Courts routinely dismiss Section 10(b) claims where, as here, the alleged "corrective disclosure" did not, in fact, "reveal[] an alleged misstatement's falsity or disclose[] that allegedly material information had been omitted." *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007).  In *AOL*, for example, the district court dismissed a Section 10(b) claim where there were no allegations that the allegedly false audit opinion "was ever the subject of a corrective disclosure," "that the financial results certified by that Opinion were ever restated, or that the truth of that Opinion was called into question at any time during the AOLTW stock decline that caused their losses." *Id.* at 678.  Similarly, *Take-Two* dismissed a fraud claim because the alleged corrective disclosure was not sufficiently connected to the defendant's alleged fraud of options backdating.  551 F. Supp. 2d at 282.  The court reasoned that the disclosure—a statement that the defendant had received grand jury subpoenas for "certain compensation and human resources documents," *id.*—did not "reveal[] at least part of the falsity" of the defendant's earlier statements because "[t]he announcement ma[de] no mention of options, options backdating, or the manner in which Take-Two accounted for its options grants," *id.* at 283–84.

As in *AOL* and *Take-Two*, the Complaint must be dismissed because it does not adequately allege loss causation.  The Complaint alleges "partial disclosures," ¶ 80, in a January 2013 press release announcing that Rio Tinto was taking a roughly $3 billion impairment to RTCM, ¶ 77, because infrastructure development had been "more challenging than . . .  originally anticipated," Rio Tinto "did not receive formal approvals[]" for barging, and there had been "a downward revision to estimates of recoverable coking coal volumes" at RTCM, ¶ 78 (quoting Ex. 17).  Plaintiff's pre-motion letter asserted a second partial disclosure in the February 2013 announcement stating that the RTCM impairment would be for "'$2,860 million post-tax,'" ¶ 81. *See* Dkt. #41 at 4.  As a matter of law, neither announcement was a corrective disclosure.

To begin, neither disclosure "reveal[ed] some then-undisclosed fact[s] with regard to the specific misrepresentations alleged." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (disclosure that repeated information already known to the market was not corrective). The adverse developments were either known to investors, *see* Ex. 12, at 67–68 (rejected barging proposal); 2011 AR at 49, 52 (revised resources and reserves figures), or only "recently learned" in November 2012, ¶ 69, and thus could not have been *corrective* of earlier statements.

Regardless, neither announcement suggested that any prior statements relating to RTCM had been false when made. Indeed, the announcements did not disclose *any* alleged fraud or suggest that RTCM should have been impaired at *any* earlier date. As in *AOL*, 503 F. Supp. 2d at 678, there has never been any restatement of Rio Tinto's financial statements. And as in *Take-Two*, 551 F. Supp. 2d at 283–84, the announcements made no mention of RTCM's previous impairment determinations, let alone suggested that RTCM should have been impaired sooner, *see also Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 244–45 (S.D.N.Y. 2006) (holding that "dire" statements that a company "'will need to raise additional funds'" were not corrective of nearly $200 million in overstated assets and equity because "nothing in those statements disclosed that the alleged misrepresentations had been false or misleading").

Moreover, the February 2013 announcement of "'a[n] impairment charge of $2,860 million post-tax'" to RTCM, ¶ 81 (alteration in original), independently must be dismissed because it was entirely duplicative of the January 2013 announcement. Plaintiff's pre-motion letter suggested that "[t]hese details were previously undisclosed." Dkt. #42 at 4. But because the January announcement had already informed the market that the RTCM impairment would be for "'*approximately* US$3 billion,'" ¶ 77 (emphasis added), the subsequent announcement that the impairment would be for US$2.86 billion, specifically, did not "reveal some then-undisclosed

fact with regard to the specific misrepresentations alleged," *Omnicom*, 597 F.3d at 511; *see also*

*In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 495 (D. Conn. 2013) (holding that "plaintiffs

fail[ed] to identify what new fraud-related information was included in [a] press release" an-

nouncing a 10–12 percent earnings decline where defendant had previously disclosed that it "had

significantly underestimated" the negative revenue impact of an internal reorganization).

Plaintiff's allegations fail, in short, because "the Complaint, at best, advances a narrative

in which [Rio Tinto's] stock price dropped on the disappointing news" of a $14 billion impair-

ment—*not* a corrective disclosure of an earlier alleged fraud.  *Nguyen v. New Link Genetics

Corp.*, 297 F. Supp. 3d 472, 500 (S.D.N.Y. 2018); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352,

385 (E.D.N.Y. 2013) ("[L]oss causation is not adequately pled simply by allegations of a drop in

stock price following an announcement of bad news if the news did not disclose the fraud.").  All

Section 10(b) claims must be dismissed, accordingly.

### C.    The Section 20(a) Claims Must Be Dismissed for Failure to Plead a Primary Violation, Culpable Participation, or Control.

Plaintiff's Section 20(a) claim against Mr. Albanese and Mr. Elliott must be dismissed

for failure to plead a primary violation of the securities laws or to plead either individual's culpa-

ble participation in a primary violation.  The Section 20(a) claim against Mr. Elliott must also be

dismissed for failure adequately to allege that Mr. Elliott "controlled" Mr. Albanese.

