**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ANTON COLBERT, Individually and on Behalf of All Others Similarly Situated,<br><br>                         Plaintiff,<br><br>       v.<br><br>RIO TINTO PLC, RIO TINTO LIMITED, THOMAS ALBANESE, and GUY ROBERT ELLIOTT,<br><br>                       Defendants. | No. 1:17-cv- 08169<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

**TABLE OF CONTENTS**

**Page**

I.      NATURE AND SUMMARY OF THE ACTION ...............................................................1

II.     JURISDICTION AND VENUE ........................................................................................4

III.    PARTIES .........................................................................................................................5

IV.     BACKGROUND FACTUAL ALLEGATIONS ...............................................................6

       A.    Rio Tinto's Acquisition of Riversdale Mining Ltd. and Basis for Original
           Valuation ...............................................................................................................7

       B.    The Mandatory Governing Financial Reporting Standards for Rio Tinto ..............8

       C.    The Company Learns of Drastic Limitations on its Ability to Transport RTCM
           Coal .......................................................................................................................9

       D.    Significant Reduction of RTCM's Reserves and Resources ................................11

       E.    Business Unit Modeling Indicates That RTCM Has No Economic Value............12

V.      DEFENDANTS FALSELY REPRESENT RTCM'S DIMINISHED VALUE, OMIT
       MATERIAL FACTS ABOUT RTCM, AND FAIL TO CORRECT THESE
       MISLEADING STATEMENTS.......................................................................................12

       A.    Defendants Falsely Represent RTCM's Value in the 2011 Annual Report and
           Omitted Material the Adverse Facts .....................................................................13

       B.    Albanese and Elliott Learn that RTCM had a *Negative* Valuation........................14

       C.    Albanese and Elliott Impeded RTCM's 2012 Half-Year Impairment Review......16

       D.    Defendants' False and Misleading Statement at the Annual Shareholders
           Meeting ................................................................................................................20

       E.    Defendants Falsely Represent RTCM's Value in the August 2012 Semi-Annual
           Report and Bond Offering and Omitted Material Facts........................................21

       F.    Rio Tinto Falsely and Misleadingly Promotes RTCM at the October Investor
           Meeting ................................................................................................................23

VI.     CLASS PERIOD FALSE AND MISLEADING STATEMENTS....................................24

VII.    THE TRUTH BEGINS TO BE REVEALED ................................................................27

       A.    Rio Tinto Begins to Reveal RTCM's Diminished Value and the Facts
           Surrounding The Extent, Nature and Reasons For Impairment...........................27

010716-11 1067191 V1

B.    Subsequent Credit Downgrade, Management Change, Impairments, and RTCM
      Sale.........................................................................................................................31

C.    Regulators Act After Extensive Investigation and Reveal Further Facts ..............32

VIII.   ADDITIONAL SCIENTER ALLEGATIONS.....................................................................33

IX.     LOSS CAUSATION.............................................................................................................35

X.      CLASS ACTION ALLEGATIONS .....................................................................................38

XI.     APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET
        DOCTRINE ..........................................................................................................................39

XII.    NO SAFE HARBOR .............................................................................................................40

XIII.   CAUSES OF ACTION ..........................................................................................................41

COUNT I  VIOLATION OF § 10(B) OF THE EXCHANGE ACT AND RULE 10B-5
        PROMULGATED THEREUNDER (AGAINST ALL DEFENDANTS) ........................41

COUNT II  VIOLATION OF § 20(A) OF THE EXCHANGE ACT (AGAINST ALBANESE
        AND ELLIOTT) ...................................................................................................................42

XIV.    PRAYER FOR RELIEF ........................................................................................................42

XV.     JURY TRIAL DEMANDED..................................................................................................43

010716-11 1067191 V1

Plaintiff, Anton Colbert ("Plaintiff"), by and through his attorneys, alleges the following based upon personal knowledge as to himself, and upon information and belief as to all other matters. This information and belief is based upon the investigation by his attorneys, including a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission (the "SEC"), the allegations of the SEC in a complaint filed in the Southern District of New York on October 17, 2017, and the Final Notice of Financial Penalty (the "Final Notice") imposed on Rio Tinto plc issued by the U.K. Financial Conduct Authority ("FCA") on the same day.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Defendant Rio Tinto plc ("Rio Tinto" or the "Company") securities between October 23, 2012 and March 15, 2013, inclusive (the "Class Period"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

2.    Rio Tinto is incorporated in the United Kingdom ("U.K"), and its American Depositary Receipts ("ADR" or "ADRs") are listed on the New York Stock Exchange ("NYSE"). The Company finds, mines, processes, and markets mineral resources. It has operations in Australia, North America, Asia, Europe, Africa, and South America.

3.    This action concerns a fraud unknown to investors prior to its revelation in a complaint filed by the SEC on October 17, 2017, captioned: _Securities and Exchange Commission v. Rio Tinto Plc, Rio Tinto Limited, Thomas Albanese, and Guy Robert Elliott_, No. 1:17-cv-07994 (S.D.N.Y.), and in formal findings by the FCA in the Final Notice issued the same day. Both the facts plead in the SEC complaint and the facts set forth in the FCA Final

- 1 -

Notice levying a fine on Rio Tinto, which Defendants do not deny, are incorporated by reference as if plead herein.

4.     The SEC's allegations and FCA Final Notice relate to the Company's August, 2011 $3.7 billion acquisition of certain coal "tenements" or licenses to exploit from Riversdale Mining Limited ("Riversdale", later renamed Rio Tinto Coal Mozambique ("RTCM")), in Mozambique. The RTCM assets consisted of three largely undeveloped areas—Benga, Zambese, and Tete East.

5.     Given severe infrastructure constraints in Mozambique, the profitability of Rio Tinto's acquisition of the Mozambican coal business turned on the ability of the Company to transport the coal it mined down the Zambezi River by barge to a port on the Indian Ocean.

6.     Unbeknownst to the Company's investors, by no later than November 2011, Rio Tinto had determined that barging was not a realistic option to transport the coal, leaving the Company with no efficient means to exploit the RTCM acquisition. This immediately and dramatically diminished the value of the RTCM venture.

7.     Defendants did not contemporaneously disclose to investors this material decline in the value of RTCM, or the threat to Rio Tinto's business that these logistical problems represented, as they knew that such a disclosure would call into question management's ability to pursue the core of Rio Tinto's business model—identifying and developing long-term, low-cost, and highly-profitable mining assets. Disclosure of the impairment to RTCM would also hobble the Company's ability to raise capital through billions in bond offerings.

8.     Company executives sought to conceal the impairment of RTCM from Rio Tinto's auditors, preventing the auditors from functioning as an effective check on the Company's accounting.

010716-11 1067191 V1

9.      By May of 2012, RTCM executives advised Rio Tinto's then-CEO Thomas Albanese and CFO Guy Elliott that RTCM's valuation in the most optimistic scenario was *negative* $680 million.  Nevertheless, Rio Tinto continued to carry RTCM on its books at a value of more than $3 billion, and Defendants continued to repeatedly promote RTCM to investors as a key growth opportunity for the Company.

10.      In October and November of 2012, the Company's management repeatedly extolled the RTCM acquisition to investors in seminars and meetings, without disclosing that transportation impediments had effectively foreclosed the profitable exploitation of the tenements.

11.      On November 2, 2012, the Company filed with the SEC a Form 6-K attaching a report which asserted that production at the Benga mine was "ramp[ing] up", and that work was progressing to expand the capacity of the railway line—again without disclosing that the barging system that the RTCM valuation had relied upon was no longer an option.

12.      In fact, it was not until January 15, 2013, more than a year after Rio Tinto's management became aware of the impracticability of the barging option, that the Company even began to disclose that the RTCM acquisition would be written down by billions of dollars. On this date the Company issued a short press release stating that the inability to barge the coal and other logistical constraints—issues that the Company had known since late 2011—required the write down.

13.      Nevertheless, in a registration statement for a February 5, 2013 offering of $3 billion in bonds, the Company still incorporated by reference information from the Company's Annual Report for the year ending December 31, 2011—a report listing the Riverdale property at an unimpaired value of approximately $3.6 billion.

- 3 -

14.     Essential details regarding the scope and nature of the impairment to Company's business and prospects were not provided until February 20, 2013, when the Company announced certain unaudited details of the impairments.  Pre-tax impairments relating to RTCM were $3.269 billion, or almost 9% more than the figure suggested in the press release. In response, during the next two trading days, the price of Rio Tinto ADRs fell $2.51, or about 4.3%, to close at $55.26 on February 20, 2013.  This sharp reaction occurred despite that fact that *on that same day* the Company abruptly announced a well-timed "surprise" 15% increase in its full-year dividend.

