**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
:
ANTON COLBERT, Individually and on
Behalf of All Others Similarly Situated,
:
Plaintiff,
:
v.                                                           Case No. 17 Civ. 8169 (AT) (DCF)
:   [rel. No. 1:17-cv-7994 (AT) (DCF)]
RIO TINTO PLC, RIO TINTO LIMITED,
THOMAS ALBANESE, and GUY ROBERT          :   CLASS ACTION
ELLIOTT,
:   ORAL ARGUMENT REQUESTED
Defendants.
:
:
:
:
:
:
---------------------------------------------------------x

<u>**MEMORANDUM OF LAW IN SUPPORT OF**</u>
<u>**DEFENDANTS' CONSOLIDATED MOTION TO DISMISS**</u>

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 5

      A.    Rio Tinto Acquired Riversdale, an Exploratory Mining Asset, in
            2011 ............................................................................................... 5

      B.    Allegations Pertaining to Events Outside the Five-Year Repose
            Period .......................................................................................... 7

      C.    Allegations Pertaining to Events within the Five-Year Repose
            Period ........................................................................................ 16

      D.    Additional Background Regarding Thomas Albanese ........................... 18

      E.    Additional Background Regarding Guy Elliott ....................................... 19

      F.    Plaintiff Initiates This Proceeding More Than Five Years after
            Most of the Events at Issue. .................................................... 20

LEGAL STANDARDS ............................................................................................ 21

ARGUMENT ........................................................................................................... 21

    I.    The Entire Complaint Must Be Dismissed Because The Vast Majority Of
       The Allegations Are Time-Barred And The Remaining Allegations Fail
       To State A Claim. ........................................................................... 22

      A.    Alleged Violations Occurring Prior to October 23, 2012 Are Time-
            Barred. ........................................................................................ 22

      B.    Plaintiff's Attempts to Circumvent the Statute of Repose Fail. ............... 24

      C.    Alleged Violations Occurring after October 23, 2012 Are
            Insufficiently Pleaded. ............................................................... 29

    II.    Even Considering Alleged Violations That Occurred Before October 23,
       2012, The Complaint Must Be Dismissed As To All Defendants. ..................... 34

      A.    The Complaint Fails to Satisfy Rule 9(b)'s Heightened Pleading
            Requirements. ........................................................................... 34

      B.    The Complaint Fails Adequately to Plead Numerous Essential
            Elements of a Section 10(b) Fraud Claim. .............................. 35

      C.    The Section 20(a) Claims Must Be Dismissed for Failure to Plead
            a Primary Violation, Culpable Participation, or Control. ....................... 60

CONCLUSION ....................................................................................................... 60

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alpha Capital Anstalt v. New Generation Biofuels, Inc.*,
2014 WL 6466994 (S.D.N.Y. Nov. 18, 2014)..........................................................23, 24, 27

*In re AOL Time Warner, Inc. Sec. Litig.*,
503 F. Supp. 2d 666 (S.D.N.Y. 2007)..............................................................................57, 58

*Arnold v. KPMG LLP*,
334 F. App'x 349 (2d Cir. 2009) (summary order) ...............................................................28

*ATSI Commc'ns v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007).....................................................................................................40

*In re Barclays Bank PLC Sec. Litig.*,
2017 WL 4082305 (S.D.N.Y. Sept. 13, 2017).......................................................................42

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988).........................................................................................................29, 42

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...............................................................................................................48

*Boudinot v. Shrader*,
2012 WL 489215 (S.D.N.Y. Feb. 15, 2012).........................................................................23

*Caiafa v. Sea Containers Ltd.*,
525 F. Supp. 2d 398 (S.D.N.Y. 2007)...................................................................................34

*Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*,
137 S. Ct. 2042 (2017)...........................................................................................................27

*Carlucci v. Han*,
886 F. Supp. 2d 497 (E.D. Va. 2012) ...................................................................................25

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002).............................................................................................5, 13

*Chill v. Gen. Elec. Co.*,
101 F.3d 263 (2d Cir. 1996).............................................................................................50, 53

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
957 F. Supp. 2d 277 (S.D.N.Y. 2013)...................................................................................36

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
　856 F.3d 605 (9th Cir. 2017) ..........................................................................38, 39

*City of Omaha Civilian Empls. Ret. Sys. v. CBS Corp.*,
　679 F.3d 64 (2d Cir. 2012)..............................................................................37, 40

*In re Comverse Tech., Inc. Sec. Litig.*,
　543 F. Supp. 2d 134 (E.D.N.Y. 2008) ...................................................................26

*de la Fuente v. DCI Telecomms., Inc.*,
　206 F.R.D. 369 (S.D.N.Y. 2002) ..........................................................................26

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
　2017 WL 4049253 (S.D.N.Y. June 28, 2017) .......................................................49

*Dietrich v. Bauer*,
　76 F. Supp. 2d 312 (S.D.N.Y. 1999).....................................................................34

*Dupler v. Berson*,
　2010 WL 10827361 (S.D.N.Y. Jan. 29, 2010) ................................................23, 24

*In re Dynex Capital Sec. Litig.*,
　2006 WL 314524 (S.D.N.Y. Feb. 10, 2006)..........................................................26

*ECA v. JP Morgan Chase Co.*,
　553 F.3d 187 (2d Cir. 2009).........................................................47, 49, 50, 53

*In re Eletrobras Sec. Litig.*,
　245 F. Supp. 3d 450 (S.D.N.Y. 2017)....................................................................48

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
　2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015)........................................................40

*Fait v. Regions Fin. Corp.*,
　655 F.3d 105 (2d Cir. 2011)......................................................................31, 37, 38

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*,
　873 F.3d 85 (2d Cir. 2017)...................................................................................47

*Fogel v. Wal-Mart de Mexico SAB de CV*,
　2017 WL 751155 (S.D.N.Y. Feb. 27, 2017).............................................24, 27, 28

*Friedman v. JP Morgan Chase & Co.*,
　2016 WL 2903273 (S.D.N.Y. May 18, 2016) ........................................................24

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Ganino v. Citizens Utils. Co.*,
　228 F.3d 154 (2d Cir. 2000)....................................................................47

*In re Gentiva Sec. Litig.*,
　932 F. Supp. 2d 352 (E.D.N.Y. 2013) .....................................................59

*Halperin v. eBankerUSA.com, Inc.*,
　295 F.3d 352 (2d Cir. 2002)........................................................31, 42, 43

*Harris v. Mills*,
　572 F.3d 66 (2d Cir. 2009)......................................................................21

*Heat & Frost Insulators Pension Fund v. IBM Corp.*,
　205 F. Supp. 3d 527 (S.D.N.Y. 2016)................................................51, 55

*Ho v. Duoyuan Glob. Water, Inc.*,
　887 F. Supp. 2d 547 (S.D.N.Y. 2012)................................................33, 46

*Howe v. Scheckin*,
　238 F. Supp. 3d 1046 (N.D. Ill. 2017) ...............................................25, 26

*IBEW Local Union No. 58 Pension Tr. Fund v. Royal Bank of Scot. Grp.*,
　783 F.3d 383 (2d Cir. 2015)........................................................31, 47, 48

*Intesa SanPaolo, S.p.A. v. Credit Agricole*,
　924 F. Supp. 2d 528 (S.D.N.Y. 2013).......................................................27

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
　2018 WL 1449206 (S.D.N.Y. Mar. 23, 2018) ...........................................60

*Janus Capital Grp., Inc. v. First Derivative Traders*,
　564 U.S. 135 (2011)....................................................32, 33, 43, 45

*Kalnit v. Eichler*,
　264 F.3d 131 (2d Cir. 2001)...............................................................51, 53

*Kleinman v. Elan Corp., PLC*,
　706 F.3d 145 (2d Cir. 2013)....................................................................42

*Kowal v. IBM (In re IBM Corp. Sec. Litig.)*,
　163 F.3d 102 (2d Cir. 1998)....................................................................27

*Kramer v. Time Warner Inc.*,
　937 F.2d 767 (2d Cir. 1991)......................................................................5

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Kuwait Inv. Office v. Am. Int'l Grp., Inc.*,
128 F. Supp. 3d 792 (S.D.N.Y. 2015)..............................................................23, 24, 25, 26, 29

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005)........................................................................................35, 56, 57

*Leykin v. AT&T Corp.*,
423 F. Supp. 2d 229 (S.D.N.Y. 2006).........................................................................................58

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
939 F. Supp. 2d 360 (S.D.N.Y. 2013).........................................................................................23

*Marini v. Adamo*,
995 F. Supp. 2d 155 (E.D.N.Y. 2014) ........................................................................................26

*Martin v. Quartermain*,
732 F. App'x 37 (2d Cir. 2018) (summary order) ....................................................................39

*Matusovsky v. Merrill Lynch*,
186 F. Supp. 2d 397 (S.D.N.Y. 2002).........................................................................................21

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
277 F. Supp. 3d 500 (S.D.N.Y. 2017)..............................................................................34, 41, 56

*Merck & Co., Inc. v. Reynolds*,
559 U.S. 633 (2010)..............................................................................................................23, 25, 27

*Mills v. Polar Molecular Corp.*,
12 F.3d 1170 (2d Cir. 1993).........................................................................................................34

*Moon Joo Yu v. Premiere Power LLC*,
2018 WL 456244 (S.D.N.Y. Jan. 17, 2018) .............................................................................32

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan &*
*Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*,
2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016)................................................................37, 40

*Nadoff v. Duane Reade, Inc.*,
107 F. App'x 250 (2d Cir. 2004) (summary order) ...................................................................31

*Nguyen v. New Link Genetics Corp.*,
297 F. Supp. 3d 472 (S.D.N.Y. 2018)........................................................................................59

## TABLE OF AUTHORITIES
(continued)

Page(s)

*In re Nokia Oyj* (*Nokia Corp.*) *Sec. Litig.*,
  423 F. Supp. 2d 364 (S.D.N.Y. 2006)...............................................................5, 41

*Nordstrom, Inc. v. Chubb & Son, Inc.*,
  54 F.3d 1424 (9th Cir. 1995) .............................................................................55

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)..................................................21, 32, 40, 50, 52, 54

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015) ..........................................................................37, 38, 39

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010)...........................................................................58, 59

*In re OSG Sec. Litig.*,
  971 F. Supp. 2d 387 (S.D.N.Y. 2013)...................................................................53

*Plymouth Cty. Ret. Ass'n v. Schroeder*,
  576 F. Supp. 2d 360 (E.D.N.Y. 2008) .................................................................26

*Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*,
  721 F.3d 95 (2d Cir. 2013)...........................................................................22, 23

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)..............................................................32, 40, 41, 43

*San Leandro Emergency Med. Plan v. Philip Morris*,
  75 F.3d 801 (2d Cir. 1996)..................................................................................50

*SEC v. Kelly*,
  817 F. Supp. 2d 340 (S.D.N.Y. 2011)...................................................................56

*SEC v. Rio Tinto plc, et al.*,
  No. 1:17-cv-7994 (S.D.N.Y. filed Oct. 17, 2017) .................................................1

*SEC v. Stoker*,
  865 F. Supp. 2d 457 (S.D.N.Y. 2012)...................................................................56

*In re ShengdaTech, Inc. Sec. Litig.*,
  2014 WL 3928606 (S.D.N.Y. Aug. 12, 2014)......................................................60

*Silvercreek Mgmt., Inc. v. Citigroup, Inc.*,
  248 F. Supp. 3d 428 (S.D.N.Y. 2017)...................................................................56

# TABLE OF AUTHORITIES
(continued)

Page(s)

*In re Smith Barney Transfer Agent Litig.*,
    884 F. Supp. 2d 152 (S.D.N.Y. 2012)...............................................................43, 56

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*,
    365 F.3d 353 (5th Cir. 2004) ..........................................................................55, 56

*SRM Global Master Fund Ltd. P'ship v. Bear Stearns Cos. LLC*,
    829 F.3d 173 (2d Cir. 2016)..............................................................22, 24, 28, 60

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008).....................................................................................5

*Stoll v. Ardizzone*,
    2007 WL 2982250 (S.D.N.Y. Oct. 9, 2007) .........................................................26

*Stoneridge Inv. Partners v. Scientific-Atl.*,
    552 U.S. 148 (2008).........................................................................................33, 41

*In re SunEdison, Inc. Sec. Litig.*,
    300 F. Supp. 3d 444 (S.D.N.Y. 2018).....................................................................60

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)...............................................................57, 58

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)............................................................................55, 56

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................21, 49, 52

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)............................................................................37, 39

*In re UBS AG Sec. Litig.*,
    2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012).......................................................51

*United States v. TEVA Pharm. USA, Inc.*,
    2016 WL 750720 (S.D.N.Y. Feb. 22, 2016)..........................................................50

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
    299 F. Supp. 3d 1055 (D. Minn. 2018)..................................................................25

*WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*,
    655 F.3d 1039 (9th Cir. 2011) ..............................................................................56

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Xerox Corp. Sec. Litig.*,
935 F. Supp. 2d 448 (D. Conn. 2013) .....................................................................59

**Statutes**

15 U.S.C. § 78u-4 ......................................................................................................21, 49

28 U.S.C. § 1658.................................................................................................3, 5, 22, 25

**Rules**

Fed. R. Civ. P. 9(b) ...........................................................................................................21

**Regulations**

17 C.F.R. § 240.10b-5....................................................................................................25, 43

**Other Authorities**

IAS 36 ("Impairment of Assets") ...............................................................................10, 12

IFRS 6 ("Exploration for and Evaluation of Mineral Resources")...............................10

Restatement (Third) of Agency § 5.03 (2006) ...............................................................55

U.S. Bureau of Mines and the U.S. Geological Survey, Circular 831,
*Principles of a Resource/Reserve Classification for Minerals* (1980),
available at https://pubs.usgs.gov/circ/1980/0831/report.pdf ...................................6

Defendants Rio Tinto PLC and Rio Tinto Limited (collectively, "Rio Tinto") and Thomas Albanese and Guy Elliott (together, "Individual Defendants") respectfully move to dismiss this private securities action brought by Plaintiff Anton Colbert.

## INTRODUCTION

Seizing on the Securities and Exchange Commission's ("SEC's") allegations of fraud in *SEC v. Rio Tinto plc, et al.*, No. 1:17-cv-7994 (S.D.N.Y.) (AT) (DCF) ("SEC Action"), Plaintiff filed this putative securities-fraud class action concerning Rio Tinto's acquisition in 2011 and subsequent impairment in early 2013 of an exploratory coal mining asset in Mozambique. Despite Plaintiff's voluntary amendment to his Complaint, the vast majority of his claims remain untimely under the applicable five-year statute of repose. Plaintiff filed this action on October 23, 2017, yet alleges virtually no fraudulent conduct within five years of that date (October 23, 2012). And all of his allegations—timely or not—still fail to comply with the heightened pleading standards of the Private Securities Litigation Reform Act, in addition to suffering from the same pleading deficiencies that warrant dismissal of the SEC Action. The entire First Amended Complaint, therefore, must be dismissed.

In 2011, Rio Tinto sought to capitalize on booming prices for hard coking coal, a scarce and valuable type of coal, by paying $3.7 billion in a hotly contested public sales process for a publicly traded Australian company called Riversdale Mining Limited (later renamed Rio Tinto Coal Mozambique or "RTCM"). Riversdale owned rights to explore what was believed to be one of the world's largest undeveloped coking coal sites—an area in Mozambique over 40 times the size of Manhattan. RTCM faced significant challenges at acquisition, including that the amount and quality of mineable coal were not known with any certainty, and there was little physical infrastructure in place for transporting the coal to market. There were also inherent uncertainties in developing a 50-year business plan for as-yet unproven properties.

Believing that it had invested for the long term and could overcome these challenges, Rio Tinto conducted a complex series of studies through 2012, including extensive drilling, exploring, and testing of the ore-body, and investigated a series of options for transporting the coal to market by barge or rail.  Rio Tinto encountered setbacks—chiefly, the coal quality was not as valuable as expected, and barging (the cheapest transportation option) became unfeasible for the foreseeable future.  At the same time, projected coal prices increased significantly, strategic transportation options evolved, and internal valuations—including many exceeding RTCM's $3.7 billion acquisition price—varied widely as a result.  But by the end of 2012, and after receiving late-breaking ore-body test results, Rio Tinto determined that infrastructure and resource challenges would be economically insurmountable.  It then promptly impaired RTCM's value, publicly announcing the impairment on January 17, 2013.