*First*, the Complaint fails to allege a primary violation because, as explained *supra* I-II.B,

the Section 10(b) claims are untimely and deficient in other respects.  *See*, *e.g.*, *Bear Stearns*,

829 F.3d at 177 ("[B]ecause [plaintiff] fails to state a claim under Section 10(b), . . . its Section

20(a) claim 'must also fail for want of a primary violation.'" (citation omitted)).

*Second*, Plaintiff fails to allege that Mr. Albanese or Mr. Elliott "'was in some meaning-

ful sense a culpable participant in the fraud perpetrated by the controlled person,'" *SEC v. First*

*Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (alterations omitted) (citation omitted),

meaning that "'the controlling person knew or should have known that the primary violator, over

whom that person had control, was engaging in fraudulent conduct,'" *Special Situations Fund III

QP, L.P.* v. *Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 439 (S.D.N.Y. 2014) (cita-

tion omitted).  Here, the Complaint fails to allege either Individual Defendant's culpable partici-

pation for the same reasons it fails adequately to plead their scienter.  *See*, *e.g.*, *In re Inv. Tech.

Grp., Inc. Sec. Litig.*, 2018 WL 1449206, at *7–*8 (S.D.N.Y. Mar. 23, 2018) (finding that inade-

quate allegations of defendant's scienter also inadequately alleged defendant's culpable partici-

pation in a primary violation); *In re ShengdaTech, Inc. Sec. Litig.*, 2014 WL 3928606, at *11

(S.D.N.Y. Aug. 12, 2014) ("Because the Complaint fails to plead even recklessness with the par-

ticularity required by the PSLRA . . . in the § 10(b) context, it also necessarily fails to do the

same in the § 20(a) context.").

   *Third*, the Section 20(a) claim against Mr. Elliott also must be dismissed as to the post-

October 23, 2012 allegations because there are no plausible allegations that Mr. Elliott, Rio

Tinto's former CFO, "controlled" Mr. Albanese, Rio Tinto's former CEO, for purposes of Sec-

tion 20(a), as would be required to assert that Mr. Elliott "controlled" Mr. Albanese's alleged

misstatements at the November 2012 investor conference.  *See In re SunEdison, Inc. Sec. Litig.*,

300 F. Supp. 3d 444, 497 (S.D.N.Y. 2018) (dismissing Section 20(a) claim against a company's

CFO for failing to allege that the CFO "controlled" the company's CEO for purposes of Section

20(a)).

## <u>CONCLUSION</u>

   For the foregoing reasons, the entire Complaint must be dismissed with prejudice.

Dated: New York, New York
September 7, 2018

By:   /s/ Peter J. Romatowski (on consent)[1]    By:   /s/ Mark A. Kirsch
     Kristen A. Lejnieks                              Mark A. Kirsch
     Peter J. Romatowski                             Lawrence J. Zweifach
     JONES DAY                                       Caitlin J. Halligan
     51 Louisiana Avenue, NW                         Jennifer L. Conn
     Washington, DC 20001                            Michael J. Springer
     Tel: (202) 879-7625                             GIBSON, DUNN & CRUTCHER LLP
     Fax: (202) 626 1700                             200 Park Avenue
     kalejnieks@jonesday.com                         New York, New York 10166-0193
     pjromatowski@jonesday.com                       Tel: (212) 351-4000
                                                     Fax: (212) 351-4035
     David R. Woodcock (pro hac vice)                mkirsch@gibsondunn.com
     JONES DAY                                       lzweifach@gibsondunn.com
     2727 North Harwood Street                       challigan@gibsondunn.com
     Dallas, TX 75201                                jconn@gibsondunn.com
     Tel: (214) 969-3681                             mspringer@gibsondunn.com
     Fax: (214) 969-5100
     dwoodcock@jonesday.com                          Richard W. Grime (pro hac vice)
                                                     Kellam M. Conover (pro hac vice)
*Attorneys for Defendant Thomas Albanese*           GIBSON, DUNN & CRUTCHER LLP
                                                     1050 Connecticut Avenue, NW
By:   /s/ Walter G. Ricciardi (on consent)          Washington, D.C. 20036
     Theodore V. Wells, Jr.                          Tel: (202) 955-8500
     Walter G. Ricciardi                             Fax: (202) 530-9652
     Geoffrey R. Chepiga                             rgrime@gibsondunn.com
     Livia Fine                                      kconover@gibsondunn.com
     PAUL, WEISS, RIFKIND, WHARTON
     & GARRISON LLP                                *Attorneys for Defendants Rio Tinto PLC and*
     1285 Avenue of the Americas                   *Rio Tinto Limited*
     New York, NY 10019
     Tel: (212) 373-3000
     Fax: (212) 757-3990
     twells@paulweiss.com
     wricciardi@paulweiss.com
     gchepiga@paulweiss.com
     lfine@paulweiss.com

*Attorneys for Defendant Guy Robert Elliott*

---

   [1]  The parties are using electronic signatures with consent in accordance with Rule 8.5(b) of the
Court's ECF Rules and Instructions.