15.     It was not until March 15, 2013 when the full impact of the impairment was disclosed to investors with the filing of the Company's audited financial statements for its fiscal year ended December 31, 2012.  Among other things, the audited financial statements offered the following breakdown of the $3.269 RTCM-related impairment:

> [t]he annual impairment review of Rio Tinto Coal Mozambique resulted in an impairment of US $541 million to goodwill. The review also resulted in a US$1,581 million pre-tax impairment to exploration and evaluation assets held within intangible assets and a US$1,147 million post-tax impairment of investments in equity accounted units.

This news drove the price of Rio Tinto ADRs down $3.30, or about 6.6%, to close at $46.50 on March 19, 2013.

16.     Defendants' wrongful conduct has inflicted significant damages on Rio Tinto investors.

## II.     JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

010716-11 1067191 V1

18.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  A substantial part of the conduct complained of herein, and the subsequent damages, occurred in this Judicial District, and the Company's ADRs are traded on the NYSE, which is located in this Judicial District.  Moreover, Rio Tinto transacts business in this district through Rio Tinto Finance (USA) Limited, a wholly owned subsidiary of Rio Tinto Limited, and Rio Tinto Finance (USA) plc, an indirect wholly owned subsidiary of Rio Tinto plc.

19.     In connection with the acts, conduct, and other wrongs alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mails, interstate telephone communications, and the facilities of the national securities markets.

### III.    PARTIES

20.     Rio Tinto plc is a NYSE-listed company with a sponsored ADR facility, the underlying shares of which are registered with the SEC and listed on the NYSE.  During the relevant period, Rio Tinto plc filed Annual Reports with the SEC on Form 20-F, and furnished other reports to the SEC on Form 6-K.  These submissions were filed with SEC headquarters via the SEC's internet-based EDGAR system, as required of all foreign issuers during the relevant period and were publicly available to United States investors through the SEC's website, https://www.sec.gov.  Rio Tinto plc also regularly held earnings calls, which were attended by United States-based analysts.

21.     Rio Tinto Limited is an entity listed on the Australian Securities Exchange, that like Rio Tinto plc, filed annual reports with the SEC on Form 20-F, and other reports to the SEC on Form 6-K.

010716-11 1067191 V1

22.     Collectively, Rio Tinto plc and Rio Tinto Limited comprise an international mining group that is headquartered in the United Kingdom and that does business as "Rio Tinto Group." Rio Tinto Group is listed in the London Stock Exchange.

23.     Thomas Albanese was the Chief Executive Officer of Rio Tinto from May 2007 until January 2013, when he was forced out in the wake of Rio Tinto's announced impairments. Albanese is a citizen of the United States.

24.     Guy Robert Elliott was the Chief Financial Officer of Rio Tinto plc and Rio Tinto Limited from 2002 to April 18, 2013. From 1996 to 1999, he served as President of Rio Tinto Brazil, having joined Rio Tinto's predecessor company in 1980. He retired from Rio Tinto at the end of 2013. Elliott is a citizen of the United Kingdom.

## IV.     BACKGROUND FACTUAL ALLEGATIONS

25.     Even before the acquisition of RTCM, the ability of the Company's executive management to find and exploit new resources was already under a cloud.

26.     In July 2007, Rio Tinto acquired Alcan, Inc. ("Alcan"), an aluminum processing company, for approximately $38 billion. Alcan was Albanese's first major acquisition as CEO of Rio Tinto. Less than two years after the acquisition, in February 2009, Rio Tinto announced a $7.9 billion impairment charge to Alcan's carrying value. Rio Tinto announced a second impairment to Alcan in 2010 and a third impairment of Alcan in February 2012. The fourth and final impairment of Alcan was announced with the RTCM impairment—and Albanese's departure as CEO—in a January 17, 2013 press release. Collectively, these impairments wrote off substantially all of Alcan's acquisition value, increasing investor and analyst scrutiny of the judgment of the Company's management regarding acquisition of new mining opportunities.

27.     Both Albanese and Elliott were familiar with the impairment process based on, among other things, their experience with Alcan. Elliott oversaw the impairment review process

- 6 -

that led to the first Alcan impairment, and he explained the impairment to the market.  Further, as Rio Tinto's CFO in February 2012, Elliott oversaw the impairment review process, which culminated in Rio Tinto's recognition of the third, $8.9 billion Alcan impairment.  Albanese and Elliott signed Rio Tinto's 2011 Annual Report filed with the SEC on March 15, 2012 in Form 20-F.

## A.  Rio Tinto's Acquisition of Riversdale Mining Ltd. and Basis for Original Valuation

28.   As reflected in papers presented to the Company's Investment Committee during the acquisition process, Rio Tinto had estimated that Riversdale's coal mining "tenement" or exploration license for the RTCM land was worth approximately $3.4 billion based on assumptions that it had production potential of approximately 30 million tons of coal per year by 2020 and 45 million tons per year by 2030, of which 60 percent was expected to be valuable "hard coking" coal used in steel production.

29.   In August 2010, during the due diligence period prior to the acquisition, Rio Tinto's Technical Evaluation Group ("TEG") told the Company's Investment Committee, which included Albanese and Elliott as members, that the project's value turned on the assumption that the majority of the mined coal could be cheaply barged down the Zambezi river, and warned that the

> assumption that the majority of product will be barged downstream . . . is only a concept at this stage and a number of potentially 'showstopping' unknowns exist (such as the ability to dredge and maintain an open channel over the river mouth bar, the impact of cyclones/ flooding on river navigability and the ability to obtain environmental approvals).

30.   It was the Company's assumption that the balance of the coal could be transported by rail using existing infrastructure in Mozambique.

- 7 -

31.     The Investment Committee considered the Riversdale acquisition again at a November 18, 2010 meeting.  In advance of the meeting, TEG submitted a paper observing that expanding Riversdale's coal production would be largely reliant on barging and that "significant uncertainties remain over its practical operation, permitting, feasibility and cost."

32.     Rio Tinto submitted its proposal for the acquisition of Riversdale on December 20, 2010 and successfully acquired a majority interest on April 8, 2011.  Rio Tinto completed the acquisition in August 2011, paying approximately $3.7 billion (net of cash acquired at acquisition).  The purchase price represented a substantial premium to Riversdale's market capitalization at the time the acquisition was proposed.

**B.      The Mandatory Governing Financial Reporting Standards for Rio Tinto**

33.     Rio Tinto plc and Rio Tinto Limited are subject to the reporting requirements of the Exchange Act applicable to foreign private issuers.  Rio Tinto's financial statements are presented by both Rio Tinto plc and Rio Tinto Limited as consolidated accounts.  During the time period relevant to the allegations herein, Rio Tinto was required to comply with the standards issued by the International Accounting Standards Board in preparing and filing annual and interim financial reports with the SEC.  These standards are referred to as either IAS or IFRS.

34.     The requirements for impairments are governed by International Accounting Standards Rule ("ISA") 36, the objective of which is to ensure that assets are carried at no more than the recoverable amount and, if they are not, that an impairment loss is recognized.  IAS 36 requires that an assessment is made at the end of each reporting period, including, at the time of interim financial statements, of whether there is any indication that an asset may be impaired.  If there is such an indicator, IAS 36 requires an estimation of the recoverable amount to be made ("an impairment test").  IAS 36 includes a non-exhaustive list of indicators that an asset may be

impaired that should be considered "as a minimum," including a variety of both internal and external factors. Pursuant to IAS 36 issued by the International Accounting Standards Board, Rio Tinto was required to recognize in its financial statements any significant impairment of the value of RCTM.

35.    IAS 34 prescribes the minimum content of an interim financial report and the principles for recognition and measurement in complete or condensed financial statements for an interim period. It requires the inclusion of significant events which include recognition of a loss from the impairment of assets. ISA 34 required Rio Tinto to conduct an impairment test of RTCM and record any material impairment in accordance with IAS 36.