Plaintiff does not challenge the *amount* of that impairment—only its timing.  Plaintiff alleges that the correctly calculated impairment should have been taken sooner, within just five months (or at most eleven months) of the acquisition date (the Complaint is unclear on this point), and that the failure to take an impairment earlier amounted to fraud.  Yet the impairment came a mere seventeen months after Rio Tinto had gained full control of its asset—a remarkably quick turnaround given that resource feasibility tests can take years.  Plaintiff all but ignores the extraordinarily complex scientific, infrastructural, geographic, and political environment surrounding the planned 50-year project, including that projected coal prices were rising, resource studies were ongoing, and transportation options were evolving.  While Plaintiff may not grasp the enormous challenges that Defendants faced, the market and credit-ratings agencies certainly did—and they were indifferent to the impairment.  Rio Tinto had already cautioned the market that RTCM's value was provisional and under review, that coal-quality estimates could change

significantly given that estimates based on geological data can be imprecise, and that there were potential infrastructure hurdles.  In the context of a company with total assets of about $120 billion, the market saw a $3 billion impairment to a still-exploratory mining asset as immaterial.

The First Amended Complaint must be dismissed for several reasons.  As a threshold matter, the vast majority of the allegations are time-barred.  The statute of repose bars alleged violations occurring "more than . . . 5 years" before the filing of the Complaint.  28 U.S.C. § 1658(b)(2).  Because this action was filed on October 23, 2017, all alleged violations occurring before October 23, 2012 must be dismissed—including the impairment determinations in 2012 and any alleged misstatements or omissions during that period.  The remaining handful of allegations pertaining to the actionable period after October 23, 2012 and before January 17, 2013 all manifestly fail to state a claim for fraud.

Even if this Court were to consider the pre-October 23, 2012 alleged violations, it still must dismiss the Complaint in its entirety.  Plaintiff treats Rio Tinto's impairment determinations as rote calculations, but they were complex matters of opinion and judgment that could be false only in circumstances completely absent here.  Rio Tinto has never restated the relevant financial statements, nor have its independent auditors withdrawn their unqualified opinions or modified their conclusions on those statements.  Plaintiff also ignores that RTCM's challenges were well known and publicly disclosed; and RTCM was a minor asset that was still undeveloped, unproven, and under extensive study.  The claims against Rio Tinto thus fail as a matter of law.

The claims against the Individual Defendants fail as well.  Tom Albanese was the CEO of Rio Tinto during the relevant period.  As CEO, Mr. Albanese had wide-ranging responsibilities for more than 65,000 employees, projects and operations on six continents, and products including aluminum, copper, gold, silver, diamonds, borates, titanium, coal, uranium, iron ore, and salt.

3

The claims at issue here address a single coking-coal project in Mozambique.  In the face of significant uncertainty and complexity regarding this project, Mr. Albanese—a mining engineer, not an accountant, by trade—relied on Rio Tinto's robust impairment-review process and internal and external experts whose job it was to conduct valuation analyses and make accounting determinations.  These procedures and personnel, including professional auditors and company accountants, had worked effectively in the past, and resulted in sizable impairments on Rio Tinto assets when warranted.  Mr. Albanese justifiably—and correctly—relied on them to do so with RTCM.  There are no allegations that Mr. Albanese sought to enrich himself as a result of the timing of the RTCM impairment, nor that he received a bonus or sold any stock.

Nor does Guy Elliott, Rio Tinto's former CFO, belong in this case.  As CFO, Mr. Elliott did not sponsor or advocate for the RTCM acquisition, and he had no role in RTCM's day-to-day operations.  No one at RTCM reported to him.  The impairment review process was run by Rio Tinto Controllers in coordination with RTCM, and signed off on by Rio Tinto's external auditors at PricewaterhouseCoopers ("PwC").  Plaintiff does not even allege that Mr. Elliott made a *single* public misstatement or omission about RTCM in the actionable time period between October 23, 2012 and January 17, 2013.  The only public statements that could possibly be attributed to Mr. Elliott prior to the public announcement of the impairment are in Rio Tinto's 2011 Annual Report, but those statements were neither false nor material.  The Complaint also falls far short of pleading that Mr. Elliott ever acted with any motive or intent to defraud.  Mr. Elliott had no such motive:  He had been planning his retirement before the alleged fraud is even alleged to have occurred.  He publicly announced in July 2012 that he would retire in the following year.  There are no allegations that he sold any Rio Tinto stock during the relevant period, and the only allegation about Mr. Elliott's compensation is that he *did not* receive a bonus for 2012 or 2013.

The Court should dismiss the entire First Amended Complaint with prejudice.

## STATEMENT OF FACTS

This case concerns the valuation of an exploratory mining asset that Rio Tinto acquired in August 2011 and impaired in January 2013.  Because the Complaint was not filed until October 23, 2017, the vast majority of the alleged violations fall outside the applicable statute of repose, which bars all claims filed "later than . . . 5 years after [the alleged] violation."  28 U.S.C. § 1658(b)–(b)(2).[1]  For the sake of completeness, this Statement sets forth the relevant allegations occurring before, and after, the applicable repose cutoff date of October 23, 2012.

### A.    Rio Tinto Acquired Riversdale, an Exploratory Mining Asset, in 2011.

Rio Tinto is a world leader in exploring and developing new metal and mineral resources. ¶ 2; 2011 AR at 3 (Ex. 2).[2]  During the relevant period, Rio Tinto's assets totaled roughly $120 billion and included exploratory mining operations in about 20 countries.  *See* 2012 AR at 32, 142 (Ex. 3); 2012 6-K at F-5 (Ex. 4); 2011 AR at 30, 134.

---

[1]  Defendants have not moved to dismiss the SEC Action on this basis because they signed tolling agreements with the SEC before the statute of repose had run.  *See* Att. A, ¶ 176, Dkt. #60 ("SEC Compl.").

[2]  Citations to the operative Complaint (Ex. 1) are styled as "¶ [paragraph number]."  Rio Tinto's annual and interim reports were incorporated into, respectively, its Form 20-F and Form 6-K SEC filings.  For convenience, citations to Rio Tinto's annual reports are styled as "[year] AR," and citations to its interim reports are styled as "[year] 6-K."  Citations to "Ex. __" are to the exhibits attached to the Declaration of Caitlin J. Halligan, submitted herewith; these include excerpted copies of all cited SEC filings.  On this motion, the Court may consider documents incorporated in the Complaint and matters of which judicial notice may be taken, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002), including public SEC filings, *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991), investor conference transcripts, *In re Nokia Oyj* (*Nokia Corp.*) *Sec. Litig.*, 423 F. Supp. 2d 364, 371–74 nn.3–5 (S.D.N.Y. 2006), and media reports "offered to show that certain things were said in the press," *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).  All cited documents fall within these categories.

As Rio Tinto publicly disclosed, the value of *all* of its exploratory assets reflected several substantial risks.  *First*, because geological analyses take time to develop, there were "numerous uncertainties inherent in estimating ore reserves"—such as interpreting available geologic data, selecting appropriate mining methods, and establishing extraction schedules—that could cause estimates of the quantity and quality of the available ore-body to "change significantly with new information."  2011 AR at 11, 148.[3]  *Second*, potential "[l]imitations to . . . infrastructure access"—such as government restrictions on the use of waterways, or limited rail capacity—could inhibit Rio Tinto's ability to transport its ore efficiently to market.  *Id.* at 10.  *Third*, "volatility in commodity prices" could affect the value of ore that reached the market.  *Id.*  Given these risks, Rio Tinto needed to "thoroughly stud[y]" each of its exploratory mining assets "to identify the optimal configuration" for mining and transporting the ore-body to market.  *Id.* at 7.  Feasibility studies could take "ten to 20 years" and cost hundreds of millions of dollars.  *Id.* at 30.  Rio Tinto also cautioned that its exploratory assets "might be unsuccessful."  *Id.* at 11.

In 2011, Rio Tinto acquired Riversdale, ¶ 32, which owned the rights to exploratory and early-development coal assets covering 965 square miles in Mozambique, ¶ 4; Ex. 5, at 5.  The Moatize Basin, where Riversdale was located, was believed to contain "some of the world's largest deposits of hard coking coal," SEC Compl. ¶ 66, an especially high-value coal resource, ¶ 28.  Prior to the acquisition, Rio Tinto identified certain infrastructure and resource risks, SEC Compl. ¶ 51, including risks relating to barging and other transport options, ¶ 29.  Although a

---

[3]  "Resource" refers to the amount of coal that drilling and other test results show to a sufficient level of certainty is in the ground; "reserve" refers to the amount expected to be economically mineable.  *See* U.S. Bureau of Mines and the U.S. Geological Survey, Circular 831, *Principles of a Resource/Reserve Classification for Minerals* 1–2 (1980), *available at* https://pubs.usgs.gov/circ/1980/0831/report.pdf.  Coal "quality" refers to the relative percentage of high-value coal in the reserves.  *See id.* at 3.

key investment assumption relied on barging coal down the Zambezi river to port, it was only a concept at acquisition, and other options, by rail, were also thought viable. *See* ¶¶ 29–30.

After acquiring a majority interest in Riversdale on April 8, 2011, Rio Tinto completed the acquisition in August 2011, paying approximately $3.7 billion.  ¶ 32.  It is axiomatic that an acquisition involving such a public, arm's-length transaction provides the "best evidence" of a company's fair value.  2011 AR at 143.  Although the demand for coking coal was thought to be booming, Ex. 6, at 2–3; Ex. 7, at 3, and Riversdale had "some of the world's largest deposits of hard coking coal," SEC Compl. ¶ 66, analysts also understood that the ore-body was untested and that there were challenges to transporting coal through Mozambique, *see* Ex. 8, at 2–3.

### B.   Allegations Pertaining to Events Outside the Five-Year Repose Period

#### 1.   Throughout 2011 and 2012, Rio Tinto Undertook Extensive Testing and Feasibility Studies, and the Business Case for RTCM Evolved.

From acquisition through 2012, Rio Tinto conducted an extensive exploration campaign, including "further review" of the acquisition value, 2011 AR at 190, separate "feasibility studies into infrastructure solutions," *id.* at 27, and several rounds of testing to evaluate the quantity and quality of available coal, *see* ¶¶ 45, 96.

As is common in early-stage development projects, 2011 AR at 10–12, this ongoing analysis of complex mine-study data, revised assumptions, and evolving business planning generated wide-ranging valuations.  During its 2011 annual planning process, for example, RTCM determined that, although the diminished barging and rail capacity had impacted its value by about $2 billion, ¶ 37, its overall value had *increased* roughly $1.2 billion due largely to rising projected prices for coking coal, Ex. 9, at 2, 5.  Another valuation exercise yielded a potential valuation range of $4.9 billion, *see* SEC Compl. ¶ 151, and still another yielded a potential value of $4 billion to $5 billion, *id.* ¶ 153.  As new information became available, RTCM's long-term business

planning evolved, and Rio Tinto updated its internal valuations of RTCM throughout 2012. ¶¶ 37, 56; SEC Compl. ¶¶ 151, 153.

**a.        Options for Barging and Rail Transportation**

After acquiring RTCM, Rio Tinto studied the feasibility of three main transportation options—barging, relying on existing rail, and constructing a new "greenfield" railway—and various combinations thereof. *See* ¶ 56; SEC Compl. ¶ 67. Rio Tinto's in-house experts initially estimated that 30 million tons of coal could be barged down the Zambezi river per year, but in October 2011, its Energy Product Group revised that estimate down to ten million tons per year. ¶ 36. Rio Tinto also assumed that approximately twelve to fifteen million tons of coal per year could be transported by existing rail, but later learned that existing rail significantly limited capacity. SEC Compl. ¶ 80. When RTCM analyzed these developments during its routine annual planning process in late 2011, it "assumed" a rail option—instead of barging—"as the primary long term[] coal chain option," and concluded that any limitations nevertheless were "offset by" a potential "[g]reenfield" railway solution involving the construction of a new railway. Ex. 9, at 2, 6.

In December 2011, the Government of Mozambique stated that it was not favorable to Rio Tinto's environmental application for barging coal, ¶ 39, and "suggest[ed] that the available investment be directed to the improvement and construction of railway lines to transport coal," Ex. 10, § 4.8. For months afterwards, the Government of Mozambique publicly stated that the company was welcome to resubmit a new barging proposal that addressed its concerns, Ex. 11, at 2, and Rio Tinto persisted in "raising the subject of barging," ¶ 42.

Rio Tinto believed that a modified barging option could become available in the future, Ex. 12, at 13, but it shifted its short-term focus to other transportation options, including a green-field railway solution, Ex. 9, at 2.[4]  Plaintiff alleges that, in May 2012, Mr. Albanese challenged solo construction of a greenfield railway due to capital constraints, but "instructed RTCM managers to seek out partners" for joint construction of a railway.  ¶ 57.  There is no allegation that, prior to 2013, Defendants ever doubted they could find such partners; indeed, internal analyses performed after May 2012 assumed partner funding, *see* Ex. 13, at 2–3.

Meanwhile, investors knew about the barging setbacks from contemporaneous news and analyst reports.  Ex. 11; Ex. 14, at 67–68.  They also knew about rail capacity issues from public reports that "[c]urrent rail infrastructure" was limited to 6 million tons and that miners generally "lack[ed] options for getting their product to the port" in that area of Mozambique.  Ex. 11, at 2.

### b.  Coal Resources and Reserves Estimates

To understand the quality and quantity of coal available in such a large asset, Rio Tinto undertook time-intensive, extensive drilling and testing of the ore-body.  *See* 2012 AR at 32. The results were publicly disclosed.  *See* 2011 AR at 30.  Prior to acquisition, Rio Tinto internally estimated the available coal resource and reserves, *id.* at 26, and its 2011 Annual Report accurately disclosed revised reserves and resources figures determined after additional evaluation, *id.* at 49, 52.  The Complaint conclusorily alleges that this write-down was "substantially greater" than anticipated, ¶ 45, but does not dispute that Rio Tinto had anticipated a significant write-down of Riversdale's reported reserves and resources, that the reserves and resources figures in the 2011 Annual Report were reasonable estimates at the time, or that those estimates were sufficient to meet the mine plan developed during the acquisition, *see* 2011 AR at 26.

---

[4]  Barging was unavailable for the "short to medium term."  SEC Compl. ¶ 155.  There is no allegation that the Government of Mozambique ever ruled out barging for the long term.

Rio Tinto continued to test the ore-body, and those post-acquisition tests—which were not "confirmed as correct" until late 2012, ¶ 93—ultimately resulted in further "downward revision" of the quality of available coal, 2012 AR at 29; ¶ 96.

### 2.     As the Business Planning for RTCM Evolved, Rio Tinto Made Appropriate Impairment Decisions.

Impairment determinations generally are governed by International Accounting Standards Rule 36 ("IAS 36").  *See* IAS 36 ("Impairment of Assets").  International Financial Reporting Standard 6 ("IFRS 6"), however, varies how IAS 36 applies to "exploration and evaluation" assets.  *See* IFRS 6 ("Exploration for and Evaluation of Mineral Resources").  Because RTCM's "technical feasibility and commercial viability" were not yet "demonstrable" while its post-acquisition studies were ongoing, RTCM was subject to IFRS 6 at all relevant times.  IFRS 6.3–5.

These accounting standards and Rio Tinto's internal accounting policies prescribed two relevant impairment-review processes.  At each *half-year* ("HY") period, Rio Tinto assessed for indications that an asset was impaired; a formal impairment test was required only if there was such an impairment indicator.  ¶ 34.  IFRS 6 lists significantly fewer impairment indicators than IAS 36.  *Compare* IFRS 6.20, *with* IAS 36.12.  At each *year-end* ("YE") period, Rio Tinto undertook a formal impairment test for assets with goodwill—even if there was no impairment indicator.  IAS 36.6, 36.10, 36.19–20.  When formal impairment testing was necessary at either reporting period, Rio Tinto determined whether the asset's carrying value exceeded its recoverable value; if it did not, the asset was not impaired.  IAS 36.19.  Both review processes required inherent business judgments and are assessed for reasonableness.  *See* IAS 36; IFRS 6.