## C.    The Company Learns of Drastic Limitations on its Ability to Transport RTCM Coal

36.    By October 2011, the Vice President of Rio Tinto Energy Product Group ("RTE"), the group responsible for the Company's Coal mining business that reported to defendant Albanese, had determined internally that, based on the best information available, barging capacity was limited to 10 million tons per year—not the 30 million tons per year assumed in the acquisition valuation—due to the hydrogeological properties of the Zambezi River and to ecological constraints impeding the construction of a port at the mouth of the river, the site of an internationally-designated wetland. Moreover, the immutable physical constraints on the river meant that even limited barging was significantly more expensive than had been assumed previously. Accordingly, as a result of this determination Rio Tinto knew by the fall of 2011 that a central pillar of its valuation assumption for the RCTM project was faulty, vastly diminishing the value of the tenement.

- 9 -

37.     Consistent with this knowledge, as part of the routine annual planning process in 2011, RTCM internally generated an updated valuation that reduced the value of RTCM by approximately $2.1 billion as a result of the loss of barging capacity.

38.     At the time, RTE'S CEO advised an RTCM employee that the value differential between RTCM's purchase price and the new valuation was "causing some consternation." The RTCM employee responded that the aggressive assumptions about coal chain and capacity that were made in the acquisition model were no longer viable.  The RTCM employee further noted that Albanese had "quickly identified the impact of changes in the coal chain assumptions."

39.     Even greater impediments to barging quickly emerged.  Rio Tinto needed government approval to be able to barge any coal down the Zambezi River.  As the SEC also revealed, in late November 2011, officials from the Government of Mozambique notified RTCM that its barging proposal would be rejected, and formally rejected it some time in December 2011, citing 36 separate grounds for its decision.

40.     In a letter signed by eight government ministries, the Government summarized its position, stating:

> The Zambezi River is part of a series of environmentally sensitive areas and protected by international conventions and holds the largest biodiversity in the country . . . .  [T]his project will bring significant negative impacts to the [environment] and to the population living along the Zambezi . . . and therefore we suggest the assessment of other available alternatives [*e.g.*, rail] . . . at the detriment of this current proposal.

41.     Rio Tinto management expressed dismay at this decision to RTCM because barging "was critical to cost effective and near term volume/value unlocking."

42.     The SEC asserts, based on its own investigation, that Albanese and Elliott learned of the rejection in December 2011 and January 2012, respectively.  Rio Tinto never formally

- 10 -

submitted a revised or updated barging proposal, and by April 2012, it had been warned by the Government of Mozambique that, if it persisted in raising the subject of barging, it risked losing its mining licenses altogether. Indeed, as the FCA concluded in its Final Report, by April of 2012 the bid model that had been developed for the acquisition of Riverdale had been "killed dead."

43.    Accordingly, within eight months of the acquisition, Defendants knew that the lowest-cost transportation method that they had relied upon in valuing RTCM was not available, and that the Company had not identified a viable alternative means of transportation that could support the volume assumed at acquisition. However, they did not disclose these issues to the public, and at no time prior to January of 2013 did they correct any of the misleading statements that they had made regarding the tenements.

**D.    Significant Reduction of RTCM's Reserves and Resources**

44.    RTCM's valuation was dependent both on the amount of coal reserves and resources and the ability to mine that coal and transport it to market in a cost-effective manner. In addition to mounting transportation problems, RTCM realized that its previous reserve and resource estimates were inaccurate.

45.    By January 2012, as RTCM evaluated the potential resources post-acquisition, it determined that they would in fact have to be written down by closer to 80 percent, to less than three billion tons—a substantially greater write-down than had been anticipated at the time of acquisition, which in turn called into question the estimates for marketable coal used in RTCM's valuation modeling. Thus, RTCM had roughly half the amount of coal—down from approximately seven billion tons to less than three billion tons—that it had assumed at acquisition.

- 11 -

46.    Albanese and Elliott learned and understood the significance of the reserves and resources write-down.  In January 2012, according to the SEC, Elliott forwarded a report on RTCM's reserves and resource estimates to Albanese, stating that they were "[w]orse by far than expected," and in a follow-up e-mail, Elliott informed Albanese that "the market won't see" what Rio Tinto assumed for the acquisition.  In other words, since "the market" did not know what Rio Tinto had assumed about Riversdale's reserves and resources estimates at the time of acquisition (approximately seven billion tons), investors would not know that Rio Tinto's 80 percent write-down to approximately three billion tons was far worse than the company had expected when it acquired Riversdale.

E.    **Business Unit Modeling Indicates That RTCM Has No Economic Value**

47.    Between late 2011 and early 2012, RTCM created a ground-up valuation model that, when completed, generated valuations ranging from approximately *negativ*e $3.45 billion to approximately *negative* $9 billion based on RTCM's improved understanding of available coal transportation options and declining estimates related to coal quality and quantity.

48.    Even those negative valuations rested on aggressive assumptions, including the prospect that a largely-untested coal tenement called "Minjova" would contribute hundreds of millions of tons of coal production to the overall project—but Minjova had no declared reserves or resources and was not originally included in the Riversdale acquisition.  The valuations also assumed that Rio Tinto would sell millions of tons of excess rail capacity on a rail line RTCM had neither sought nor received governmental permission to build much less fund or construct.

V.    **DEFENDANTS FALSELY REPRESENT RTCM'S DIMINISHED VALUE, OMIT MATERIAL FACTS ABOUT RTCM, AND FAIL TO CORRECT THESE MISLEADING STATEMENTS**

49.    Even though the Government of Mozambique's rejection of Rio Tinto's barging proposal materially impacted the economic viability of RTCM, Rio Tinto did not publicly

- 12 -

010716-11 1067191 V1

disclose the rejection or its effect on RTCM's valuation before January of 2013.  Moreover, Defendants concealed the nature and effect of these materially adverse developments from Rio Tinto's independent auditors.  Consequently, in connection with their audit of Rio Tinto's financial statements for fiscal year 2011, Rio Tinto's independent auditors did not know of these adverse developments and relied instead on Rio Tinto's assurances that nothing significant had changed since the company's acquisition of Riversdale.  By concealing the true nature and effect of these adverse developments, and by failing to correct previously-issued false statements, Defendants made a series of misrepresentations and omissions throughout the Class Period.

A.    **Defendants Falsely Represent RTCM's Value in the 2011 Annual Report and Omitted Material the Adverse Facts**

50.    On March 15, 2012, Defendants filed the Rio Tinto 2011 Annual Report ("2011 Annual Report") with the SEC on Form 20-F.  The 2011 Annual Report contained Rio Tinto's 2011 financial statements and included a "Directors' declaration," in which Albanese and Elliott each "confirmed" that the financial statements "give a true and fair view of the assets, liabilities, financial position and profit" of Rio Tinto and have been prepared in accordance with applicable accounting standards.  Albanese and Elliott also "confirmed" that "there is no relevant audit information of which [Rio Tinto] Group's auditors are unaware" and that each of them has taken all the steps necessary "to establish that [Rio Tinto] Group's auditors are aware" of any relevant audit information, when in fact that had sought to conceal information relating to the impairment from the Company's auditors.

51.    The 2011 Annual Report was false when made and contained material omissions.  Therefore, Defendants had a duty to correct it and disclose the adverse facts, which duty continued throughout the Class Period.  The 2011 Annual Report, Defendants declared, in the attached financial statements, that the value of RTCM was the amount it paid to acquire

- 13 -

Riversdale, *i.e*., approximately $3.7 billion dollars.  This valuation was false when made.  It also concealed that Rio Tinto did not test RTCM for impairment.  It concealed the presence of several impairment indicators, discussed above.  It concealed the government elimination of the option to barge ore down the Zambezi which had erased most of the value of the tenements.  And it violated the obligations to test for and impair the value of the RTCM tenements IAS 34 and 36.

52.     The March Form 20-F 2011 Annual Report filed with the SEC, along with the false financial report was also filed in connection with the March 2012 issuance by Rio Tinto of four bonds totaling two $2.5 billion through Rio Tinto Finance (USA) plc:  a $500 million 1.125% bond due 2015, a $500 million 2.0% bond due 2017, a $1 billion 3.5% bond due 2022, and a $500 million 4.75% bond due 2042.  The bonds were listed on the NYSE and were fully and unconditionally guaranteed by Rio Tinto plc and Rio Tinto Limited.

53.     The March 15, 2012 Form 20-F, was in turn incorporated into a February 5, 2013 registration statement issued during the Class Period by the Company in connection with the issuance of an additional $3 billion in bonds.