Rio Tinto's impairment review process began with the business unit (in this case RTCM) and the product group (here, Rio Tinto Energy), who best understood RTCM's challenges and were responsible for valuing their assets and determining potential impairment indicators.  SEC

Compl. ¶¶ 35–36.  All business units provided financial information to "Rio Tinto's Controller's office," *id.* ¶ 35, and certified the accuracy of that information, *see* Ex. 15.  The Controller's office, in turn, "coordinat[ed] the impairment review process," SEC Compl. ¶ 35, by applying its accounting expertise to the information reported by the business units and working closely with Rio Tinto's independent auditors at PwC to ensure compliance with financial reporting requirements, including IAS and IFRS standards.  PwC played a critical role by independently evaluating impairment-trigger and valuation decisions.  ¶ 68.  Together, the Controller's office and PwC drafted recommendations to Rio Tinto's Audit Committee; these entities collectively determined whether impairment triggers existed and appropriate next steps.  *See* ¶¶ 58–72.

Rio Tinto employed this impairment review process consistently in the years during and before the events at issue in this case, and it recognized impairments to the carrying value of assets in each of 2009, 2010, 2011, and 2012.  2011 AR at 33–34, 133; 2012 6-K at 21.  These included a series of impairments to Alcan Inc., an aluminum producer acquired by Rio Tinto in 2007.  ¶ 26.  There is no allegation that Mr. Albanese, Mr. Elliott, or anyone else interfered with the impairment process for Alcan (or any other asset) in any way.

At the culmination of the impairment process with respect to RTCM, the Individual Defendants and others in Rio Tinto's senior management reasonably agreed with the business unit, their supervisors, the highly trained accountants in the Controller's group, and the independent auditors at PwC, that RTCM was not impaired at YE 2011, and that no impairment indicator existed at HY 2012, as described below.

### a.    At YE 2011, Rio Tinto Reasonably Relied on the Acquisition Value as the Fair Value and Disclosed RTCM's Setbacks.

Because part of RTCM's value was recorded as goodwill, 2011 AR at 190, Rio Tinto reviewed RTCM for impairment at YE 2011.  Rio Tinto never restated its YE 2011 financial statements, nor has PwC ever withdrawn its unqualified opinion on those statements.  Plaintiff alleges that Rio Tinto "did not test RTCM for impairment" at YE 2011, ¶ 51; but, in fact, Rio Tinto assessed a "provisional" fair value "based on fair values at the acquisition date," 2011 AR at 162, 190.  This process was consistent with IAS 36, which permits use of "the most recent detailed calculation made in the preceding period of the recoverable amount" if the assets "have not changed significantly," the most recent recoverable amount "exceeded the carrying amount by a substantial margin," and there is only a "remote" likelihood that impairment is required.  IAS 36.99.  RTCM's most recent recoverable amount value factored in certain adverse developments yet exceeded the acquisition value by $1.2 billion due to rising coal prices.  Ex. 9, at 2.

In its 2011 Annual Report, Rio Tinto explained that RTCM was an "exploration and early development stage project[]" with ongoing post-acquisition "feasibility studies into infrastructure solutions," and that the fair values of the RTCM assets at acquisition were "provisional" and "subject to further review" in 2012.  2011 AR at 27, 190.  Rio Tinto also cautioned investors that "saleable production w[ould] initially be constrained by existing rail and port infrastructure," listed "[r]oad and rail" (not barging) as the forms of "[a]ccess" to RTCM, and accurately reported the most current resources and reserves figures.  *Id.* at 26, 27, 49, 52, 60.  Mr. Albanese and Mr. Elliott signed the 2011 Annual Report.  ¶ 50.[5]

---

[5]  Rio Tinto incorporated the 2011 Annual Report into both its Form 20-F filed with the SEC on March 15, 2012, and its offering documents for bond offerings on the New York Stock Exchange ("NYSE") in March 2012 and August 2012.  ¶¶ 52–53, 81.

**b.      In May 2012, the Individual Defendants Received an Update on RTCM.**

Rio Tinto continued to pursue exploration and feasibility studies concerning RTCM, and in April 2012, Mr. Elliott requested an update from the RTCM business unit.  ¶ 54.  In May 2012, RTCM's director met with Mr. Albanese, Mr. Elliott, and others in Brisbane.  *Id.*  At this meeting, officials from RTCM and management discussed the status of RTCM.  *Id.*  In the Complaint's telling, Mr. Albanese and Mr. Elliott were provided information about the challenges facing RTCM, including that "[b]ased on the best information available and under the best potential configuration, RTCM was worth negative $680 million."  ¶ 56.  Yet the Complaint—strikingly—fails to quote from the actual PowerPoint presentation given at the meeting.  ¶¶ 54–57.[6]  At the meeting, in response to transportation issues, Mr. Albanese noted capital constraints on pursuing a greenfield railway independently and "instructed RTCM managers to seek out partners" for joint construction.  ¶ 57.

**c.      At HY 2012, Rio Tinto's Robust Impairment Process Determined That There Were No Impairment Indicators.**

At HY 2012, Rio Tinto considered impairment *indicators* for RTCM under applicable accounting rules, but determined that no formal impairment *testing* was required because, despite adverse developments, there was no sufficient indication of impairment.  ¶ 68.  Although Plaintiff alleges that this determination rested on misrepresentations in certain materials submitted to the Audit Committee, ¶ 72, the statements selectively quoted in the Complaint were part of a

---

[6]  While Plaintiff's factual allegations are accepted as true at this stage, and it is unnecessary for the Court to resolve any factual disputes to grant Defendants' instant motion, it is telling that Plaintiff never quotes from the actual PowerPoint presented at the May 2012 Brisbane meeting.  *See* ¶¶ 54–57.  The PowerPoint—which can be considered, as it is referenced in the Complaint, ¶ 54, and relied on by the Plaintiff, ¶ 56, *see Chambers*, 282 F.3d at 153—differs from the Complaint's telling and, among other things, informed attendees that the "business will provide major long-term cash flows," Ex. 16, at 23; the "resource potential is large and still being explored," *id.* at 6; and there were positive as well as negative "[g]overnment issues" in Mozambique, *id.* at 13.

comprehensive and accurate consideration of the overall risks facing RTCM at the time, as described below.  As with its YE 2011 statements, Rio Tinto has never had to restate any amounts from its HY 2012 interim report, nor has PwC ever modified its conclusion about that report.

In June and July 2012, based on information from RTCM, Rio Tinto's Controller and independent auditors submitted two papers to its Audit Committee.  *See* ¶¶ 60 ("First Controller's Paper"), 68 ("Second Controller's Paper") (collectively, the "Controller's Papers").  The Controllers and PwC also reviewed a paper, drafted by the business unit, that evaluated RTCM for potential impairment indicators.  *See* ¶ 64 ("Impairment Paper").  All three papers explained the significant "uncertainty" around the infrastructure solution—noting that there was "not enough rail capacity to accommodate increased production levels," and that barging "setbacks due to environmental and other approvals being withheld" were "likely to result in a reduction in the volume of coal brought to market in the short term."  *See* Ex. 12, at 13; Ex. 13, at 2; Ex. 17, at 14. The papers also stressed that Rio Tinto would continue to study transportation options, *see* Ex. 12, at 13; Ex. 13, at 2, but was "confident of finding a viable infrastructure path" because of the "numerous options" for the "routing of the network . . . , ownership structures and commercial agreements," Ex. 13, at 2–3.  The Impairment Paper added that the revised resource estimates "w[ould] not impact the acquisition valuation" because they "still significantly exceed[ed] the [necessary ore material] assumed during the life of the project."  *Id.* at 7.

The Controller and PwC ultimately determined that none of the alleged impairment indicators would require a formal impairment test for at least two reasons.  *See* Ex. 12, at 13; Ex. 13, at 2–4.  First, the impact of the alleged indicators "ha[d] not been quantified with any degree of accuracy."  ¶ 67.  The "central case view [wa]s still under development," ¶ 65; post-acquisition

feasibility studies were ongoing, 2011 AR at 27; and some internal valuations were not even accurate to within $5 billion, *see* ¶ 47. Second, modeling based on more "certain" inputs, such as the "upward trajectory" of projected rising coal prices and the potential for recovering coal bed methane, indicated a "potential value" of $5.1 billion—with possible "upside" of $1 billion, even factoring in the revised resource estimates and uncertainty surrounding transportation. Ex. 13, at 2–3. Projections for the ten-year average price for coking coal, for example, had risen nearly 9% since the acquisition. *Id.* at 4. The Audit Committee accepted these recommendations. ¶ 72.[7]

### 3. Statements to Investors Were Consistent with Impairment Determinations.

Throughout this period, Defendants appropriately provided investors with balanced information about RTCM's value and engaged in strategic planning to maximize that value consistent with company-wide strategic priorities and capital constraints. In April 2012, Mr. Albanese told shareholders that Rio Tinto was "growing its coal business," with "a target" of starting shipments from some assets in the first half of 2012, ¶ 73—and, in fact, RTCM's Benga mine "officially opened in May 2012 with first coal exported in June 2012," 2012 AR at 29.

In August 2012, Mr. Albanese told analysts that Rio Tinto was "looking at a 'greenfield' rail development," ¶ 78, and that RTCM "probably had even 'more potential in total as [it went] forward,' and that the Moatize was truly a world-class basin coal deposit," *id.* (alteration in original). These optimistic projections were consistent with the infrastructure solutions then under review, ¶ 57, and were also tempered by notes of caution. For example, the Complaint omits that Mr. Albanese warned investors that "it's realistic and likely that we'll take longer to develop this infrastructure than previously planned" due to "internal constraints on capital." Ex. 18, at 3.

---

[7] In August 2012, Rio Tinto filed its Form 6-K with the SEC, ¶¶ 76–77, and included all of its SEC filings in another NYSE bond offering, ¶ 81.

C.      **Allegations Pertaining to Events within the Five-Year Repose Period**

Plaintiff does not allege any false or misleading statement in any Rio Tinto public SEC

filing within the applicable statute of repose (*i.e.*, after October 23, 2012).  Within the actionable

period, the Complaint alleges just three public misrepresentations in November 2012, as well as

non-public misstatements and omissions allegedly made internally to Rio Tinto employees dur-

ing the YE 2012 impairment review process.

1.      **Public Statements to Investors Were Consistent with Impairment De-
                terminations.**

In November 2012, Rio Tinto filed a Form 6-K with the SEC, which is not alleged to

have been misleading.  *See* ¶ 88.  Also in November 2012, "Defendants" identified RTCM as ev-

idence that Rio Tinto's "presence in Africa is growing" at the Metal Bulletin African Iron Ore

Conference.  ¶ 89.  This was consistent with the start of coal production at Benga earlier that

year, 2012 AR at 29.  Mr. Albanese also told investors that the Moatize Basin was "a long-term

opportunity with the potential to grow beyond 25 million tons of coal per year," ¶ 91, and that

Rio Tinto would look at "all" transportation options in response to a question whether barging

was still on "'the agenda,'" ¶ 90—a statement consistent with "various options," including long-

term partial barging, then under review, Ex. 13, at 2.  He warned investors about "constrained

capital."  Ex. 20, at 15.  Indeed, investors acknowledged that "obviously the small-scale opera-

tions [are] starting up and it is going to be some years before you do the big infrastructure thing."

*Id.* at 9; *see* ¶ 90.  There is no allegation of any misstatement by Mr. Elliott at this conference.

2.      **At YE 2012, Rio Tinto Reasonably Concluded That Impairment Was
                Required in Light of New Information.**

Rio Tinto did not expect its post-acquisition feasibility studies to be complete by the YE

2012 impairment review process.  *See* Ex. 12, at 13.  Even so, at a November 26, 2012 Audit

Committee meeting, Mr. Elliott explained that Rio Tinto's in-house experts in the Technology

and Innovation ("T&I") Division had uncovered recent challenges facing RTCM, *see* SEC Compl. ¶ 158 (alleging that Mr. Elliott told the Audit Committee that there was "late breaking" news regarding RTCM).  Soon after Rio Tinto completed its investigation and verification of this information, ¶¶ 93, 95, the Board approved an impairment of RTCM's value in January 2013, resulting in a revised value of $611 million, ¶ 95.  This impairment, announced January 17, 2013, ¶ 96, was taken because of further "downward revision to estimates of recoverable coking coal volumes," and because infrastructure development had been "more challenging than . . . anticipated," 2012 AR at 29.  There is no allegation that, had the Board learned of the "late breaking" news sooner, it would have taken an impairment without first verifying that information.

On January 17, 2013, Rio Tinto announced an "approximately US$3 billion" impairment to RTCM and also a "US$10–11 billion" impairment to its aluminum mining asset Alcan.  ¶ 100.  As a result of these business setbacks, Mr. Albanese stepped down as CEO, ¶ 99, and was thanked "for his considerable contribution to Rio Tinto over more than 30 years of service and for his integrity and dedication to the company," Ex. 21, at 1.  On February 15, 2013, Rio Tinto clarified that the impairment would be for $2.86 billion post-tax, ¶ 135, and its 2012 Annual Report, filed March 15, 2013, "detailed" a "breakdown" of that impairment, ¶ 108.

### 3. Market Reaction to the Announced Impairment Confirms Its Immateriality.

In commenting on the RTCM impairment, investors declared the Riversdale acquisition a "'significant mistake,'" ¶ 110, or "poorly timed mining deal" that had occurred when "coal prices were rocketing," Ex. 22, at 2; *see also* Ex. 23.  The Complaint does not allege any credit downgrade at the time of the impairment; in fact, the day after the announcement, Moody's stated that the impairment would "not affect the company's ratings."  Ex. 24, at 1.  Such impairments are common among mining exploration companies.  *See*, *e.g.*, Ex. 25, at 58 ($1.73 billion

in 2013) (Alcoa Corp.); Ex. 26, at 84 ($4.02 billion in 2012) (Vale, S.A.); Ex. 27, at 85 ($3.62 billion in 2012) (BHP Billiton, Ltd.).  Although the Complaint alleges a drop in the price of Rio Tinto ADRs on the day of the impairment announcement, ¶ 104, and in February 2013 and March 2013 when Rio Tinto announced its financial results for the 2012 fiscal year, ¶¶ 107, 109, the announcements on each day included the substantially larger Alcan impairment, ¶ 100.

### D.     Additional Background Regarding Thomas Albanese

Mr. Albanese began working for Rio Tinto in 1993, and continued to do so for two decades.  He became chief executive of the Industrial Minerals group in 2000, and chief executive of the copper group and head of exploration in 2004.  2011 AR at 77.  In 2007, he was selected to serve as Rio Tinto's CEO and assumed responsibility for day-to-day management of the business.  ¶ 23.  There is no allegation that he sold any stock, received any bonus, or personally enriched himself from the timing of the RTCM impairment.

After the Riversdale acquisition, Mr. Albanese, an engineer by training, worked to support the project and to adapt to constant developments, positive and negative.  As these developments arose, Mr. Albanese reasonably relied on Rio Tinto's robust process for valuing assets and determining whether impairments were necessary.  Among other points, Plaintiff's selective quotation of the SEC's Complaint ignores that the process leading to the HY 2012 impairment determination involved multiple technical papers drafted or reviewed by RTCM, internal experts from Rio Tinto's Controller's office, and external experts from PwC.  *See* ¶ 3; SEC Compl. ¶¶ 123, 130, 134.  These papers noted positive developments, but also reported on challenges, such as transportation issues and decreased resource and reserve estimates.  *See* SEC Compl. ¶¶ 124–27.  Considering all the factors, the internal and external experts agreed that no impairment indicator was present.  Mr. Albanese had no reason not to rely on that assessment and no basis to reject it.