**B.     Albanese and Elliott Learn that RTCM had a *Negative* Valuation**

54.     During mid-April 2012, Elliott requested an all-hands meeting with Albanese and RTCM representatives to review RTCM's status (the "Brisbane Meeting").  According to the SEC, this meeting was convened on May 11, 2012, and included a presentation by the director of RTCM.  In an e-mail, Elliott specifically asked the CEO of RTE to provide an "NPV," i.e., a "net present value," for RTCM at that meeting.  An NPV or net present value represents an approach to assessing the value of an asset using a discounted cash flow analysis.  Under a discounted cash flow, the forecasted cash flows of an asset are discounted back to the valuation date.  The NPV calculation is the output of a discounted cash flow valuation.

- 14 -

55.     Elliott did not invite the Controller to the Brisbane Meeting, which meant that Defendants could discuss RTCM's valuation outside the presence of the Rio Tinto employee who had day-to-day oversight of the impairment process.

56.     The SEC revealed, consistent with the findings in the FCA Final Report, that during this meeting management provided Albanese and Elliott with the following information:

- Based on the best information available and under the best potential configuration, RTCM was worth negative $680 million;

- There were formidable physical challenges associated with barging, the Government of Mozambique rejected barging, and the loss of early barging tons resulted in a huge value loss for the business;

- There was a significant negative impact on value stemming from issues related to the coal quality, e.g., a less-favorable split between hard coking and thermal coal;

- There was a negative impact on valuation stemming from increased costs of $20 to $40 per ton, due to the loss of low-cost barging;

- Even RTCM's negative valuation assumed production from Minjova, which was neither part of the Riversdale acquisition nor a component of the RTCM CGU;

- The transportation options considered at the time of the RTCM acquisition were no longer realistic; and

- The only way to deliver the necessary capacity at a competitive cost was to build a new ("greenfield") rail line at a cost of $16 billion—and that even then, the project did not have a positive valuation.

57.     Furthermore, again according to the SEC, Albanese specifically rejected a proposal for Rio Tinto to construct a new, $16 billion ("greenfield") rail line by itself in light of capital constraints.  Instead, Albanese instructed RTCM managers to seek out partners to construct or bring online an existing small rail operation.  However, existing rail infrastructure could not transport the amount of coal underpinning Rio Tinto's estimates and thus could not support RTCM's carrying value of over $3 billion.

- 15 -

**C.     Albanese and Elliott Impeded RTCM's 2012 Half-Year Impairment Review**

58.     As the CEO and CFO of Rio Tinto, Albanese and Elliott were ultimately responsible for the integrity of the financial reporting process, including the impairment review process.  Rio Tinto's impairment process for its interim or half-year financial reports started a few weeks after the Brisbane Meeting, but Albanese and Elliott kept key facts that they had learned at the Brisbane Meeting from the Controller's office and Rio Tinto's independent auditors.  Their decision to cabin or conceal negative information about RTCM corrupted the integrity of the half-year reporting process.

59.     The first phase of the impairment review process culminated with a June 18, 2012 Audit Committee meeting attended by Albanese, Elliott, and Rio Tinto's independent auditors.  At the meeting, the Audit Committee reviewed a paper submitted by Rio Tinto's Controller that addressed the RTCM purchase price allocation (i.e. the process that determined how RTCM would be carried on Rio Tinto's books and records) and the consideration of potential impairment indicators (the "First Controller's Paper").

60.     The First Controller's Paper, which Elliott reviewed prior to its submission to the Audit Committee, contained a series of material misrepresentations and omissions concerning RTCM.  Specifically, it claimed that "[a] number of options are available" for increasing export capacity "including securing incremental capacity on the existing rail lines, greenfield rail and port development . . . and revised partial barging options."  These assertions were materially misleading because—as Defendants well knew—one of the purported "options" (barging) was not available, Albanese had rejected another (greenfield rail and port), and the third (securing incremental rail capacity) could only support a small fraction of the production volumes assumed at acquisition.

- 16 -

61.     The First Controller's Paper also asserted that "it is not expected that any impairment will need to be recorded as it is too early to assess the impact of the developments on the fair value of the [RTCM]."  This assertion was materially misleading because—again, as Defendants knew—the impact of the post-acquisition developments had already been assessed by RTCM and resulted in a negative valuation based on the best information available.

62.     The First Controller's Paper also stated that the significantly lower coal reserves and resources were "anticipated in the due diligence."  This assertion was materially misleading because the write-down was in fact significantly greater than what had been anticipated in due diligence.  The First Controller's Paper claimed that the auditing firm that performed the initial RTCM valuation for the purchase price allocation advised Rio Tinto that the change in reserves and resources would not change their valuation.  This assertion was materially misleading, however, because this advice was contingent on confirmation from Rio Tinto's technical experts that it was appropriate to assume that RTCM could convert nearly 70 percent of resource into marketable coal instead of the roughly 17 percent assumed at acquisition.  Even though Rio Tinto's technical experts had made no such determination, the First Controller's Paper asserted that the initial valuation firm had reviewed their model and indicated that the change in reserves and resources "alone would not change their [purchase price allocation]."

63.     Neither Elliot nor Albanese corrected the materially misleading statements in the First Controller's Paper when it was presented to the Audit Committee and Rio Tinto's independent auditors at the June 18, 2012 Audit Committee meeting.  Nor did they take any steps to inform the Audit Committee or Rio Tinto's independent auditors of the significant adverse developments that they discussed at the Brisbane Meeting.

- 17 -

64.     Because Albanese and Elliott concealed the crucial information presented to them at the Brisbane Meeting, the same types of material misstatements and omissions that were in the First Controller's Paper were reiterated in a paper that Rio Tinto subsequently submitted to its independent auditors in connection with the half-year impairment review related to RTCM (the "Impairment Paper").

65.     Like the First Controller's Paper, the Impairment Paper failed to identify an impairment indicator, concluding that Rio Tinto was "confident of finding a viable infrastructure path [and that] the breadth of options mean[s] that a central case view is still under development . . . . " However, the Impairment Paper went one step further and claimed with no reasonable basis in fact that "a potential value of $5.1 billion" gave an "indication of value" for RTCM, and that on top of the $5.1 billion, there was an additional "$1 billion of value designated as possible upside."

66.     The Impairment Paper also contained misleading statements about the initial valuation firm's "advice" that the revised resource and reserve numbers would not impact the acquisition valuation.  The Impairment Paper did not disclose that this "advice" was contingent on Rio Tinto's reserve engineers confirming than 70 percent of the Zambezi resources would be converted to marketable product, as opposed to the 17 percent assumed at acquisition—a confirmation that Rio Tinto's engineers had not provided.  In fact, Rio Tinto's reserve engineers were never consulted regarding this assumption.

67.     Finally, the Impairment Paper concluded that it was not yet possible to determine whether the available options had an adverse impact on RTCM's value since "the options available have not been quantified with any degree of accuracy yet."  This was not true.  The options had been quantified through extensive modelling performed by RTCM, and the

- 18 -

010716-11 1067191 V1

models revealed that, under the best information and configuration, RTCM had a negative value. Moreover, the options that were available could only transport about five percent of the volume underpinning Rio Tinto's valuation which meant that it was virtually impossible that RTCM was still worth more than $3 billion.

68. A Controller's paper (the "Second Controller's Paper") presented to the Audit Committee and independent auditors in connection with the July 30, 2012 Audit Committee meeting—the last meeting prior to the publication of Rio Tinto's half-year 2012 financials— concluded that Rio Tinto "[did] not believe there [was] an impairment indicator" with respect to RTCM, and that "whilst [Rio Tinto was] confident of finding a viable infrastructure path the breadth of the options mean that a central case view is still under development." The Second Controller's Paper contained the independent auditor's concurrence with the conclusion that there were no impairment indicators.

69. Albanese and Elliott attended the July 30, 2012 Audit Committee meeting and therefore reviewed or should have reviewed the Second Controller's Paper. Albanese and Elliott knew, were reckless in not knowing, or should have known that the independent auditors had based their concurring opinion on incomplete and misleading information.

70. Albanese and Elliott knew that a claimed "breadth of [infrastructure] options" was not the barrier to developing a "central case view" for RTCM. To the contrary, Albanese and Elliott knew that due to a lack of infrastructure options, RTCM had little or no commercial value.

71. In fact, the adverse developments known to Albanese and Elliott—including the loss of barging, dramatically reduced rail capacity, declining coal quality, delays, and the negative valuation—qualified as impairment indicators, as they represented, pursuant to relevant accounting standards:

- 19 -

- Significant changes that are likely to have an adverse effect in the technological, legal or economic environments in which the entity operates, or in the market to which an asset is dedicated;

- Significant changes to the extent or manner of use of the asset that are likely to have an adverse effect on its recoverable value, including restructuring or discontinuation of use;

- Indications that the economic performance of an asset is, or will be, significantly worse than expected; and

- Any other change that is likely to have a material impact on the value of the CGU.