When discussing RTCM with investors, Mr. Albanese expressed an appropriate mixture of optimism and caution.  For example, in one investor call, Mr. Albanese explained that RTCM "probably had even 'more potential in total as [it went] forward' and that the Moatize was truly a world-class basin coal deposit," ¶ 78 (alteration in original), but he warned that "it's realistic and likely that we'll take longer to develop this infrastructure than previously planned due both to the timing of some of the approvals but also internal constraints on capital," Ex. 18, at 3.  Investors understood that "obviously there are a lot of challenges there."  *Id.* at 8.  In short, the Complaint and documents properly considered at this stage demonstrate that Mr. Albanese forthrightly and appropriately acknowledged RTCM's challenges both within Rio Tinto and to the public.

### E.    Additional Background Regarding Guy Elliott

Mr. Elliott began his career at Rio Tinto in 1980 and worked there for over 33 years. ¶ 24.  Through hard work and diligence, he rose through the ranks, eventually becoming CFO in 2002.  *Id.*  After almost ten years as CFO, he publicly announced in July 2012—well before the January 2013 impairments to RTCM—that he would retire from Rio Tinto in 2013.  Ex. 28.  He has never until this matter been the subject of a regulatory inquiry or lawsuit.

During Mr. Elliott's tenure as CFO, he reasonably relied on Rio Tinto's extensive and robust process to evaluate potential impairments—including certifications from the business unit and product groups, review by the controllers, and audit by the independent auditors at PwC—to accurately report Rio Tinto's financial position.  During Mr. Elliott's tenure, this process led to several impairments, often at much higher dollar values than the RTCM impairment in January 2013.  *See* ¶¶ 26, 100.

With respect to RTCM, Mr. Elliott did not sponsor or advocate for the acquisition, and he had no role in RTCM's day-to-day management.  No one at RTCM reported to him.  Mr. Elliott

had been planning his retirement from Rio Tinto before any alleged fraud concerning RTCM occurred, and when the RTCM impairment was announced in January 2013, it did not change Mr. Elliott's retirement plans or standing within Rio Tinto.  As planned, Mr. Elliott stepped down as CFO (in April 2013), and remained on the Board of Rio Tinto until the end of 2013.

Not surprisingly given his limited involvement with RTCM, the Complaint does not allege *any* public misstatements or omissions by Mr. Elliott within the applicable period from October 23, 2012 to January 17, 2013.  Notably, the Complaint does not allege that Mr. Elliott made any statements about RTCM at the November 2012 Metal Bulletin African Iron Ore Conference, ¶ 89, in the November 2012 6-K, ¶ 88, or at the November 2012 investor seminar, ¶¶ 90–91.

Even for the time-barred period prior to October 23, 2012, the Complaint does not allege that Mr. Elliott was the "maker" of any public statements about RTCM other than by certifying Rio Tinto's 2011 Annual Report.  *See* ¶ 50.  That Report, however, accurately disclosed RTCM's reserves and resources figures, and is not adequately alleged to have been false or misleading. *Infra* II.B.1.  There are no allegations of any other misstatements by Mr. Elliott.

### F.     Plaintiff Initiates This Proceeding More Than Five Years after Most of the Events at Issue.

On October 23, 2017—more than five years after most of the events alleged in the Complaint—Plaintiff filed this putative class action on behalf of persons and entities who acquired Rio Tinto securities between October 23, 2012 and March 15, 2013.  ¶ 140.  Plaintiff claims that all Defendants violated Section 10(b) of the Exchange Act, and that the Individual Defendants violated Section 20(a) of the Exchange Act.  On September 25, 2018, after Defendants moved to dismiss the Complaint, Plaintiff timely filed a First Amended Complaint—the operative Complaint here.  *See* Dkt. # 60 (Sept. 25, 2018).

## LEGAL STANDARDS

Under Rule 12(b)(6), the Complaint's allegations are accepted as true, but "'[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements,'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citation omitted and alteration in original), and allegations "contradicted" by documents referenced in the Complaint "are insufficient to defeat a motion to dismiss," *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002).

Under Rule 9(b), the Complaint must "state with particularity the circumstances constituting" the alleged fraud, Fed. R. Civ. P. 9(b), meaning it must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (internal quotation marks omitted).

Under the Private Securities Litigation Reform Act ("PSLRA"), the Complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). That means that an inference of fraud must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

## ARGUMENT

The entire Complaint must be dismissed for two independent reasons. Nearly all of the allegations are time-barred, and those that are timely fail to state a claim. And even if the untimely allegations are considered, the Complaint fails to satisfy the applicable pleading requirements and fails adequately to plead numerous essential elements of Plaintiff's claims.

I.      **The Entire Complaint Must Be Dismissed Because The Vast Majority Of The Allegations Are Time-Barred And The Remaining Allegations Fail To State A Claim.**

Plaintiff was required to file his Complaint "not later than . . . 5 years after [the alleged] violation[s]." 28 U.S.C. § 1658(b)(2).  With respect to the vast majority of the alleged violations, he did not do so.  Thus, alleged violations of Sections 10(b) and 20(a) that occurred prior to October 23, 2012—five years before the Complaint was filed—must be dismissed as untimely.  Plaintiff's attempts to circumvent this statutory command fail as a matter of law.  And because the remaining handful of allegations fail to state a claim, they all must be dismissed too.

A.      **Alleged Violations Occurring Prior to October 23, 2012 Are Time-Barred.**

Because Section 1658(b)(2) "creates a substantive right in defendants to be free from liability after five years," *SRM Global Master Fund Ltd. P'ship v. Bear Stearns Cos. LLC* ("*Bear Stearns*"), 829 F.3d 173, 177 (2d Cir. 2016), it requires the Court to dismiss as untimely all alleged violations of Sections 10(b) or 20(a) occurring prior to October 23, 2012.  This result follows directly from the Second Circuit's holding that Section 1658(b)(2) is not subject to judicial tolling because it "is not a statute of limitations"—"[i]t is a statute of repose." *Id.* at 176.

In the context of an analogous statute of repose under the Securities Act, the Second Circuit explained that there is a "conceptual distinction" between statutes of limitations and repose, and that "distinction carries significant practical consequences." *Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 106 (2d Cir. 2013).  Whereas "[s]tatutes of limitations limit the availability of remedies" and thus "may be subject to equitable considerations, such as tolling, or a discovery rule," a statute of repose "'*extinguishes* a plaintiff's cause of action after the passage of a fixed period of time,'" and "'may bar a claim *even before the plaintiff suffers injury*, leaving her without any remedy.'" *Id.* (emphases in original) (citation omitted).

A statute of repose thus "'run[s] without interruption once the necessary triggering event has occurred, even if equitable considerations would warrant tolling or even if the plaintiff has not yet, or could not yet have, discovered that she has a cause of action.'" *Id.* at 107 (citation omitted). In other words, Section 1658(b)(2) is an "unqualified bar" that "giv[es] defendants total repose after five years." *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 650 (2010).

With few exceptions discussed *infra* I.B, courts in this District have "consistently stated that the five-year period begins to run from the time that the allegedly fraudulent representations were made." *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 378 (S.D.N.Y. 2013) (alterations in original) (quoting *Boudinot v. Shrader*, 2012 WL 489215, at *4 (S.D.N.Y. Feb. 15, 2012)); *see also*, *e.g.*, *Kuwait Inv. Office v. Am. Int'l Grp., Inc.*, 128 F. Supp. 3d 792, 807 (S.D.N.Y. 2015) ("[T]he statute of repose runs from the date of each relevant misstatement or omission . . . ."); *Alpha Capital Anstalt v. New Generation Biofuels, Inc.*, 2014 WL 6466994, at *12 (S.D.N.Y. Nov. 18, 2014) ("The statute of repose runs from the time the allegedly fraudulent misrepresentations were actually made . . . ."); *Dupler v. Berson*, 2010 WL 10827361, at *6 (S.D.N.Y. Jan. 29, 2010) ("[T]he applicable five-year period of repose begins to run on the date of the alleged *misrepresentation* . . . .").

In *Kuwait*, for example, the Court dismissed "entirely or in part" all Section 10(b) and 20(a) claims in a consolidated series of actions brought between 2011 and 2015 by investors who had opted out of a class action concerning AIG's well-publicized bailout in 2008. 128 F. Supp. 3d at 796–97, 807.  As here, the *Kuwait* plaintiffs sought to avoid the statute of repose by characterizing the alleged violations as a "series of misstatements and omissions made as part of a scheme," but the Court rejected that approach as conflicting with the text of Section 1658(b)(2)

and with *IndyMac*. *Id.* at 808. "[B]ecause the statute of repose runs from the date of each relevant misstatement or omission," the Court dismissed the Exchange Act claims in one action in their "entirety" and in the remaining actions "to the extent" they were "based on misstatements or omissions made more than five years before the respective filing dates." *Id.* at 807.

Courts in this Circuit likewise have routinely dismissed Section 10(b) and 20(a) claims to the extent they are "premised on alleged material misrepresentations made prior to [the repose cutoff]." *Fogel v. Wal-Mart de Mexico SAB de CV*, 2017 WL 751155, at *9 (S.D.N.Y. Feb. 27, 2017); *see also*, *e.g.*, *Friedman v. JP Morgan Chase & Co.*, 2016 WL 2903273, at *7 (S.D.N.Y. May 18, 2016) (holding that a Section 20(a) claim is "subject to the five-year statute of repose"), *aff'd*, 689 F. App'x 39 (2d Cir. 2017); *Alpha Capital*, 2014 WL 6466994, at *13 (striking as untimely "all allegations that are based solely on misrepresentations or omissions contained in [an SEC filing] filed more than five years prior to the filing of the Complaint"); *Dupler*, 2010 WL 10827361, at *6 (dismissing as untimely "affirmative misrepresentations . . . made prior to the deadline imposed by the statute of repose"); *accord Bear Stearns*, 829 F.3d at 177 (dismissing Section 10(b) and Section 20(a) claims "[b]ecause the complaint fails to allege that the defendants made any misrepresentations within five years of the filing of [plaintiff's] complaint").

Because Plaintiff did not file his Complaint until October 23, 2017, all alleged violations that occurred prior to October 23, 2012 are therefore time-barred and must be dismissed.

### B.     Plaintiff's Attempts to Circumvent the Statute of Repose Fail.

In the only pre-motion letter that he has filed, Plaintiff made several inconsistent arguments as to why this Court should nevertheless sustain claims relating to alleged violations made prior to October 23, 2012. *See* Dkt. #41 at 1–2 (July 26, 2018). None of these arguments holds water, however, because they all ignore the statutory text and controlling precedent.

*First*, Plaintiff asserted that the statute of repose "runs from the date of the last alleged misrepresentation regarding related subject matter." Dkt. #41 at 1. Although the Second Circuit has not directly ruled on the viability of this so-called "continuing violations" theory, courts in this District and elsewhere have rightly noted that the theory "is unsupported by the plain language of the statute" and would undermine the very purpose of the statute of repose. *Kuwait*, 128 F. Supp. 3d at 808 (discussing Section 1658(b)(2)). Section 1658 requires filing within five years of the alleged "violation," 28 U.S.C. § 1658(b)(2), and Rule 10b-5 makes unlawful a single misleading "statement," "omission," or deceptive "act," 17 C.F.R. § 240.10b-5(b)–(c). Because "even one misstatement can give rise to a 'violation' for the purposes of the Exchange Act," *each* alleged misrepresentation (or omission or deceptive act) is a separate "violation" triggering the statute of repose. *Kuwait*, 128 F. Supp. 3d at 808; *see also W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 299 F. Supp. 3d 1055 (D. Minn. 2018) ("The plain and ordinary meaning requires the violation of Section 10(b)—the independently actionable breach of the Exchange Act—to have occurred within the repose period.").[8]

Because Section 1658(b)(2) was designed to "giv[e] defendants total repose after five years," *Merck*, 559 U.S. at 650, "expansion of [the statutory term] 'violation' to include a series of misstatements and omissions"—or to extend an alleged "scheme" beyond the five-year repose period—"would almost certainly require the operation of equitable considerations . . . foreclosed by the reasoning in *IndyMac*." *Kuwait*, 128 F. Supp. 3d at 808; *see also Carlucci v. Han*, 886 F. Supp. 2d 497, 515 (E.D. Va. 2012) (rejecting a continuing-violations theory because "the statute

---

[8] Plaintiff cannot repackage his untimely misrepresentations or omissions claims as a fraudulent "scheme" because any such scheme-liability claim would fail as a matter of law, *infra* II.B.5, and "[t]he plain language" of the statute bars scheme-liability claims to the extent they are based on untimely conduct, *W. Va. Pipe Trades*, 299 F. Supp. 3d at 1064; *Howe v. Scheckin*, 238 F. Supp. 3d 1046, 1050–51 (N.D. Ill. 2017) (rejecting a "continuing fraudulent scheme theory").

of repose is an unqualified bar that may not be equitably tolled").  A "majority of courts across circuits" thus have concluded that Plaintiff's theory "would unjustifiably qualify the repose period and permit stale claims."  *Howe*, 238 F. Supp. 3d at 1050–51.

Even before *IndyMac* confirmed that statutes of repose are not subject to equitable tolling, the "weight of authority in this circuit" had rejected a continuing-violations theory as incompatible with statutes of repose in the securities context.  *In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 155 (E.D.N.Y. 2008); *see also, e.g.*, *Stoll v. Ardizzone*, 2007 WL 2982250, at *2 (S.D.N.Y. Oct. 9, 2007) ("[T]here is no 'continuing violations' exception to the absolute bar of the statutory limitations period."); *de la Fuente v. DCI Telecomms., Inc.*, 206 F.R.D. 369, 385 (S.D.N.Y. 2002) (citing cases indicating "[i]t is not at all clear that the continuing fraud doctrine applies in securities fraud cases").  Although some pre-*IndyMac* cases in this Circuit had accepted a continuing-violations theory, *see Plymouth Cty. Ret. Ass'n v. Schroeder*, 576 F. Supp. 2d 360, 378 (E.D.N.Y. 2008); *In re Dynex Capital Sec. Litig.*, 2006 WL 314524, at *5 (S.D.N.Y. Feb. 10, 2006), those cases were "thin on analysis," *Kuwait*, 128 F. Supp. 3d at 808, and even they recognized that the law was "somewhat unresolved," *Plymouth*, 576 F. Supp. 2d at 378.

Ever since *IndyMac*'s "strict construction and application of the statute of repose," *Kuwait*, 128 F. Supp. 3d at 807, courts in this Circuit have been *unanimous* in rejecting a continuing-violations theory in this context.  *See id.* (holding that the theory is "inconsistent with the substantive right to repose after five years"); *Marini v. Adamo*, 995 F. Supp. 2d 155, 184 (E.D.N.Y. 2014) ("agree[ing] with the persuasive analysis of a majority of district courts throughout the country that have rejected the continuing violations doctrine in this context"); *see*

*also Fogel*, 2017 WL 751155, at *9 (implicitly rejecting continuing-violations theory); *Alpha Capital*, 2014 WL 6466994, at *13 (same).[9]  This Court should do the same.

*Second*, Plaintiff asserts that Defendants had a continuing "duty to correct" alleged "pre-Class Period false and misleading statements."  ¶ 87.  That novel theory, however, "would essentially render [the repose period] a nullity" in cases involving uncorrected misrepresentations or omissions.  *Intesa SanPaolo, S.p.A. v. Credit Agricole*, 924 F. Supp. 2d 528, 537 (S.D.N.Y. 2013).  Indeed, the five-year deadline would never "*even beg[i]n running*" on an uncorrected misrepresentation, *id.*, meaning that—under Plaintiff's theory—even a decades-old misrepresentation could give rise to liability so long as it was not corrected in the five-year period preceding the filing of the lawsuit.  That absurd result is incompatible with the "unqualified bar" provided by Section 1658(b)(2).  *Merck*, 559 U.S. at 650.  In his pre-motion letter, Plaintiff's sole authority for this radical theory was *Kowal v. IBM (In re IBM Corp. Sec. Litig.)*, 163 F.3d 102 (2d Cir. 1998).  *See* Dkt. #41, at 2.  But *Kowal* did not involve a statute of repose; and it involved a duty to *update* a statement that "becomes misleading because of a subsequent event," 163 F.3d at 110—not, as alleged here, a duty to "correct" a statement that was misleading when made. There is, in short, no authority for Plaintiff's "continuing omissions" theory, which would nullify Section 1658(b)(2).  *See Intesa*, 924 F. Supp. 2d at 537 ("[I]t does not appear that any such [authority] exists.").