72.    Neither the Audit Committee nor the independent auditors recognized these impairment indicators because they were relying on the First and Second Controller's Papers. Albanese and Elliott reviewed the Controller's Papers and knew facts that rendered them materially false and misleading.  Albanese and Elliott attended Audit Committee meetings where the First and Second Controller's Papers were reviewed and discussed with Rio Tinto's independent auditors.  At those meetings, neither Albanese nor Elliott took any steps to communicate the extent and scope of the adverse developments that would impact RTCM's valuation to the Audit Committee or the independent auditors.  Instead, they allowed the Audit Committee and the independent auditors to base their decisions regarding impairment on the misleading information in the Controller's Papers.

**D.      Defendants' False and Misleading Statement at the Annual Shareholders Meeting**

73.    On April 19, 2012, Rio Tinto held its annual shareholders meeting in London. During the meeting, Albanese told shareholders that Rio Tinto was growing its coal business, with a target of starting shipments from the newly-acquired hard coking coal assets in Mozambique in the first half of 2012.

74.    Neither Rio Tinto nor Albanese disclosed that the government had rejected RTCM's barging proposal, that RTCM had available to it just a small fraction of the transport

- 20 -

infrastructure assumed at acquisition, that Rio Tinto significantly reduced the quantity of RTCM's coal reserves and resources, or that the coal quality and mix between hard coking and thermal coal was not as favorable as initially assumed.

75.    Because of these omissions, Rio Tinto's and Albanese's statements to shareholders gave the misleading impression that RTCM remained on track and concealed from shareholders the fact that Rio Tinto was in fact on the cusp of another multi-billion dollar impairment under Albanese's leadership.

**E.    Defendants Falsely Represent RTCM's Value in the August 2012 Semi-Annual Report and Bond Offering and Omitted Material Facts**

76.    On August 9, 2012, Rio Tinto filed its interim financial report for half-year 2012 as an exhibit to a Form 6-K filed with the SEC on August 9, 2012.  The interim financial report recorded a valuation of more than $3 billion for RTCM and reported net earnings for Rio Tinto for the period of approximately $5.8 billion.  The RTCM valuation reflected in the interim financial report was materially misleading and resulted in a material overstatement of Rio Tinto's net earnings and assets.  Had Rio Tinto properly impaired RTCM, Rio Tinto's net earnings would have been reduced by more than 50 percent at the half-year 2012.

77.    In addition, in the Form 6-K filed with the SEC on August 9, 2012, which included a press release about RTCM's first shipment of hard coking coal, Rio Tinto failed to disclose the material information known by Albanese and Elliott concerning RTCM's significantly reduced valuation or the significant challenges RTCM faced.

78.    During Rio Tinto's August 8, 2012 North American presentation of its half-year results, which included a question and answer session with Albanese, Albanese materially misrepresented that Rio Tinto was looking at a "greenfield" rail development in Mozambique, and that Benga, Zambezi and the regional area in the Moatize Basin was "more prospective" than

- 21 -

he would have said a year earlier.  In a similar exchange with analysts that same day—August 8, 2012—Albanese materially misrepresented to investors that the work RTCM had been doing over the past 12 months indicated that the company probably had even "more potential in total as [it went] forward," and that the Moatize was truly a world-class basin coal deposit.  Elliott participated in the August 8, 2012 session with analysts and he did not correct Albanese's material misrepresentations regarding RTCM thereby concealing from analysts the true valuation of RTCM and the existence of impairment indicators.

79.    At the time of these statements, Albanese and Elliott knew, were reckless in not knowing, or should have known that the only way to deliver the necessary capacity at a competitive cost was to build a new rail line at a cost of approximately $16 billion, a plan Albanese *had already rejected* at the end of the Brisbane Meeting.  They also knew, were reckless in not knowing, or should have known that the best information available indicated that RTCM was worth negative $680 million and that there was a less-favorable split between hard coking and thermal coal than Rio Tinto assumed at acquisition.  These facts completely contradict Albanese's statement that the Moatize Basin represented an opportunity for Rio Tinto to have a "tier one," world-class coking coal operation.

80.    Days after filing its false and misleading interim financial reports for half-year 2012, Rio Tinto issued three bonds through Rio Tinto Finance (USA) plc listed on the NYSE, raising billions of dollars:  a $1.25 billion, 1.625% bond due 2017; a $1 billion, 2.875% bond due 2022; and a $750 million, 4.125% bond due 2042.  The bonds were fully and unconditionally guaranteed by Rio Tinto plc and Rio Tinto Limited.

81.    Prior to the offering, Rio Tinto met with a credit rating agency and reiterated its commitment to investing in and operating "large, long-term, cost competitive mines and assets,"

- 22 -

and highlighted the Riversdale acquisition. Rio Tinto's offering documents for its August 2012 NYSE bond offering incorporated by reference the material misrepresentations and omissions in Rio Tinto's 2011 Annual Report, which was incorporated in Rio Tinto's Form 20-F filed with the SEC on or about March 15, 2012, and in Rio Tinto's half-year 2012 interim report. Albanese and Elliott signed the misleading 2011 Annual Report incorporated by reference and used to raise money in the August 2012 bond offerings.

82.     Rio Tinto's offering documents reported "group operating profits," which are defined as including the effect of any impairments, of $6.6 billion for half-year 2012 and $13 billion for year-end 2011. Due to Rio Tinto's failure to impair RTCM, those operating profits were materially overstated.

83.     Rio Tinto's offering documents for its August 2012 NYSE bond offerings omitted any information concerning rejection by the government of Mozambique of RTCM's barging proposal, that Rio Tinto significantly reduced the value of RTCM's coal reserves and resources, or that the best available models showed RTCM to have a negative value.

84.     The August 2012 Semi-Annual Report and Bond Offering statements identified above, were false when made, creating a duty for Defendants to correct them.

**F.     Rio Tinto Falsely and Misleadingly Promotes RTCM at the October Investor Meeting**

85.     Between August and the beginning of the Class Period, Defendants continued to tout RTCM to the market, further concealing that this acquisition under their leadership was nearly or actually worthless. During the October 9, 2012 New York/London investor seminar, the Defendants described Rio Tinto's acquisition of Riversdale as a "significant acquisition" and the purchase of a highly prospective, "tier one" coking coal resource with first production in mid-2012 and the objective of 25 million tons of coal production per year by 2020:

- 23 -



86.     This statement was false when made, and omitted material information as identified above, giving rise to a duty to correct.  In addition, the RTCM was now a liability and not a significant acquisition in the positive sense.

## VI.     CLASS PERIOD FALSE AND MISLEADING STATEMENTS

87.     During the Class Period Defendants had a duty to correct the pre-Class Period false and misleading statements identified above, which are incorporated by reference here. Defendants did not correct these statements during the Class Period, but instead continued their deception of investors with a new series of material misrepresentations and omissions.

88.     On November 2, 2012, the Company filed with the SEC its operational results for the third quarter of 2012 as an exhibit to a Form 6-K.  In its review the Company asserted that "[d]uring the quarter, production at the Benga mine in the Moatize Basin in Mozambique continued to ramp up" and that "[w]ork is progressing to expand capacity on the Sena railway line, which remains the system bottleneck."  The Company did not disclose to investors that the barging it had relied upon in its valuation estimate for the project was no longer a possibility;

- 24 -

010716-11 1067191 V1

that the value of its RTCM tenements had been dramatically impaired as a result; that the only way to deliver the necessary capacity at a competitive cost was to build a new rail line at for approximately $16 billion, a plan Albanese rejected at the end of the Brisbane Meeting; and that the best information available indicated that RTCM was worth negative $680.

89.    On November 6-8, 2012, Defendants made a presentation to the Metal Bulletin African Iron Ore Conference—seven months after the value basis of the RCTM opportunity had been "killed dead".  At the Conference Rio Tinto still identified the RTCM tenements as part of its growth in Africa:



90.    Similarly, during a November 2012 investor conference, Albanese was asked if "barging coal down the Zambezi River" was still on "the agenda" to which he responded that the company would need to look at all the transportation options:

- 25 -

QUESTION: It just might be it's a question about one of those assets that might be phased through time and Mozambique coking coal. You give us a sense in obviously the small-scale operations starting up and it is going to be some years before you do the big infrastructure thing. In the past, certainly in Riversdale and then subsequently, you have talked about barging coal down the Zambezi River. Is that still on the agenda or has that been given up on?