---

9  Plaintiff's pre-motion letters cited no post-*IndyMac* case in this Circuit applying a "continuing violations" theory—and Defendants have found none.  The sole post-*IndyMac* authority Plaintiff cited did not involve Section 1658(b)(2), and, as relevant here, it determined only *that* the statute governing the timeliness of certain securities claims is a statute of repose—not *when* that statute of repose actually begins.  *See Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2049 (2017) (holding that because the "[t]he statute . . . runs from the defendant's last culpable act (the offering of the securities)" rather than "the accrual of the claim," it was a "close to a dispositive indication that the statute is one of repose").  That case therefore provides no authority for creating an exception to Section 1658(b)(2) that Congress has not authorized.

*Finally*, Plaintiff undercuts his own "continuing violations" and "continuing duty to disclose" theories by suggesting that the repose period is triggered, instead, each time a putative class plaintiff purchased stock.  *See* Dkt. #41 at 2 ("a violation . . . occurs at each <u>transaction</u>").  Plaintiff's "transaction date" rule, however, derives from an unpublished Second Circuit decision that is not binding on this Court, *see Arnold v. KPMG LLP*, 334 F. App'x 349, 351 (2d Cir. 2009) (summary order), and is in any event incompatible with the Second Circuit's subsequent decision in *Bear Stearns*, which dismissed a complaint as untimely for failure to allege "any *misrepresentations* within five years of the filing of [plaintiff's] complaint," 829 F.3d at 177 (emphasis added).  As courts in this District have recognized, "in the years since *Arnold*," the Second Circuit has "made plain its belief that it is the date of the misrepresentation, not the transaction, that matters for purposes of the . . . statute of repose." *Fogel*, 2017 WL 751155, at *8 n.11.

In any event, Plaintiff's suggested "transaction date" rule would have no application here "'because [*Arnold*] addresses a scenario where the alleged misrepresentation was made *after* the purchase.'"  *Fogel*, 2017 WL 751155, at *8 n.11 (emphasis added) (citations omitted).  Here, the first alleged stock purchase of any class member for purposes of this action occurred no earlier than the start of the purported Class Period on October 23, 2012.  ¶ 140.  Therefore, even under *Arnold*, any alleged misstatements made before that date would be time-barred.

Because Plaintiff does not (and cannot) offer any lawful basis for creating an exception to the applicable statute of repose, the Court must dismiss all alleged violations occurring before October 23, 2012—including the allegedly fraudulent YE 2011 and HY 2012 impairment determinations; the misstatements, omissions, and false certifications alleged in the 2011 Annual Report and March bond offering, ¶¶ 50–53; alleged misstatements to investors in April 2012, ¶ 73–75; and misstatements and omissions alleged in Controller's and Impairment Papers at HY 2012,

¶¶ 60–72, in August 2012 SEC filings and bond offerings, ¶¶ 76–77, 80–84, and at investor seminars in August 2012, ¶¶ 78–79, and on October 9, 2012, ¶¶ 85–86.

### C. Alleged Violations Occurring after October 23, 2012 Are Insufficiently Pleaded.

Once the untimely allegations are dismissed, the Court can readily dismiss the remaining handful of allegations.  Notably, Plaintiff does not dispute that the RTCM impairment was for the appropriate amount, or that it was taken at the earliest reporting period after confirmation of new information learned in late November 2012.  *See* ¶ 93.  Instead, Plaintiff alleges just two sets of misstatements after October 23, 2012:  (1) public statements made in November 2012 and February 2013, *see* ¶¶ 88–92; and (2) internal statements made to Rio Tinto employees in November 2012, *see* ¶¶ 93–95.  Plaintiff alleges no other statements between October 23, 2012 and the end of the Class Period on March 15, 2013.  In addition to failing to plead fraud with particularity, these allegations fail adequately to plead materiality, scienter, loss causation, and scheme liability.  *See infra* II.A–B.  They also suffer from the following fatal pleading deficiencies.[10]

### 1. The Public Statements Are Inactionable as a Matter of Law.

The Complaint identifies five public statements made after October 23, 2012, within the applicable period of repose.  *See* ¶¶ 88–92.  None of these statements is actionable against any Defendant; furthermore, none was made by Mr. Elliott.

*First*, Plaintiff alleges that Rio Tinto did not disclose certain information in an exhibit to a Form 6-K.  ¶ 88.  But Plaintiff makes no allegation that the omitted information rendered any statement misleading or otherwise failed to satisfy some other disclosure duty.  The alleged omissions therefore are not misleading as a matter of law.  *See Basic Inc. v. Levinson*, 485 U.S.

---

[10]  Because the Section 10(b) claims are untimely and fail to state a claim, the Section 20(a) claims must be dismissed "for lack of a primary violation."  *Kuwait*, 128 F. Supp. 3d at 809.

224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading[.]"); *see infra*

II.B.1.c.

*Second*, Plaintiff asserts that "Defendants" made a presentation stating, "[o]ur presence in

Africa is growing," alongside a map and photographs of ten Rio Tinto operations in Africa (in-

cluding RTCM).  ¶ 89.  But whether viewed as a statement about Rio Tinto's presence generally,

or RTCM specifically, that statement was not misleading as a matter of law:  Rio Tinto's pres-

ence in Africa *was* growing, as was RTCM, which earlier that year had begun to produce and

ship coal from the Benga mine.  2012 AR at 29.

*Third*, Plaintiff asserts that the reference to looking at "all the transportation options" was

misleading, ¶ 90, but that statement, properly read in context, is not misleading as a matter of

law.  According to the seminar transcript, Mr. Albanese stated:  "I think what we would need to

look at would be all the transportation options, but realistically continued upgrades of the Beira

[railway] line and then looking at a transportation corridor, a sort of pathway for expansions.  *Id.*

He added, "but again I think we need to keep in mind that any of the options should always be

looked at, at different times."  *Id.*  In other words, he simply made a general statement that a

company should "always" "look at" "all the . . . options," but then qualified that statement by

adding: "but realistically continued upgrades of [an existing railway] line"—focusing on the very

option that Plaintiff claims was the "only" option left.  ¶ 79.  A defendant does not commit secu-

rities fraud by uttering the platitude that companies should always look at all the options—partic-

ularly when he then qualifies that statement by acknowledging that only one option is "realis-

tic[]."

In all events, even accepting Plaintiff's view that Mr. Albanese focused on multiple op-

tions, not just one option, the statement would still fall short of being false or misleading.  When

Mr. Albanese made this statement, Rio Tinto was still reviewing multiple options for rail transport, including both upgrading existing rail and jointly building a new greenfield railway. *Supra* 9. Both Controller's Papers referenced "the breadth of [those] options," which were a key reason why "a central case view [wa]s still under development." ¶¶ 65, 68. Because "multiple options" remained in play with respect to transportation solutions, Mr. Albanese's statement was not false or misleading as a matter of law.

*Fourth*, Mr. Albanese's reference to "the first shipment of coal from Mozambique," ¶ 91, likewise was not misleading as a matter of law. The Company's 2012 Annual Report confirms that—notwithstanding Plaintiff's protestations about the limits on Rio Tinto's "ability to transport any coal to market"—Rio Tinto *had* made an initial shipment of coal in 2012. The Report states that the Benga mine had "officially opened in May 2012 *with first coal exported in June 2012*," with "commercial production in 2012 [of] 460 thousand tonnes." 2012 AR at 29 (emphasis added). A defendant does not mislead investors by "referencing . . . the first shipment of coal," when such a first shipment did in fact occur.

Mr. Albanese's description of "the Moatize Basin as a long-term opportunity with the potential to grow beyond 25 million tons of coal per year," ¶ 91, also is not actionable and was not misleading as a matter of law. "[E]xpressions of optimism" and "projections of future performance" ordinarily are "not actionable." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 112 (2d Cir. 2011); *see also IBEW Local Union No. 58 Pension Tr. Fund v. Royal Bank of Scot. Grp.*, 783 F.3d 383, 392 (2d Cir. 2015) ("Statements of general corporate optimism . . . do not give rise to securities violations."). "This is especially true where . . . the allegedly fraudulent statements about future performance . . . are not stated as guarantees." *Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250, 252 (2d Cir. 2004) (summary order) (quoting *Halperin v. eBankerUSA.com, Inc.*,

31

295 F.3d 352, 357 (2d Cir. 2002)).  Mr. Albanese's reference to RTCM's "potential to grow" was both an "expression of optimism" and a "projection of future performance," and not even Plaintiff claims that the statement was worded as a guarantee.  It is therefore not actionable.

The statement also was not misleading as a matter of law.  The seminar transcript shows that, during the public question-and-answer session, investors recognized that "obviously the small-scale operations [are] starting up and it is going to be some years before you do the big infrastructure thing."  Ex. 20, at 9.  This public statement demonstrates that investors understood that, while the Moatize Basin may have had long-term potential, Rio Tinto had to address challenges for "some years" before it could realize that potential.  *Id.*  In other words, investors fully understood that Mr. Albanese was not making a guarantee.  They were not misled.

*Fifth*, Rio Tinto's February 5, 2013 registration statement of the March 2012 bond offering is not actionable for two reasons.  Plaintiff fails to "specify the statements" in the underlying March 2012 prospectus that he "contends were fraudulent."  *Novak*, 216 F.3d at 306.  Plaintiff's failure to allege *what* the underlying statements were and "explain *why*" they were misleading dooms his claim.  *Rombach v. Chang*, 355 F.3d 164, 175 (2d Cir. 2004) (emphasis added).  Moreover, Plaintiff cannot show that the registration statement was material, for investors were already aware by that time that RTCM had been impaired.  *See* ¶ 134.

Even if these statements were actionable (they are not), they still would need to be dismissed as to Mr. Elliott because he did not "make" any of them.  Under the Supreme Court's decision in *Janus*, an individual can be liable under Section 10(b) only if he or she has "ultimate authority" or "control" over a statement in order to "make" it.  *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).  While written statements can have multiple authors, *Moon Joo Yu v. Premiere Power LLC*, 2018 WL 456244, at *10 (S.D.N.Y. Jan. 17, 2018),

verbal statements cannot, *see Janus*, 564 U.S. at 143 ("[T]he content [of an oral statement] is entirely within the control of the person who delivers it."); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 572 n.13 (S.D.N.Y. 2012) (one cannot be liable "for the allegedly false statements made by [another]" because he "fail[ed] to correct or clarify" those statements). Under *Janus*, "it is the speaker who takes credit—or blame—for what is ultimately said," 564 U.S. at 143. Because there are no allegations that Mr. Elliott "made" any statements at the November 2012 conferences, or that he reviewed, signed or approved the November 2012 6-K or the February 2013 registration statement, Mr. Elliott cannot be liable for those statements.

### 2.   The Complaint Fails Adequately to Plead Fraud or Reliance with Respect to Internal Actions.

Plaintiff relies on the SEC's allegations that, in November 2012, Mr. Elliott told the Audit Committee of "late breaking" information about RTCM that he had "recently learned" from the head of Rio Tinto's T&I Division, SEC Compl. ¶ 158–59, and that the T&I head allegedly "expected" to be contacted after the Audit Committee meeting, but was not, ¶ 93. But that does not adequately allege fraud because, even assuming that there was no follow-up with the T&I executive, that in no way suggests that Mr. Elliott made any misstatement or omission. Moreover, Plaintiff has attempted to plead reliance using the fraud-on-the-market doctrine, *see* ¶¶ 146–47, under which "reliance is presumed when the statements at issue become public," *Stoneridge Inv. Partners v. Scientific-Atl.*, 552 U.S. 148, 159 (2008). But there are no allegations that the alleged actions became public at any point until October 2017, when the SEC filed its action against the Defendants and the U.K. Financial Conduct Authority issued its Final Notice finding no fraud by the Company or wrongdoing by the Individual Defendants. Because "[n]o member of the investing public had knowledge, either actual or presumed, of [the allegedly] deceptive acts during the relevant times," Plaintiff "cannot show reliance upon any of [Defendants'] actions." *Id.*; *see*

*also*, *e.g.*, *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 518–19 (S.D.N.Y. 2017) (dismissing fraud claim for "fail[ure] to allege that investors knew of, or relied upon, [defendant's] attempt to cover up his alleged self-dealing").

## II.   Even Considering Alleged Violations That Occurred Before October 23, 2012, The Complaint Must Be Dismissed As To All Defendants.

Even if the Court were to consider alleged violations that occurred before October 23, 2012 (and it should not), the Complaint still must be dismissed in its entirety because it fails to satisfy Rule 9(b)'s heightened pleading standards and fails adequately to plead numerous elements of a Section 10(b) private fraud claim.  The Section 20(a) claims also must be dismissed for failure adequately to allege a primary violation or culpable participation.

### A.   The Complaint Fails to Satisfy Rule 9(b)'s Heightened Pleading Requirements.

Despite amending his Complaint, Plaintiff continues to fail to satisfy Rule 9(b)'s heightened standard as to any Defendant.  For example, Plaintiff still omits critical facts—such as *what* impairment determinations Rio Tinto actually made at YE 2011 and HY 2012, *e.g.* ¶¶ 51, 76, or *when* or *by how much* an impairment should have been taken (in Plaintiff's hindsight view), ¶¶ 51, 76, 82, 93.  *See*, *e.g.*, *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 411 & n.10 (S.D.N.Y. 2007) (dismissing allegations of fraudulently overstated assets for failure "to specify the amount by which [they] were overvalued, and at what times").  And Plaintiff continues to group Defendants together, contending that "Defendants declared," ¶ 51, "Defendants knew," ¶ 43, "Defendants described," ¶ 85, or "Defendants made a presentation" on certain information, ¶ 89. But where, as here, there are multiple defendants, Rule 9(b) "is not satisfied" when "'defendants are clumped together in vague allegations.'"  *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 329 (S.D.N.Y. 1999) (citation omitted); *see also Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175

(2d Cir. 1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'").  Accordingly, the Complaint must be dismissed.

### B.   The Complaint Fails Adequately to Plead Numerous Essential Elements of a Section 10(b) Fraud Claim.

To state a Section 10(b) claim for fraud, Plaintiff must allege that Defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiff[] relied; and (5) that plaintiff['s] reliance was the proximate cause of their injury." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).  Nearly all of these elements are insufficiently pleaded here, as is Plaintiff's attempt to repackage his inadequate misrepresentations and omissions claims as a claim for scheme liability.

#### 1.   The Complaint Fails to Plead Falsity as a Matter of Law.

The Complaint alleges three types of misstatements and omissions:  (1) statements concerning RTCM's value, net earnings, and profits; (2) statements concerning RTCM's prospects; and (3) the concealment of various developments.  These allegations all fail because they ignore that investors and Rio Tinto's independent auditors were well aware that RTCM was an exploratory and extremely complex operation with significant infrastructure and resource challenges.

##### a.   Statements Regarding RTCM's Valuation Were Objectively Reasonable and in Any Event Are Non-Actionable Opinions.

The Complaint alleges misstatements regarding RTCM's value, profits, and impairment determinations.  *E.g.*, ¶¶ 50–53, 60–72, 76, 82, 92.  These statements are not misleading even if treated as statements of *fact*, and certainly fail the more stringent standard for *opinion* liability.

**i.**   Plaintiff does not adequately allege that RTCM's value was overstated.  He asserts that Rio Tinto should have taken an impairment on RTCM within just five months (or at most eleven months) of the acquisition date.  But the reality is that Rio Tinto's post-acquisition feasibility studies were extraordinarily expensive and complex—involving extensive drilling and

testing of the ore-body material for a large geographical area, repeated lobbying of the Government of Mozambique for approval of a barging option, and identifying and reaching out to potential partners to develop other transportation solutions. *See, e.g.*, 2011 AR at 27, 41, 78, 190; ¶ 57. Rio Tinto's extensive and continued studies belie the claim that it thought RTCM had no value so soon after acquisition; if that were true, it would not have spent millions of dollars on the project through 2012. *See* 2012 AR at 221. That Rio Tinto has never restated its YE 2011 or HY 2012 financial statements, nor has its auditor modified its conclusions on those statements, confirms that RTCM's impairment determinations were not misleading as a matter of law.