TOM ALBANESE: I think that what we would need to look at would be all the transportation options, but realistically continued upgrades of the Beira line and then looking at a transportation corridor of probably the highest probability, a sort of pathway for expansions, but again I think we need to keep in mind that any of the options should always be looked at, at different times. Thank you.

91. According to the SEC, during the same investor seminar, Albanese discussed the long-term optionality in RTCM's portfolio, referencing both the first shipment of coal from Mozambique and describing the Moatize Basin as a long-term opportunity with the potential to grow beyond 25 million tons of coal per year.

92. As late as February 5, 2013, the Company was referring investors to the original, unimpaired valuation of RTCM in its SEC filings. On that date, the Company filed a Form 8-A to register an issuance of $3 billion in notes pursuant to an amended prospectus filed March 16, 2012.[1] This prospectus, in turn, explicitly incorporated by reference the Company's false and misleading 2011 Annual Report. This March 16, 2012 Indenture explicitly incorporated by reference the Company's false and misleading 2011 Annual Statement.

---

[1] Rio Tinto, Registration Statement (Form 8-A) (Feb. 5, 2013), https://www.sec.gov/Archives/edgar/data/863064/000119312513037594/ d478546d8a12b.htm; Rio Tinto, Post-Effective Amendment No. 1 to Form F-3 (POSASR) (Mar. 16, 2012) https://www.sec.gov/Archives/edgar/data/863064/000119312512119561/d315364dposasr.htm.

## VII.    THE TRUTH BEGINS TO BE REVEALED

**A.    Rio Tinto Begins to Reveal RTCM's Diminished Value and the Facts Surrounding The Extent, Nature and Reasons For Impairment**

93.    According to the SEC, the executive in charge of Rio Tinto Technology & Innovation Group ("T&I") expected Elliott to share information about RTCM's valuation challenges with the Audit Committee in November 2012.  He expected that high level executives would call him to discuss the valuation challenges after the November 26, 2012 Audit Committee meeting but no one did.  As a result, the week after the meeting, the executive in charge of T&I advised Albanese that RTCM had a negative valuation.  Albanese requested verification of the information, and, upon the project's completion in the third week of December 2012, the information was confirmed as correct.

94.    Furthermore, according to the SEC, around the same time the T&I executive became increasingly concerned about the extent to which the Board of Directors had been informed of RTCM's negative valuation.  As a result, he bypassed Albanese and Elliot and spoke directly with the Chairman of Rio Tinto's Board about RTCM's negative valuation.

95.    The SEC alleges the Chairman requested an investigation in December 2012 and at a January 15, 2013 Board meeting the value of RTCM was revised downward to $611 million. This constituted a write-down of more than 80 percent of RTCM's value within two years of acquisition.  Moreover, at the time, there was considerable discussion with Rio Tinto's independent auditors about whether the write-down should be even larger.

96.    According to the press release, later issued by Rio Tinto on January 17, 2018, the substantial RTCM impairment was based on the following facts—all of which had been well known to Albanese and Elliott for nearly a year:

- In Mozambique, the development of infrastructure to support the coal assets is more challenging than Rio Tinto originally anticipated.  Rio Tinto

- 27 -

sought to transport coal by barge along the Zambezi River, but this option did not receive formal approvals.

- These infrastructure constraints, combined with a downward revision to estimates of recoverable coking coal volumes on the RTCM tenements, have led to a reassessment of the overall scale and ramp up schedule of RTCM, and consequently to the impairment announced today.

97.    Rio Tinto's Chairman was "shocked" that some senior executives held the view that RTCM was "close to worthless."  With this news coming on top of the failed Alcan acquisition, the Chairman felt that he "probably [had] no choice but to ask the board to dismiss the chief executive."  Following the Chairman's request, Albanese's departure as CEO was announced in a January 17, 2013 press release.

98.    On January 17, 2013 —just after announcing "near record" production results two days earlier—Defendants issued a mixed good news/bad news press release entitled "Rio Tinto impairments and management changes", which announced in part that:

(a)    Rio Tinto would "record a $3 billion impairment charge relating to Rio Tinto Coal Mozambique (RTCM)[]";

(b)    Defendant Albanese "stepped down as chief executive by mutual agreement with the Rio Tinto Board[]";

(c)    Doug Ritchie, who led the acquisition and integration of the Mozambique coal assets in his previous role as Energy chief executive, has also stepped down by mutual agreement[];

(d)    [i]n Mozambique, the development of infrastructure to support the coal assets is more challenging than Rio Tinto originally anticipated[];

(e)    Rio Tinto sought to transport coal by barge along the Zambezi River, but this option did not receive formal approvals. [2]

---

[2] Press Release, Rio Tinto, Rio Tinto impairments and management changes (Jan. 17, 2013), https://www.sec.gov/Archives/edgar/data/863064/000100329713000017/exhibit99-1.htm.

99.     The press release also announced that Defendant Albanese would step down as chief executive immediately "by mutual agreement." (Albanese would ultimately leave Rio Tinto on July 16, 2013 and would not receive a bonus for 2012 or 2013.)

100.    The Company also announced:  "Rio Tinto expects to recognize a non-cash impairment charge of approximately US$14 billion (post tax) in its 2012 full year results. These impairments include an amount of approximately US$3 billion relating to Rio Tinto Coal Mozambique (RTCM), as well as reductions in the carrying values of Rio Tinto's aluminum assets . . . in the range of US$10-11 billion . . . .  The final figures will be included in Rio Tinto's full year results on 14 February 2013."

101.    The Company further explained:  "In Mozambique, the development of infrastructure to support the coal assets is more challenging than Rio Tinto originally anticipated. Rio Tinto sought to transport coal by barge along the Zambezi River, but this option did not receive formal approvals[]" and "These infrastructure constraints combined with a downward revision to estimates of recoverable coking coal volumes on the RTCM tenements, have led to a reassessment of the overall scale and ramp up schedule of RTCM, and consequently to the impairment announced today."

102.    In the press release, the Chairman stated:  "The Rio Tinto Board fully acknowledges that a write-down of this scale in relation to the relatively recent Mozambique acquisition is unacceptable."  Albanese stated:  "While I leave the business in good shape in many respects, I fully recognize that accountability for all aspects of the business rests with the CEO."

103.    The press release also announced that the highly regarded, Sam Walsh—head of the record reporting iron ore division—was taking over immediately as successor.  Quoting Rio

- 29 -

Tinto Chairman, the press release said of Sam Walsh and the iron ore division's strong performance:

> "We are fortunate to have such a capable and highly experienced executive as Sam to take over and to ensure there will be a rapid and seamless transition. He is ideally placed to cast a fresh eye over how we address the challenges and opportunities in the business, and derive greater value from it.
>
> Rio Tinto's underlying business and balance sheet remain in good health, and we are taking decisive action to improve our competitive position further with an aggressive cost reduction plan. As announced on 15 January, we had a strong production year in 2012, particularly in our low-cost iron ore business where we produced a record 253 million tonnes. Since the price of iron ore dropped to a low of less than $US90 a tonne last September, prices rebounded strongly reaching a level of around $US150 a tonne earlier this week, albeit in an environment of continuing volatility."

104.    In response to these partial disclosures, the price of Rio Tinto ADRs fell $0.24 to close at $54.45 that day.

105.    On February 15, 2013, after the market closed, Rio Tinto filed its Form 6-K announcing its financial results for the fiscal year ending on December 31, 2012 and reported a net loss of almost $3 billion—the first loss in its history. It stated "[a]n impairment charge of $2,860 million post-tax was also recognized relating to Rio Tinto Coal Mozambique[.]"[3]

106.    The February 15, 2013 announcement also reported certain **unaudited** details of the impairments. Pre-tax impairments relating to RTCM were **$3.269 billion, or almost 9% more than previously disclosed**. On the same day, in an effort to moderate the effect of this news on share prices, Defendants also announced a "surprise" 15% increase in its full-year dividend.

---

[3] Press Release, Rio Tinto, Rio Tinto results for the year ended 31 December 2012 (Feb. 14, 2013), https://www.sec.gov/Archives/edgar/data/863064/000100329713000050/exh99-1.htm.