The Complaint's conclusory allegations rely on snippets taken entirely out of context. For example, Plaintiff alleges that the 2011 Annual Report "concealed that Rio Tinto did not test RTCM for impairment," ¶ 51, but omits that the Report accurately disclosed that Rio Tinto had assessed a "provisional" fair value based on the acquisition value, 2011 AR at 162. Plaintiff likewise ignores that Rio Tinto's public statements were replete with caveats that "meaningfully warned investors that there were potential contingencies, including geologic ones, that could retard development of the mine." *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 302–03 (S.D.N.Y. 2013). Specifically, RTCM was an "undeveloped" resource that offered only a "long term" development opportunity, 2011 AR at 27; RTCM's acquisition value was "provisional" and "subject to further review," *id.* at 190; and post-acquisition "feasibility studies" were ongoing, *id.* at 27. Rio Tinto also repeatedly cautioned investors that political conditions could result in "[l]imitations to . . . infrastructure access"; "numerous uncertainties inherent in estimating ore reserves" could cause previously valid assumptions to "change significantly with new information"; Rio Tinto's "ability to produce and transport products profitably" could "materially" affect performance; and Rio Tinto "may be unable to find willing and suitable

36

joint venture partners" for large projects.  2011 AR at Intro., 10–11; Ex. 29, at S-3, S-8, S-10, 4;

Ex. 30, at S-8, S-10, 4; *see also* Ex. 19, at 2.  This surrounding text clearly informed investors

that RTCM's valuation reflected a synthesis of provisional and evolving information.

      **ii.**      For similar reasons, the Complaint cannot satisfy the more stringent requirements

for *opinion* liability that apply here.  It is "well-settled in the Second Circuit" that impairment de-

terminations are statements of opinion, not fact.  *N. Collier Fire Control & Rescue Dist. Fire-*

*fighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at

*10 (S.D.N.Y. Sept. 30, 2016) (citing cases), *appeal dismissed*, 2017 WL 5201904 (2d Cir. Feb.

22, 2017).  That is because "estimate[s] of the fair value of . . . assets will vary depending on the

particular methodology and assumptions used," and "'[t]here may be a range of prices with rea-

sonable claims to being fair market value.'"  *Fait*, 655 F.3d at 110–11 (citation omitted).  As

opinion statements about the future viability of infrastructure options and the quantity and qual-

ity of available coal, statements about RTCM's valuation and impairment determinations thus

can be actionable only if (1) "the speaker did not hold the belief she professed," (2) "the support-

ing fact she supplied were untrue," or (3) the speaker omits information that makes the statement

misleading to a reasonable investor.  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus.*

*Pension Fund*, 135 S. Ct. 1318, 1327–29 (2015); *see also Tongue v. Sanofi*, 816 F.3d 199, 209–

14 (2d Cir. 2016) (applying *Omnicare* to Section 10(b) claims).

      Plaintiff does not allege that Defendants supplied untrue supporting facts or that any Rio

Tinto employee subjectively believed that impairment was required earlier.  And his allegations

(¶¶ 43, 51, 60–61, 69–72, 79, 96) that "defendants were aware of facts that *should* have led

them" to act differently are insufficient to establish subjective disbelief.  *City of Omaha Civilian*

*Empls. Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 68–69 (2d Cir. 2012) (per curiam); *see also Fait*,

655 F.3d at 110–12 ("clear indications that impairment testing was necessary" were insufficient to establish subjective falsity of "statements regarding goodwill"); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616–17 (9th Cir. 2017) (finding "no allegations of subjective falsity" where there were "no allegations" that defendant believed that the asset was impaired, or that required impairment testing had not been performed).

That leaves *Omnicare*'s third category of opinion liability, which it is "no small task" to plead. 135 S. Ct. at 1332. Because reasonable investors "do[] not expect that *every* fact known to an issuer supports its opinion statement," a court must examine the statement "in light of all its surrounding text," and ask whether, in context, there is a reasonable basis for the statement such that it "fairly aligns with the information in the issuer's possession at the time." *Id.* at 1329. Where, as here, Plaintiff "fail[s] to allege the actual assumptions that Defendants relied upon . . . it cannot be plausibly inferred that Defendants intentionally disregarded" the events, circumstances, or challenges relating to the asset. *Dearborn Heights*, 856 F.3d at 618.

Statements about RTCM's valuation and impairment determinations plainly had a reasonable basis. At YE 2011, internal models considered adverse developments, yet still concluded that RTCM's fair value had increased $1.2 billion due to a projected rise in coal prices. Ex. 9, at 2. This projection—made within a few months of acquisition—was reasonable, and there are no allegations that either Individual Defendant had any information to suggest otherwise. At HY 2012, Rio Tinto similarly considered the revised coal resource estimates, yet determined that RTCM's fair value likely still exceeded the acquisition value based on the "upward trajectory" of coal prices and revenue from adjacent mines. Ex. 13, at 3–4. The Complaint alleges that this latter valuation had "no reasonable basis in fact," ¶ 65, but that allegation is conclusory and ignores that coking coal prices had already risen 9% since the acquisition, *see* Ex. 13, at 3. The valuation

statements therefore were not misleading as a matter of law.  *See*, *e.g.*, *Dearborn Heights*, 856
F.3d at 619 (dismissing claim for failure to impair where the "failure to allege the assumptions
underlying Defendants' goodwill valuations" prevented plaintiff from showing that "Defendants
were aware of additional 'facts and circumstances'" indicating that an impairment was required).

In a recent summary order, the Second Circuit dismissed virtually identical allegations,
holding that a mining company's failure to disclose a consultant's pessimistic assessment of a
gold mine's viability was not misleading as a matter of law when properly viewed in "the context
of an investment in a gold mine." *Martin v. Quartermain*, 732 F. App'x 37, 41–42 (2d Cir.
2018) (summary order).  "[G]old mining is a volatile industry," the Court reasoned, and its inher-
ent risks are "enhanced where, as here, the mine is still under development, the physical infra-
structure is not fully in place, and the mine's developers do not yet have complete information
about its economic viability." *Id.* at 42.  Coal mining is also volatile and risky, and most of
RTCM's mines were far short of the development stage in 2012, as potential options for trans-
porting the coal to market were still under review, and tests of RTCM's economic viability were
not yet complete.  Especially because Rio Tinto "emphasized the preliminary nature" of RTCM
by qualifying its figures as "'estimates'" that "'may ultimately prove to be inaccurate,'" *id.*, the
alleged statements about RTCM must be dismissed.  *See* 2011 AR at 10–11 (ore-body estimates
could "change significantly with new information," and exploratory assets "might be unsuccess-
ful"), 190 (RTCM's value was "provisional" and "subject to further review").

Plaintiff's core fallacy is to suggest that the securities laws impose liability "merely be-
cause an issuer failed to disclose information that ran counter to an opinion expressed." *Tongue*,
816 F.3d at 212.  But an opinion statement is not necessarily misleading simply because "the is-
suer knows, but fails to disclose some fact cutting the other way." *Omnicare*, 135 S. Ct. at 1329.

Courts thus have dismissed claims of overstated assets even in egregious circumstances. *See*, *e.g.*, *City of Omaha*, 679 F.3d at 68–69 (impairment testing not required under *Fait* despite company's "general financial deterioration"); *N. Collier Fire Control*, 2016 WL 5794774, at *1, *3, *10–11 (asset not overstated under *Omnicare* even though subsidiary had "effectively ceased operations" and was "poorly performing or defunct"); *In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *18–20 (S.D.N.Y. Aug. 19, 2015) (R. & R.) (statement that asset was "well positioned for growth" not misleading under *Omnicare* even though "generally poor infrastructure and lack of investment in improvement" had rendered stated projections "impossible"), *adopted*, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015).  Under these standards, none of the statements pertaining to RTCM's valuation or the impairment process is actionable.

**b.  Other Alleged Misstatements Were Not False or Misleading.**

The Complaint next alleges misleading statements made in public filings, in bond offerings, in the Controller's and Impairment Papers, and to investors about RTCM's prospects and operations.  *See* ¶¶ 50–52, 60–72, 73–75, 77–79, 83, 85–91, 92.  These statements are not actionable or are not false as a matter of law.

Statements in Rio Tinto's public filings and bond offerings (*e.g.*, ¶¶ 50–52, 77, 83, 92) all must be dismissed because Plaintiff fails to "*specify* the statements that [it] contends were fraudulent." *Novak*, 216 F.3d at 306 (emphasis added).  For example, Plaintiff states that Defendants certified that the 2011 Annual Report provided a "true and fair view of the assets," ¶ 50, and that the Report "was false when made," ¶ 51.  But Plaintiff fails to allege *what* the underlying statements were and "explain *why*" they were misleading.  *Rombach*, 355 F.3d at 175 (emphasis added); *see also ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 103–04 (2d Cir. 2007) (dismissing under Rule 9(b) a claim based solely on "speculative inferences").

Statements in the Controller's and Impairment Papers (¶¶ 60–72) were not misleading in context because, as discussed *supra* 14, the papers clearly detailed the significant "uncertainty" surrounding RTCM's infrastructure and resource challenges, and that post-acquisition studies were ongoing, Ex. 12, at 13; Ex. 13, at 2.  The discussion of greenfield rail options was not misleading because it concerned only "independently owned or shared development" options involving a partnership, Ex. 12, at 13, *not* the solo construction that Mr. Albanese had allegedly ruled out, ¶ 57.  And it was not misleading to state that the infrastructure options "'have not been quantified with any degree of accuracy yet,'" ¶ 67, because valuations were not even accurate to within $5 billion, *see* ¶ 47 ($5.55 billion range); SEC Compl. ¶ 151 ($5.2 billion range).  Moreover, because "[n]o member of the investing public" is alleged to have "had knowledge" of these statements during the Class Period, Plaintiff "cannot show reliance upon any of [Defendants'] actions."  *Stoneridge*, 552 U.S. at 159; *see also Menaldi*, 277 F. Supp. 3d at 518–19.

Statements to investors (¶¶ 73–75, 78–79, 85–91) likewise were inactionable puffery and were not misleading as a matter of law.  For example, statements to shareholders in April 2012 that "Rio Tinto was growing its coal business, with a target of starting shipments" from some of the assets in the first half of 2012, ¶ 73, clearly were not misleading because the Benga mine "officially opened in May 2012 with first coal exported in June 2012," 2012 AR at 29.  And statements on August 8, 2012 that RTCM was "more prospective," had "more potential," and that the Moatize "was truly a world-class basin coal deposit," ¶ 78, were the sort of general "financial projections and statements of guarded optimism" that are inactionable puffery, *Rombach*, 355 F.3d at 175; *see also Nokia Corp.*, 423 F. Supp. 2d at 399–400; *supra* 31.  Moreover, the Complaint fails to include Mr. Albanese's cautionary language from that same presentation, which

warned that "it's realistic and likely that we'll take longer to develop this infrastructure than pre-viously planned due [to] . . . internal constraints on capital."  Ex. 18, at 3.

Thus, *none* of the alleged statements about RTCM's prospects or operations is actionable.

### c.      No Risks or Adverse Developments Were Concealed.

Plaintiff alleges that Defendants concealed various risks and adverse developments in public filings, statements to investors, and in the Controller's and Impairment Papers.  *See* ¶¶ 49, 51, 63, 69, 74, 77, 83.  Unlike with the omissions discussed above, Plaintiff does not allege that these particular omissions rendered any statement misleading.  Yet these allegations, too, fail to state a claim—not least because investors were well aware of the key risks that RTCM faced.

"Silence, absent a duty to disclose," is not actionable.  *Basic*, 485 U.S. at 239 n.17.  In the absence of allegations that Defendants omitted information that they were required to disclose—whether to render a statement not misleading or to satisfy another duty—the alleged omissions are not actionable.  *See Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 153 (2d Cir. 2013) (the se-curities laws "'do not create an affirmative duty to disclose any and all material information'" (citation omitted)); *see also In re Barclays Bank PLC Sec. Litig.*, 2017 WL 4082305, at *12–13 (S.D.N.Y. Sept. 13, 2017) (granting summary judgment with respect to omissions that rendered no statement misleading and violated no disclosure duty), *appeal filed* (2d Cir. Oct. 16, 2017).

Regardless, the alleged omissions cannot be *misleading* because no "reasonable investor could have been misled into thinking that the [omitted] risk[s] . . . did not actually exist." *Halperin*, 295 F.3d at 359.  It was well known and specifically disclosed that RTCM was a large and complex operation, with only provisional value subject to further review, and that significant infrastructure and resource risks in Mozambique could cause previously valid assumptions to "change significantly with new information."  2011 AR at 11; *see also* Ex. 6; Ex. 8.  Investors were aware that Rio Tinto's barging proposal had been rejected, that "current rail infrastructure"

was limited to six million tons, and that miners generally "lack[ed] options for getting their product to the port." Ex. 11, at 2.  In these circumstances, *no* reasonable investor would have thought that RTCM's infrastructure and resource risks "did not actually exist."  *Halperin*, 295 F.3d at 359; *see Rombach*, 355 F.3d at 175–76 (holding that falsity was not established where cautionary statements provided a sufficiently "sobering picture" of the issuer's financial condition).

Because the Complaint thus fails to allege any actionable misstatement or omission, the Section 10(b) claims must be dismissed in their entirety.

## 2. Most Alleged Misstatements Were Not "Made" by Mr. Albanese or Mr. Elliott.

Rule 10b-5 forbids "any person . . . [t]o *make* any untrue statement of a material fact" in connection with the purchase or sale of securities.  17 C.F.R. § 240.10b-5 (emphasis added).  In *Janus*, the Supreme Court held that "[t]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it."  564 U.S. at 142.  One who assists, publishes, crafts, or even is "significantly involved in preparing" the statement does not thereby "make" the statement, for "[w]ithout control, a person or entity can merely suggest what to say, not 'make' a statement in its own right."  *Id.* at 142–43, 148.  Further, "in the ordinary case attribution within a statement . . . is strong evidence that a statement was made by—and only by—the party to whom it is attributed."  *Id.* at 143.  As a result, in the context of public company filings, "only those officers whose signatures appear on misleading statements may be liable as the 'makers' of those statements."  *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152, 165 (S.D.N.Y. 2012).

Plaintiff alleges that Mr. Albanese and Mr. Elliott made two categories of misrepresentations: (1) written statements in Rio Tinto's interim financial report for HY 2012, ¶¶ 76–77, in the Controller's Papers and Impairment Paper, ¶¶ 63–64, 69, in the March 2012 and August 2012

bond-offering documents, ¶¶ 52–53, 80–84, and in the February 2013 registration statement, ¶ 92; and (2) oral representations at investor seminars in late 2012, ¶¶ 78, 85, 89–91.  Claims relating to the written statements must be dismissed because Mr. Albanese and Mr. Elliott did not "make" those statements under *Janus*.  And claims relating to the oral statements that were not "made" by Mr. Elliott fail for separate reasons, including that they were not false or misleading, *see supra* II.B.1.b.

          **a.**       **Neither Individual Defendant "Made" Certain Alleged Written Statements.**

The Complaint fails to allege that Mr. Albanese or Mr. Elliott "made" any written statements about RTCM—other than in the 2011 Annual Report, which is addressed *supra* II.B.1.a–b.

The Complaint does not allege that Mr. Albanese or Mr. Elliott signed or were required to sign the HY 2012 report.  *See* ¶¶ 76–77.  Indeed, the paragraphs of the Complaint that discuss the report do not even mention either Defendant.  *Id.*

The Complaint also fails to allege that Mr. Albanese or Mr. Elliott "made" any statements in the Controller's Papers or Impairment Paper.  They did not sign these papers, *see* Exs. 12, 13, 17; in fact, the Controller's Papers state that they were "from Dan Larsen and Pricewaterhouse-Coopers," *see* Ex. 12, at 1; Ex. 13, at 1.  And none of these papers even mentions Mr. Albanese or Mr. Elliott.