- 30 -

107.    On the heels of the February 15, 2013 announcements, the market reacted by dropping the price of Rio Tinto ADRs $2.51, or about 4.3%, to close at $55.26 on February 20, 2013, damaging investors.

108.    On March 15, 2013, Defendants filed the Company's Form 20-F containing audited financial statements for its fiscal year ended December 31, 2012.  Among other things, the audited financial statements detailed the following breakdown of the $3.269 RTCM-related impairment:

> The annual impairment review of Rio Tinto Coal Mozambique resulted in an impairment of US$541 million to goodwill. The review also resulted in a US$1,581 million pre-tax impairment to exploration and evaluation assets held within intangible assets and a US$1,147 million post-tax impairment of investments in equity accounted units. [4]

109.    This news drove the price of Rio ADRs down $3.30, or about 6.6%, to close at $46.50 on March 19, 2013, damaging investors.

**B.    Subsequent Credit Downgrade, Management Change, Impairments, and RTCM Sale**

110.    One of Rio Tinto's largest investors described this entire episode as evidence of a "significant mistake by [Albanese and Elliott]" and that Rio Tinto management had been "reckless and profligate" with shareholder capital.  Research analysts declared that the impairment would "remind shareholders of [Rio Tinto's] recent chequered M&A track record." [5]

111.    On February 25, 2013, a credit agency revised its outlook for Rio Tinto from "Stable" to "Negative."

---

[4] Rio Tinto, Annual Report (Form 20-F) (Mar. 15, 2013), https://www.sec.gov/Archives/edgar/data/863064/000119312513108628/d497913d20f. htm.

[5] James Regan, *Mozambique blunder final straw for Rio Tinto chief,* Reuters (Jan. 18, 2013, 2:09 a.m.), https://www.reuters.com/article/australia-rio-mozambique-idUSL4N0AN1QN20130118.

010716-11 1067191 V1

112.    Elliott was replaced as the Company's CFO effective April 18, 2013 and he, like Albanese, did not receive a bonus for 2012 or 2013.

113.    On February 13, 2014, Rio Tinto announced in its Form 6-K filed with the SEC "[a] post tax impairment charge of US$470 million relating to Rio Tinto Coal Mozambique . . . has been recognized."

114.    In October 2014, Rio Tinto sold RTCM to International Coal Ventures Private Limited for $50 million.  The $50 million sale represented less than two percent of what Rio Tinto had paid for RTCM three years earlier.

C.    **Regulators Act After Extensive Investigation and Reveal Further Facts**

115.    On October 17, 2017, the SEC filed its complaint against Rio Tinto plc, Rio Tinto Limited, Albanese, and Elliott after extensive investigation.  In it, the SEC detailed a course of fraud outlined above to conceal the rapid and dramatic decline in value of the acquired RTCM business.  See Attachment A, the alleged facts of which are incorporated by reference as if plead herein.

116.    In the "Final Notice" issued on the same day, the FCA announced that Rio Tinto had agreed to settle with the Authority for a financial penalty of £27,385,400 for the Company's failure to account correctly for RTCM, and in particular to reflect the effect of the elimination of barging on the estimates of RTCM's value.  See Attachment B, the facts of which are incorporated by reference as if plead herein.  The FCA described this misconduct was "not merely the result of a flawed process" and noted that

> The breach continued for between two and three months during the period leading up to and including HY2012 reporting on 8 August 2012.  However the Authority considers that the duration of the breach is of secondary importance compared to the impact or potential impact of Rio Tinto's published financial information being materially inaccurate for over five months until the recording of the impairment on 17 January 2013.

010716-11 1067191 V1

117. Australian securities regulators have commenced their own action against Rio Tinto limited, alleging that it "fail[ed] to recognize an impairment of a wholly owned subsidiary, Rio Tinto Coal Mozambique (RTCM) in its 2012 Interim Financial Statements in accordance with the relevant accounting standards, RTL's failure to disclose the substantial impairment and other related breaches of the Corporations Act."

## VIII.    ADDITIONAL SCIENTER ALLEGATIONS

118. Defendants' misconduct paid off. Rio Tinto raised a total of $5.5 billion in U.S. debt offerings that incorporated materially misleading statements and omissions concerning RTCM's valuation.

119. In or around the time that Rio Tinto acquired RTCM, it secured long-sought upgrades from two major credit rating agencies. In October 2010, a major credit rating agency upgraded Rio Tinto's long-term debt rating from Baa1 to A3 and a second major credit rating agency followed suit in April 2011, upgrading Rio Tinto's long-term debt ratings from BBB+ to A- with a "Stable" outlook.

120. In March 2012—just days after issuing its materially false and misleading 2011 Annual Report—Rio Tinto issued four bonds totaling two $2.5 billion through Rio Tinto Finance (USA) plc: a $500 million 1.125% bond due 2015, a $500 million 2.0% bond due 2017, a $1 billion 3.5% bond due 2022, and a $500 million 4.75% bond due 2042.

121. The bonds were listed on the NYSE, and were fully and unconditionally guaranteed by Rio Tinto plc and Rio Tinto Limited.

122. Shortly before the offerings, Rio Tinto had met with a credit rating agency and highlighted the successful completion of the Riversdale acquisition.

123. Rio Tinto's offering documents for its March 2012 NYSE bond offerings incorporated by reference the material misrepresentations and omissions in Rio Tinto's 2011

- 33 -

Annual Report, which was incorporated in Rio Tinto's Form 20-F filed with the SEC on or about March 15, 2012. Albanese and Elliott signed the misleading financial statements incorporated by reference and used to raise money in the March 2012 bond offerings.

124. The offering materials also reported "group operating profits," which are defined as including the effect of any impairments, of $13 billion for year-end 2011. Due to Rio Tinto's failure to impair RTCM, the operating profits reflected in the offering materials were materially overstated.

125. Thus, Rio Tinto's materials announcing its March 2012 NYSE bond offerings referenced a more than $3 billion valuation of RTCM and omitted any information concerning the project's transportation and ore reserve challenges.

126. In addition, Days after filing its false and misleading interim financial reports for half-year 2012, Rio Tinto issued three bonds through Rio Tinto Finance (USA) plc listed on the NYSE, raising billions of dollars: a $1.25 billion, 1.625% bond due 2017; a $1 billion, 2.875% bond due 2022; and a $750 million, 4.125% bond due 2042.

127. The bonds were fully and unconditionally guaranteed by Rio Tinto plc and Rio Tinto Limited.

128. Prior to the offering, Rio Tinto met with a credit rating agency and reiterated its commitment to investing in and operating "large, long-term, cost competitive mines and assets," and highlighted the Riversdale acquisition.

129. Rio Tinto's offering documents for its August 2012 NYSE bond offering incorporated by reference the material misrepresentations and omissions in Rio Tinto's 2011 Annual Report, which was incorporated in Rio Tinto's Form 20-F filed with the SEC on or about March 15, 2012, and in Rio Tinto's half-year 2012 interim report. Albanese and Elliott signed

- 34 -

the misleading 2011 Annual Report incorporated by reference and used to raise money in the August 2012 bond offerings.

130.    Rio Tinto's offering documents reported "group operating profits," which are defined as including the effect of any impairments, of $6.6 billion for half-year 2012 and $13 billion for year-end 2011.  Due to Rio Tinto's failure to impair RTCM, those operating profits were materially overstated.

131.    Rio Tinto's offering documents for its August 2012 NYSE bond offerings omitted any information concerning rejection by the government of Mozambique of RTCM's barging proposal, that Rio Tinto significantly reduced the value of RTCM's coal reserves and resources, or that the best available models showed RTCM to have a negative value.