The Complaint likewise fails to allege that Mr. Albanese or Mr. Elliott "made" the statements in Rio Tinto's March and August 2012 bond-offering documents and February 2013 registration statement.  There are no allegations that either Defendant had control over the contents of these documents or signed the documents, or even that the statements therein were attributed to Mr. Albanese or Mr. Elliott.  *See* ¶¶ 52–53, 80–84, 92.

Plaintiff nevertheless seeks to hold Mr. Albanese and Mr. Elliott liable on the ground that these documents state that they incorporate the 2011 Annual Report by reference, and "Albanese and Elliott signed the . . . 2011 Annual Report." ¶ 81; *see also* ¶¶ 92, 123, 129. Plaintiff's theory of liability flatly contradicts *Janus*, in which the Supreme Court held that a statement is "made" "*only by*" the "person or entity" to whom it is attributed and who has "control" over its contents. 564 U.S. at 142 (emphasis added). The Court specifically rejected the theory that "a person who 'provides the false or misleading information that another person then puts into the statement'" is the maker of the statement, reasoning that such conduct "is merely an . . . act preceding the decision of an independent entity to make a public statement." *Id.* at 145 (citation omitted). In this case, Plaintiff never alleges that Mr. Albanese or Mr. Elliott had control over the contents of the bond-offering documents, or that these documents were attributed to them. Instead, he alleges at most that Mr. Albanese and Elliott "provide[d] the [allegedly] false or misleading information" (the 2011 Annual Report) that was then "pu[t] into the statement" (the bond-offering documents). *Id.* To accept that allegation as sufficient is to contradict *Janus*.

As in *Janus*, Plaintiff's theory of liability contradicts the ordinary "meaning" of the word "make" "when 'make' is . . . directed at an object expressing the action of a verb." 564 U.S. at 144. In ordinary English, *A* does not "make" the statements in a document authored by *B*, simply because *B* has chosen to refer to something that *A* had previously written. For example, this brief refers to (and even quotes) opinions from the Second Circuit. Yet all would agree that the "makers" of the statements in this brief are the lawyers who wrote the brief—not the judges who wrote the opinions to which those lawyers chose to refer. The Court should dismiss the claims that Mr. Albanese and Mr. Elliott are liable as makers of statements in these written documents.

> **b.      Mr. Elliott Did Not "Make" Any Misrepresentations at Investor Conferences.**

The Complaint's allegations that various Defendants made oral misrepresentations at investor conferences, *see* ¶¶ 78–79, 85–86, 88–91, fail as to all Defendants for reasons discussed *supra* I.C.2, II.B.1.b.  And they fail as to Mr. Elliott for the additional reason that he did not "make" any misstatements at any of these conferences, and he did not even attend the Metal Bulletin African Iron Ore Conference, *see* ¶ 89.

For the August conference, the Complaint alleges only that Mr. Elliott "participated" in that conference and "did not correct [Mr.] Albanese's [alleged] material misrepresentations regarding RTCM."  ¶ 78.  But Mr. Elliott cannot be liable for failure to correct someone else's alleged misstatements.  Indeed, in a case almost exactly on point, a court in this District explained that "holding [the CFO] liable for [the CEO's] alleged false statements [during a conference call] based on a failure to correct, or omission, would be in tension with the Supreme Court's [*Janus*] decision."  *Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d at 572 n.13.

Similarly, for the October and November 2012 investor conferences, the Complaint identifies statements by "Defendants"—not by Mr. Elliott.  For the October conference, the Complaint alleges only that "Defendants described Rio Tinto's acquisition of Riversdale as . . . the purchase of a highly prospective, 'tier one' coking coal resource."  ¶ 85.  Yet the transcript of that conference shows that Mr. Elliott did not make any statement about Riversdale or RTCM.  *See* Ex. 19.  There are no allegations that Mr. Elliott participated in or made any misstatements at the November conference.  Mr. Elliott cannot be liable for alleged misstatements he never made.

> **3.      The Alleged Misstatements and Omissions Were Immaterial as a Matter of Law.**

The Section 10(b) claims also must be dismissed because Plaintiff has failed to plead materiality as a matter of law.  A statement or omission is material if "'a reasonable investor would

view it as significantly altering the "total mix" of information made available.'" *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 146 (2d Cir. 2017) (brackets and citation omitted).  Courts conduct this "objective" inquiry, *id.*, by considering "both quantitative factors and qualitative factors," *id.* at 147.  Those factors demonstrate that the alleged misstatements and omissions here were "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000).

To begin, the alleged misstatements "carr[y] the preliminary assumption of immateriality" because they "relate[] to less than 5% of a financial statement." *IBEW*, 783 F.3d at 390.[11] Rio Tinto owned dozens of other exploratory assets, 2011 AR at 30, and RTCM was a relatively minor asset, amounting to less than 3% of Rio Tinto's total assets, *see* 2012 AR at 142 ($118 billion in total assets); 2012 6-K at F-5 ($121 billion); 2011 AR at 134 ($120 billion), and not even 25% of the $14 billion impairment announced in January 2013, ¶ 100.  Even when a number "may sound staggering, the number must be placed in context"—and in this context, $3 billion was presumptively immaterial. *ECA v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009).

Qualitative factors cannot overcome this presumption here because *none* supports a finding of materiality.  *See IBEW*, 783 F.3d at 390–91 (listing qualitative factors considered).  Many factors simply are not present:  none of the alleged misrepresentations changed "a loss into income or vice versa" or involved the "concealment of an unlawful transaction" or "a change in earnings or other trends"; and there are no allegations that the purported misstatements "hid[] a failure to meet analysts' consensus expectations." *Id.* at 391.

---

[11]   The Second Circuit has established that "items in issue should be compared to like items on the corporate financial statement." *Ganino*, 228 F.3d at 165.  Because the value of an asset is at issue here, the relevant comparison is to the value of Rio Tinto's other assets.

There also was no "negative market reaction" to the impairment announcement, *IBEW*, 783 F.3d at 391, presumably because mining companies frequently take impairments on exploratory assets, *see supra* 17–18.  Although one investor viewed the RTCM acquisition as a mistake and some research analysts claimed that the impairment spoke to a "chequered M&A track record," ¶ 110, there is no allegation that the market as a whole reacted negatively.  In fact, the day after the announcement, Moody's stated that the impairment would "not affect the company's ratings," Ex. 24, at 1, and the only alleged credit-*outlook* downgrade occurred well over a month after the impairment announcement, just after Rio Tinto had announced its first loss ever, ¶ 111.  Conclusory allegations of stock drops "[i]n response to" the impairment announcement, ¶ 104; *see also* ¶ 107, cannot overcome the presumption here, for the "obvious alternative explanation" for those drops given the allegations in the Complaint, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 567 (2007), was the outsized $11 billion Alcan impairment taken the same day, ¶ 100.

Further, there are no allegations that RTCM's value was an "item capable of precise measurement."  *IBEW*, 783 F.3d at 391.  Nor could there be:  because RTCM involved "exploration and early development stage projects," its value could only be "provisionally estimated" before YE 2012.  2011 AR at 190; *see In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 466 (S.D.N.Y. 2017) (finding that certain payments were incapable of precise measurement because relevant "annual reports emphasize the uncertain nature of the amounts of illicit payments").  Indeed, the Complaint alleges *nine* different valuations, ranging from $5 billion to -$9 billion, *see* ¶¶ 32, 37, 47, 56, 65, 76, 100, 114; SEC Compl. ¶¶ 151, 153—and even some of those estimates were unable to narrow RTCM's value to within a $5 billion range, *see* SEC Compl. ¶¶ 151, 153.

Finally, RTCM did not "play[] a significant role in [Rio Tinto's] operations or profitability," *IBEW*, 783 F.3d at 391, but was instead an undeveloped and unproven asset—as investors

were well aware, *see* 2011 AR at 27, 190; *see also* ¶ 29.  In fact, RTCM did not even begin to contribute to Rio Tinto's revenue until June 2012.  *See* 2012 AR at 29 (noting first coal shipment from Benga mine in June 2012).  In these circumstances, and especially in light of the ongoing studies, RTCM did not *yet* play any significant role in Rio Tinto's operations and profitability.

Because the alleged statements and omissions were presumptively immaterial, and qualitative factors cannot overcome that presumption, the Section 10(b) claims must be dismissed.

### 4.    The Complaint Fails Adequately to Allege Facts Giving Rise to a Strong Inference of Scienter.

All Section 10(b) claims must be dismissed for the independent reason that Plaintiff fails to allege with particularity facts giving rise to a "strong inference" of scienter.  15 U.S.C. § 78u-4(b)(2).  "The PSLRA requires plaintiffs to '*with respect to each act or omission* alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at *8 (S.D.N.Y. June 28, 2017) (Torres, J.) (emphasis in original) (quoting 15 U.S.C. § 78u-4(b)(2)), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018) (summary order).  In a Section 10(b) claim, "the required state of mind is 'scienter,' that is, an intent 'to deceive, manipulate, or defraud.'"  *Id.* (quoting *Tellabs*, 551 U.S. at 313).  A "strong" inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314 (citation omitted).  To meet this standard, Plaintiff must plead either "motive and opportunity to commit fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness."  *ECA*, 553 F.3d at 198.  "Where multiple defendants are asked to respond to allega-

tions of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *United States v. TEVA Pharm. USA, Inc.*, 2016 WL 750720, at *12 (S.D.N.Y. Feb. 22, 2016). Plaintiff has failed to satisfy this heavy burden as to each Defendant.

### a. The Complaint Fails Adequately to Allege Facts Giving Rise to a Strong Inference of Scienter as to Mr. Albanese.

The Complaint fails adequately to allege that Mr. Albanese had a "motive . . . to commit fraud." Plaintiff nowhere alleges that the purported fraud would have enriched Mr. Albanese or even benefited him in any "concrete and personal way." *Novak*, 216 F.3d at 307.

Plaintiff instead hypothesizes that Mr. Albanese was "motivated to suppress bad news" about RTCM to avoid "a pattern of evaluation failure or performance failure," Dkt. #43 at 4 (July 26, 2018), and to enable Rio Tinto to secure "upgrades from two major credit-rating agencies" and "issue[] four bonds," ¶¶ 119–20. But it is well established that "the motive to maintain the appearance of . . . the success of an investment," *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996), or the "desire to maintain a high bond or credit rating" does not "qualif[y] as a sufficient motive for fraud," *San Leandro Emergency Med. Plan v. Philip Morris*, 75 F.3d 801, 814 (2d Cir. 1996). Every corporation "naturally" has interests in maintaining an image of success and securing a good credit rating; "if scienter could be pleaded on that basis alone, virtually every company . . . could be forced to defend securities fraud actions." *Chill*, 101 F.3d at 268. These allegations thus do not satisfy Plaintiff's burden. *See id.*; *Novak*, 216 F.3d at 307 (holding that allegations of a corporate officer's "desire to maintain a high corporate credit rating" and "stock price . . . to . . . prolong the benefits of holding corporate office" do not adequately allege scienter).

In the absence of a sufficient allegation of motive, Plaintiff must allege "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198. Where, as

here, "motive is not apparent," "the strength of the circumstantial allegations must be corre-

spondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).  That is particularly

true with respect to the Complaint's core allegation:  that statements regarding the accounting

treatment and carrying value of RTCM were false or misleading.  Where "all that is involved is a

dispute about the timing of the writeoff[,] the inquiry is framed by the recklessness standard—

that is, whether the failure to take a write-down amounted to highly unreasonable conduct which

represents an extreme departure from the standards of ordinary care." *Heat & Frost Insulators

Pension Fund v. IBM Corp.*, 205 F. Supp. 3d 527, 535–36 (S.D.N.Y. 2016).

Plaintiff's burden is even higher still here because his own allegations and other docu-

ments properly considered at this stage *undercut* any inference of scienter.  These allegations and

documents establish the following.  *First*, Rio Tinto was a massive and complex organization,

*see* ¶¶ 20–22, making it difficult for Mr. Albanese or anyone in his position to control the details

of each operation.  *Second*, Mr. Albanese was not an accountant, and the responsibility for valua-

tion and impairment lay with others in Rio Tinto.  *See* SEC Compl. ¶ 35.  *Third*, Rio Tinto con-

sistently took impairments throughout the relevant period, including much larger impairments on

other assets.  *See* ¶ 26.  *Fourth*, constantly changing circumstances after the acquisition made it

unrealistic to value RTCM with precision.  *See* ¶¶ 36–45.  *Fifth*, there are no allegations that Rio

Tinto's independent auditors have ever withdrawn or restated any relevant opinions.  Taken to-

gether, these factors defeat any suggestion that Mr. Albanese acted with scienter.

Plaintiff's efforts to overcome these hurdles fail.  Plaintiff alleges that Mr. Albanese

stepped down in July 2013 at the same time the impairment was announced.  ¶¶ 98–99.  Yet

courts have "made clear" that "such allegations are insufficient" in the absence of "additional

factual allegations linking the executives' resignation to the alleged fraud." *In re UBS AG Sec.*

*Litig.*, 2012 WL 4471265, at *18 (S.D.N.Y. Sept. 28, 2012). Plaintiff tries to link the resignation to the alleged fraud through the press release announcing Mr. Albanese's retirement. ¶¶ 98–99. But in that same press release, Rio Tinto's chairman "pa[id] tribute" to Mr. Albanese "for his considerable contribution to Rio Tinto over more than 30 years of service and for his integrity and dedication to the company." Ex. 21, at 1. Far from supporting an inference of scienter, the circumstances surrounding Mr. Albanese's departure contradict it.

Plaintiff also suggests that Rio Tinto's history of impairments on other assets—particularly Alcan—caused Mr. Albanese to hide bad news on RTCM. Dkt. #43 at 4. But Plaintiff fails to justify his counterintuitive theory that investors or the Board would be outraged by losses on RTCM (an investment initially valued at $3.7 billion) while accepting significant impairments on Alcan (an investment worth almost $38 billion). The inference that Mr. Albanese plotted to conceal the smaller impairment while accepting the ordinary process for the larger investment is neither "cogent" nor "compelling." *Tellabs*, 551 U.S. at 324.

> **b.     The Complaint Fails Adequately to Allege Facts Giving Rise to a Strong Inference of Scienter as to Mr. Elliott.**

Plaintiff has failed adequately to plead that Mr. Elliott had any motive to commit fraud. In fact, there are no plausible allegations that he stood to gain *anything* of value, let alone to "benefit[] in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307–08. The only allegations relating to his finances are that he did *not* receive bonuses for 2012 or 2013. ¶ 112. Indeed, Mr. Elliott had begun planning his retirement before the alleged fraud took place, *see* Ex. 28, he was not removed from his position as a result of the impairment, and he retired as planned at the end of 2013, *see* ¶ 24. Plaintiff's suggestions that Mr. Elliott committed fraud because he wanted Rio Tinto to remain profitable and RTCM to succeed, was concerned about the history of impairments at Alcan, or that he wanted to maintain his reputation,

are all vague and generic.  *See* ¶¶ 118–31.  None of the allegations in the section of the Complaint titled "Additional Scienter Allegations" is particular to Mr. Elliott, and all of those allegations could be attributed to *any* executive at *any* company.  And the inference that Mr. Elliott plotted to conceal the smaller impairment at RTCM while accepting the ordinary process for the larger impairment concerning Alcan is counterintuitive and nonsensical.  The Second Circuit has made clear that such allegations are insufficient to plead scienter as a matter of law where every company "naturally" has an interest in success.  *Chill*, 101 F.3d at 268; *see also In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 407 (S.D.N.Y. 2013); *supra* 50.

The Complaint also fails to allege particularized facts showing "strong circumstantial evidence of conscious misbehavior or recklessness" by Mr. Elliott.  *ECA*, 553 F.3d at 198.  Where, as here, there is no legally sufficient allegation of motive, the strength of the recklessness allegations "'must be correspondingly greater.'"  *Kalnit*, 264 F.3d at 142 (citation omitted).  Yet several allegations are lacking here:  Mr. Elliott was not responsible for running RTCM as a business and no one at RTCM reported to him, *see* ¶ 24; Rio Tinto regularly took impairments to other assets when necessary, including impairments far larger than the one for RTCM, *see* ¶¶ 26, 100; the highly fluid circumstances in Mozambique meant that internal valuations for RTCM were widely variable and unreliable, *see, e.g.*, ¶¶ 37, 47, 56, 65; and Mr. Elliott—who is not trained as an accountant, ¶ 24—reasonably relied on Rio Tinto's well-established impairment review process, which involved determinations from the business unit, product group, Controller's office, and the independent auditors at PwC, who have never withdrawn their opinions.