## IX.    LOSS CAUSATION

132.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

133.    Throughout the Class Period, the market price of Rio Tinto securities was inflated by the material omissions and false and misleading statements made by the Company, Albanese, and Elliott, which were widely disseminated to the securities markets, investment analysts, and the investing public.  The false and misleading statements materially misrepresented to the market the Company's financial results and prospects, and caused Rio Tinto securities, including its ADRs, to trade in excess of their true value.  As a result, Plaintiff purchased Rio Tinto ADRs at artificially inflated prices.  When the partial truth about Rio Tinto's asset values was revealed to the market, the price of its ADRs declined in response, as the artificial inflation caused by Defendants' misrepresentations and omissions was partially removed from the price of Rio Tinto ADRs, thereby causing substantial damages to Plaintiff and the Class.  For example:

- 35 -

134. On January 17, 2013—just after announcing "near record" production results two days earlier—Defendants announced that Rio Tinto would "record a $3 billion impairment charge relating to Rio Tinto Coal Mozambique (RTCM)[]"; and that "Rio Tinto sought to transport coal by barge along the Zambezi River, but this option did not receive formal approvals"—factors which the market viewed as bad news. [6] The press release also reported that Albanese had stepped down that day and that Doug Richie, who led the acquisition and integration of the Mozambique coal assets in his previous role as Energy chief executive, has also stepped down by mutual agreement—factors the market viewed as good news. The Company also announced the "final figures will be included in Rio Tinto's full year results on 14 February 2013." The Company further explained: "In Mozambique, the development of infrastructure to support the coal assets is more challenging than Rio Tinto originally anticipated. Rio Tinto sought to transport coal by barge along the Zambezi River, but this option did not receive formal approvals[]" and "These infrastructure constraints combined with a downward revision to estimates of recoverable coking coal volumes on the RTCM tenements, have led to a reassessment of the overall scale and ramp up schedule of RTCM, and consequently to the impairment announced today." The press release also announced that the highly regarded head of the solidly performing iron ore division, Sam Walsh, would take over immediately.[7]

---

[6] Press Release, Rio Tinto, Rio Tinto impairments and management changes (Jan. 17, 2013), https://www.sec.gov/Archives/edgar/data/863064/000100329713000017/exhibit99-1.htm.

[7] *See* Niles Pratley, *The Albanese years at Rio Tinto; a squandered opportunity*, The Guardian (Jan. 17, 2013), https://www.theguardian.com/business/nils-pratley-on-finance/2013/jan/17/rio-tinto-mining. "The pricing dynamics in iron ore, where Rio is the world's second-largest producer, are almost heaven-sent. It costs the company about $47 to dig a tonne of the stuff out of the Pilbara desert in Australia and ship it to China, where it can currently be sold to steelmakers for $145. That's why Sam Walsh, the new boss, starts on the front foot."

In response to these partial disclosures and mixed news, the price of Rio Tinto ADRs fell $0.24 to close at $54.45 that day, damaging investors.

135.    On February 15, 2013, after the market closed, Rio Tinto filed its Form 6-K announcing its financial results for the fiscal year ending on December 31, 2012 and reported a net loss of almost $3 billion—the first loss in its history.  It stated "[a]n impairment charge of $2,860 million post-tax was also recognized relating to Rio Tinto Coal Mozambique[.]"[8] The February 15, 2013 announcement also reported certain **unaudited** details of the impairments.  Pre-tax impairments relating to RTCM were **$3.269 billion, or almost 9% more than previously disclosed**.  Rio Tinto also admitted that "following aluminum and Mozambique coal impairments" Rio Tinto would experience a "Net loss" for 2012 in the amount of $3 billion—almost the entire amount of the RTCM impairment.

136.    On the same day, in an effort to moderate the effect of this news on share prices, Defendants also announced a "surprise" 15% increase in its full-year dividend.

137.    Despite this mixed bad news/good news, during the next two trading days, the price of Rio Tinto ADRs fell $2.51, or about 4.3%, to close at $55.26 on February 20, 2013, damaging investors.

138.    On March 15, 2013, Defendants filed the Company's Form 20-F containing audited financial statements for its fiscal year ended December 31, 2012.  Among other things, the audited financial statements detailed the following breakdown of the $3.269 RTCM-related impairment:

> The annual impairment review of Rio Tinto Coal Mozambique resulted in an impairment of US$541 million to goodwill. The review also resulted in a US$1,581 million pre-tax impairment

---

[8] Press Release, Rio Tinto, Rio Tinto results for the year ended 31 December 2012 (Feb. 14, 2013), https://www.sec.gov/Archives/edgar/data/863064/000100329713000050/exh99-1.htm.

- 37 -

to exploration and evaluation assets held within intangible assets and a US$1,147 million post-tax impairment of investments in equity accounted units. [9]

139.   This news drove the price of Rio ADRs down $3.30, or about 6.6%, to close at $46.50 on March 19, 2013, damaging investors.

## X.   CLASS ACTION ALLEGATIONS

140.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Rio Tinto securities between October 23, 2012 and March 15, 2013 inclusive. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

141.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Rio Tinto securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Rio Tinto or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

142.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

---

[9] Rio Tinto, Annual Report (Form 20-F) (Mar. 15, 2013), https://www.sec.gov/Archives/edgar/data/863064/000119312513108628/d497913d20f. htm.

a. Whether the Exchange Act was violated by Defendants;

b. Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

c. Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

d. Whether the price of the Company's securities was artificially inflated; and

e. The extent of damage sustained by Class members and the appropriate measure of damages.

143. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

144. Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

145. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

XI. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

146. At all relevant times, the market for Rio Tinto ADRs was an efficient market for the following reasons:

a. Rio Tinto ADRs met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

b. As a regulated issuer, Rio Tinto filed periodic public reports with the SEC and the NYSE;

- 39 -

010716-11 1067191 V1

c.   Rio Tinto regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.   Rio Tinto was followed by several securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

147.   As a result of the foregoing, the market for Rio Tinto ADRs promptly digested current information regarding Rio Tinto from all publicly available sources and reflected such information in the prices of the ADRs.  Under these circumstances, all purchasers of Rio Tinto ADRs during the Class Period suffered similar injury through their purchases at artificially inflated prices and/or purchases of options tied to the artificially inflated price and a presumption of reliance applies.

## XII.   NO SAFE HARBOR

148.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Amended Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking

- 40 -

statement was authorized and/or approved by an executive officer of Rio Tinto who knew that those statements were false when made.

## XIII.   CAUSES OF ACTION

### COUNT I

#### VIOLATION OF § 10(B) OF THE EXCHANGE ACT
#### AND RULE 10B-5 PROMULGATED THEREUNDER
#### (AGAINST ALL DEFENDANTS)

149.   Plaintiff repeats and realleges all paragraphs above as if fully set forth herein.

150.   By reason of the conduct described above, Rio Tinto, Albanese and Elliott, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, directly or indirectly:

        a.    Used or employed devices, schemes, or artifices to defraud;

        b.    Made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

        c.    Engaged in acts, practices, or courses of business, which operated or would operate as a fraud or deceit upon other persons, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

151.   While engaging in the conduct described above, Rio Tinto, Albanese and Elliott acted knowingly or recklessly.

152.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Rio Tinto ADRs.  Plaintiff and the Class would not have purchased Rio Tinto ADRs at the prices they paid, or at all, if they had known that the market prices were artificially and falsely inflated by Defendants' misleading statements.

- 41 -

153.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Rio Tinto ADRs during the Class Period.

## COUNT II

### VIOLATION OF § 20(A) OF THE EXCHANGE ACT
### (AGAINST ALBANESE AND ELLIOTT)

154.    Plaintiff repeats and realleges each and every paragraph contained above as if set forth herein.

155.    Albanese and Elliott acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein.  By reason of their positions as senior executives and/or directors of Rio Tinto, they had the power and authority to cause the Company to engage in the wrongful conduct complained of herein.  By reason of such conduct, Albanese and Elliott are liable pursuant to Section 20(a) of the Exchange Act.

### XIV.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

- 42 -

## XV.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


DATED:  September 25, 2018               Respectfully Submitted,

                                        HAGENS BERMAN SOBOL SHAPIRO LLP

                                        By ___ /s/*Michael W. Stocker*_____
                                              Michael W. Stocker, MS-1309
                                        Reed R. Kathrein (*pro hac vice*)
                                        Danielle Smith (*pro hac vice*)
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        715 Hearst Avenue, Suite 202
                                        Berkeley, CA  94710
                                        Telephone: (510) 725-3000
                                        Facsimile:  (510) 725-3001
                                        mikes@hbsslaw.com
                                        reed@hbsslaw.com
                                        danielles@hbsslaw.com

                                        Steve W. Berman
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        1301 Second Avenue, Suite 2000
                                        Seattle, WA  98101
                                        Telephone: (206) 623-7292
                                        Facsimile:  (206) 623-0594
                                        steve@hbsslaw.com

                                        *Lead Counsel for Plaintiffs*

- 43 -

CERTIFICATE OF SERVICE

I hereby certify that I am the ECF user whose ID and password are being used to electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses registered, as denoted on the Electronic Mail Notice List, and I hereby certify that I have caused to be mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

/s/*Michael W. Stocker*
Michael W. Stocker

- 1 -

010716-11 1067191 V1