The Complaint includes only a handful of allegations to suggest that Mr. Elliott was engaged in conscious misbehavior, and none of them survives scrutiny:

- The Complaint alleges that Mr. Elliott learned about the Government of Mozambique's rejection of barging, ¶ 42, but that development was public, and therefore irrelevant as a matter of law, *see supra* 8–9.

- The Complaint alleges that Mr. Elliott was aware that RTCM's "reserves and resources" had been reduced, ¶ 46, but it is undisputed that the revised "reserves and resources" numbers were fully disclosed in the 2011 Annual Report, 2011 AR at 49, 52, and that what remained after the write-down was still a sufficient amount of coal to support RTCM's mine plan, Ex. 13, at 7.

- Mr. Elliott's alleged comment that "the market" would not see Rio Tinto's internal assumptions about the size of the reduction in resources, ¶ 46, does not suggest any fraudulent intent.  Mr. Elliott merely stated the fact that Rio Tinto, like other mining companies, did not disclose previous internal forecasts.  Riversdale's estimates were publicly disclosed, and Rio Tinto publicly disclosed its revised resource estimates.  *See supra* 9.

- Mr. Elliott allegedly "did not invite the Controller to the Brisbane Meeting," ¶ 55, but this hardly implies that he *intended to defraud* anyone, particularly in the absence of any allegation that the Controller would ordinarily be expected to attend this kind of meeting half a world away from his London office.

- Mr. Elliott reviewed the Controller's Papers, which stated that a "number of options are available" for transportation and that "a central case view is still under development."  ¶¶ 60, 68.  But those statements were wholly consistent with other information Mr. Elliott allegedly learned, including that "RTCM was in the process of undergoing several analyses to evaluate potential future pathways," Att. B at 12, Dkt. #60 (FCA Final Notice), and RTCM was "seek[ing] out partners" for infrastructure solutions, ¶ 57.

The most plausible inference from these allegations is that Mr. Elliott's statements were "consistent with" the information "reasonably available" to him at the time.  *Novak*, 216 F.3d at 309.

In sum, the Complaint does not allege a "strong inference" of conscious misbehavior or recklessness.  The more cogent inference is that Mr. Elliott, like the market, knew of certain adverse developments, but could not know that they would result in severe reduction of RTCM's value at the time, and that he relied in good faith on Rio Tinto's internal controls and well-established accounting processes.  Ultimately, "'all that is involved is a dispute about the timing of the

writeoff,'" and Plaintiff has failed to support the inference "'that the failure to take an impair-

ment charge earlier was an error so grievous that it exceeded differences over accounting princi-

ples and rose to the level of fraud.'"   *Heat & Frost Insulators*, 205 F. Supp. 3d at 535–36 (altera-

tions and citations omitted).

### c.   The Complaint Fails Adequately to Allege Facts Giving Rise to a Strong Inference of Scienter as to Rio Tinto.

The Complaint fails adequately to plead Rio Tinto's corporate scienter, too.  To do so,

Plaintiff must allege "that an agent of the corporation committed a culpable act with the requisite

scienter, and that the act (and accompanying mental state) are attributable to" Rio Tinto.  *Team-*

*sters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir.

2008).  Plaintiff cannot mix-and-match the knowledge of some employees with statements made

by others.  Rather, scienter can be imputed to Rio Tinto "only if the individual corporate officer

*making* the statement has the requisite level of scienter."  *Southland Sec. Corp. v. INSpire Ins.*

*Solutions Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) (emphasis added) (citation omitted); *see also*

*Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th Cir. 1995) ("[T]here is no case

law supporting an independent 'collective scienter' theory."); Restatement (Third) of Agency

§ 5.03 cmt. d(2) (2006) (corporations are not liable for fraud "if one agent makes a statement, be-

lieving it to be true, while another agent knows facts that falsify the other agent's statements").

Here, Rio Tinto's alleged scienter can be based only on the scienter of Mr. Albanese or

Mr. Elliott because they are the only employees alleged to have committed a culpable act with

fraudulent intent.  Indeed, the Complaint alleges that the Controller's office, the Audit Commit-

tee, and the independent auditors were not aware of "the significant adverse developments" at

RTCM.  ¶ 63.  And there are no "'dramatic'" allegations from which a jury could reasonably *in-*

*fer* that the alleged misrepresentations must have been approved by other "'corporate officials

sufficiently knowledgeable'" to know that the statements were misleading.  *Teamsters*, 531 F.3d at 196 (citation omitted); *see id.* at 195–96 (discussing hypothetical where General Motors claimed to have sold one million SUVs, but actually sold none).  To the extent that neither Individual Defendant *made* a particular statement or omission, *see supra* II.B.2, or neither made any statements or omissions *with fraudulent intent*, *see supra* II.B.4a–b, Rio Tinto thus cannot be liable either.  *See Teamsters*, 531 F.3d at 195; *Southland*, 365 F.3d at 366; *see also Silvercreek Mgmt., Inc. v. Citigroup, Inc.*, 248 F. Supp. 3d 428, 440 (S.D.N.Y. 2017).

## 5.    The Complaint Fails to Plead Scheme Liability as a Matter of Law.

Plaintiff's attempt to allege scheme liability fails because "alleged misrepresentations or omissions" cannot be the "sole basis" for scheme liability.  *Lentell*, 396 F.3d at 177; *see also*, *e.g.*, *WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011) (scheme liability must "encompass[] conduct beyond . . . misrepresentations or omissions"); *SEC v. Stoker*, 865 F. Supp. 2d 457, 467 (S.D.N.Y. 2012) (scheme liability requires "'a deceptive scheme . . . beyond the misrepresentations'" (citation omitted)).  Courts in this District thus have been careful to "scrutinize pleadings to ensure that misrepresentation or omission claims do not proceed under the scheme liability rubric."  *In re Smith Barney*, 884 F. Supp. 2d at 161; *see also Menaldi*, 277 F. Supp. 3d at 519–20 ("deceptive cover-up" of misrepresentations that merely "repackage[d] the misrepresentations allegations" was insufficient for scheme liability).  Otherwise, virtually any misrepresentations or omissions claim would state a claim for scheme liability.

Here, Plaintiff has merely "repackage[d] the misrepresentations allegations" as an alleged deceptive scheme.  *Menaldi*, 277 F. Supp. 3d at 520.  To the extent he alleges deceptive actions or concealment, that alleged conduct was part-and-parcel of—not distinct from—Defendants' alleged public misrepresentations and omissions to investors about RTCM.  Accordingly, any claim of scheme liability must be dismissed.  *See*, *e.g.*, *SEC v. Kelly*, 817 F. Supp. 2d 340, 343

(S.D.N.Y. 2011) (dismissing a scheme-liability claim where the alleged misrepresentations were the "primary purpose and effect" of the allegedly deceptive conduct).

### 6.    The Complaint Fails Adequately to Allege Loss Causation.

Plaintiff also does not adequately allege loss causation, which "'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'"  *Lentell*, 396 F.3d at 172 (citation omitted).  "[T]o establish loss causation, 'a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' . . . *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."  *Id.* at 173 (citation omitted).  Thus, "a particular disclosure constitutes a sufficient foundation for loss causation allegations only if it somehow reveals to the market that a defendant's prior statements were not entirely true or accurate."  *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008).

Courts routinely dismiss Section 10(b) claims where, as here, the alleged "corrective disclosure" did not "reveal[] an alleged misstatement's falsity or disclose[] that allegedly material information had been omitted."  *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007).  *In re AOL*, for example, dismissed a fraud claim where there were no allegations that the allegedly false audit opinion "was ever the subject of a corrective disclosure," "that the financial results certified by that Opinion were ever restated, or that the truth of that Opinion was called into question at any time" during an alleged stock drop.  *Id.* at 678.  Similarly, *Take-Two* dismissed a fraud claim because the alleged disclosure—a statement that the defendant had received grand jury subpoenas for "certain compensation and human resources documents"—did not reveal anything about the defendant's alleged fraud of options backdating.  551 F. Supp. 2d at 282.  As the Court explained, "[t]he announcement ma[de] no mention of options,

options backdating, or the manner in which Take-Two accounted for its options grants." *Id.* at 283–84.

As in *In re AOL* and *Take-Two*, the Complaint must be dismissed for failure to allege loss causation adequately.  Plaintiff alleges "partial disclosures" in a January 2013 announcement that Rio Tinto was taking a roughly $3 billion impairment to RTCM because infrastructure development had been "more challenging than . . . originally anticipated," Rio Tinto "did not receive formal approvals" for barging, and there had been "a downward revision to estimates of recoverable coking coal volumes" at RTCM.  ¶ 134 (quoting Ex. 21).  Plaintiff asserts additional partial disclosures in a February 2013 announcement that the impairment was for $2,860 million post-tax, ¶ 135, and a March 2013 announcement that "detailed" a "breakdown" of the impairment, ¶ 138.  As a matter of law, none of these announcements was a corrective disclosure.

*First*, the announcements did not "reveal some then-undisclosed fact[s] with regard to the specific misrepresentations alleged."  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (disclosure repeating information already known to the market was not corrective).  The adverse developments mentioned were already known to investors, *see* Ex. 14, at 67–68 (rejected barging proposal); 2011 AR at 49, 52 (resources and reserves figures), or "recently learned" in November 2012, SEC Compl. ¶ 159, and thus did not *correct* any earlier statements.

*Second*, the announcements did not suggest that any previous statement about RTCM had been false when made.  Indeed, they did not disclose *any* alleged fraud or suggest that RTCM should have been impaired at *any* earlier date.  As in *AOL*, 503 F. Supp. 2d at 678, Rio Tinto has never restated the relevant financial statements.  And as in *Take-Two*, 551 F. Supp. 2d at 283–84, the announcements did not mention RTCM's previous impairment determinations, let alone suggest that RTCM should have been impaired sooner, *see also Leykin v. AT&T Corp.*, 423 F. Supp.

2d 229, 244–45 (S.D.N.Y. 2006) (holding that "dire" statements that a company "'will need to raise additional funds'" were not corrective of a nearly $200 million overstatement because "nothing in those statements disclosed that the alleged misrepresentations had been false or misleading").

*Third*, the February 2013 announcement of a "'$2,860 million post-tax'" impairment to RTCM, ¶ 135 (citation omitted), and the March 2013 "breakdown" of that impairment, ¶ 138, were wholly duplicative of the January 2013 announcement that the impairment would be for "'approximately US$3 billion,'" ¶ 100 (citation omitted).  Greater specificity about the *impairment* amount—that it was for $2.86 billion post-tax (or $3.27 billion pre-tax), or that it was allocated among several accounting categories—did not "reveal some then-undisclosed fact with regard to the specific *misrepresentations* alleged," *Omnicom*, 597 F.3d at 511 (emphasis added); *see also In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 495 (D. Conn. 2013) (holding that "plaintiffs fail[ed] to identify what new fraud-related information was included" in the announcement of a 10–12% earnings decline where defendant had previously disclosed that it "had significantly underestimated" the negative revenue impact of an internal reorganization).

The Section 10(b) claims thus fail because "the Complaint, at best, advances a narrative in which [Rio Tinto's] stock price dropped on the disappointing news" of a $14 billion impairment—*not* a corrective disclosure of an earlier alleged fraud.  *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 500 (S.D.N.Y. 2018); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 385 (E.D.N.Y. 2013) ("[L]oss causation is not adequately pled simply by allegations of a drop in stock price following an announcement of bad news if the news did not disclose the fraud.").

### C.     The Section 20(a) Claims Must Be Dismissed for Failure to Plead a Primary Violation, Culpable Participation, or Control.

The Section 20(a) claims against Mr. Albanese and Mr. Elliott must be dismissed for several reasons. *First*, the Complaint fails to allege a primary violation because the Section 10(b) claims are untimely and deficient in other respects explained *supra* I–II.B. *See*, *e.g.*, *Bear Stearns*, 829 F.3d at 177 ("[B]ecause [plaintiff] fails to state a claim under Section 10(b), . . . its Section 20(a) claim 'must also fail for want of a primary violation.'" (citation omitted)).

*Second*, the Complaint fails to allege either Individual Defendant's culpable participation for the same reasons it fails adequately to plead their scienter. *See*, *e.g.*, *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 2018 WL 1449206, at *7–8 (S.D.N.Y. Mar. 23, 2018) (finding that inadequate scienter allegations also inadequately alleged culpable participation in a primary violation); *In re ShengdaTech, Inc. Sec. Litig.*, 2014 WL 3928606, at *11 (S.D.N.Y. Aug. 12, 2014) ("Because the Complaint fails to plead even recklessness with the particularity required by the PSLRA . . . in the § 10(b) context, it also necessarily fails to do the same in the § 20(a) context.").

*Third*, the Section 20(a) claim against Mr. Elliott also must be dismissed as to the post-October 23, 2012 allegations because there are no plausible allegations that, as then-CFO, Mr. Elliott "controlled" then-CEO Mr. Albanese for purposes of Section 20(a). *See In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 497 (S.D.N.Y. 2018) (dismissing Section 20(a) claim against CFO for failing to allege that the CFO "controlled" the CEO for Section 20(a) purposes).

## <u>CONCLUSION</u>

For the foregoing reasons, the entire First Amended Complaint must be dismissed with prejudice.

Dated: New York, New York
October 30, 2018

By:    /s/ Peter J. Romatowski (on consent)[1]
    Kristen A. Lejnieks
    Peter J. Romatowski
    JONES DAY
    51 Louisiana Avenue, NW
    Washington, D.C. 20001
    Tel: (202) 879-7625
    Fax: (202) 626 1700
    kalejnieks@jonesday.com
    pjromatowski@jonesday.com

    David R. Woodcock (pro hac vice)
    JONES DAY
    2727 North Harwood Street
    Dallas, TX 75201
    Tel: (214) 969-3681
    Fax: (214) 969-5100
    dwoodcock@jonesday.com

*Attorneys for Defendant Thomas Albanese*

By:    /s/ Walter G. Ricciardi (on consent)
    Theodore V. Wells, Jr.
    Walter G. Ricciardi
    Geoffrey R. Chepiga
    Livia Fine
    PAUL, WEISS, RIFKIND, WHARTON
    & GARRISON LLP
    1285 Avenue of the Americas
    New York, N.Y. 10019
    Tel: (212) 373-3000
    Fax: (212) 757-3990
    twells@paulweiss.com
    wricciardi@paulweiss.com
    gchepiga@paulweiss.com
    lfine@paulweiss.com

*Attorneys for Defendant Guy Robert Elliott*

By:    /s/ Mark A. Kirsch
    Mark A. Kirsch
    Lawrence J. Zweifach
    Caitlin J. Halligan
    Jennifer L. Conn
    Michael J. Springer
    GIBSON, DUNN & CRUTCHER LLP
    200 Park Avenue
    New York, N.Y. 10166-0193
    Tel: (212) 351-4000
    Fax: (212) 351-4035
    mkirsch@gibsondunn.com
    lzweifach@gibsondunn.com
    challigan@gibsondunn.com
    jconn@gibsondunn.com
    mspringer@gibsondunn.com

    Richard W. Grime (pro hac vice)
    Kellam M. Conover (pro hac vice)
    GIBSON, DUNN & CRUTCHER LLP
    1050 Connecticut Avenue, NW
    Washington, D.C. 20036
    Tel: (202) 955-8500
    Fax: (202) 530-9652
    rgrime@gibsondunn.com
    kconover@gibsondunn.com

*Attorneys for Defendants Rio Tinto PLC and
Rio Tinto Limited*

---

[1]  The parties are using electronic signatures with consent in accordance with Rule 8.5(b) of the Court's ECF Rules and Instructions.