USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/3/2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANTON COLBERT, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

-against-

RIO TINTO PLC, RIO TINTO LIMITED, THOMAS ALBANESE, and GUY ROBERT ELLIOTT,

Defendants.

17 Civ. 8169 (AT) (DCF)

**ORDER**

ANALISA TORRES, District Judge:

On October 23, 2017, Plaintiff brought this putative class action against Defendants Rio Tinto plc and Rio Tinto Limited (collectively, "Rio Tinto"), Thomas Albanese, and Guy Robert Elliott (Albanese and Elliott together, the "Individual Defendants"), alleging violations of (1) Section 10(b) the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, against all Defendants; and (2) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Individual Defendants. ECF No. 1. On September 25, 2018, Plaintiff filed an amended complaint. Compl., ECF No. 60. Defendants move to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 65. For the reasons stated below, Defendants' motion is GRANTED.

## BACKGROUND

The following facts are taken from the complaint, which the Court accepts as true for purposes of this motion.[1] *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

---

[1] The Court presumes the parties' familiarity with the allegations in this case, which are set forth only as necessary to resolve this motion. Many of the allegations are similar or identical to those made by the Securities and Exchange Commission (the "SEC") in the related case *SEC v. Rio Tinto PLC et al.*, No. 17 Civ. 7994 (S.D.N.Y. Oct. 17, 2017) (the "SEC Action"), which is also pending before this Court. *See* Compl. at 1. In addition, Plaintiff states that "[b]oth the facts [pleaded] in the SEC complaint and the facts set forth in [a Final Notice issued by the United Kingdom's Financial Conduct Authority] levying a fine on Rio Tinto, which Defendants do not deny, are incorporated by reference as if [pleaded] herein." *Id.* ¶ 3. Where necessary, therefore, the Court will refer to allegations made in the SEC's complaint in the SEC Action, which is attached to Plaintiff's complaint as Exhibit A.

Rio Tinto is an international mining group that is headquartered in the United Kingdom. Compl. ¶ 22. Rio Tinto's American Depositary Receipts ("ADRs") are publicly traded on the New York Stock Exchange. *Id.* ¶ 2. Albanese was Rio Tinto's Chief Executive Officer from May 2007 through January 2013. *Id.* ¶ 23. Elliott was Rio Tinto's Chief Financial Officer from 2002 through April 2013. *Id.* ¶ 24.

Rio Tinto is obligated to comply with the accounting standards issued by the International Accounting Standards Board ("IAS" standards). *Id.* ¶ 33. Pursuant to one standard (IAS 36), Rio Tinto must assess whether an asset is impaired at the end of each reporting period (i.e., at each half year and year end). *Id.* ¶ 34. This is done by determining whether there are any "impairment indicators," and if there are, by testing for impairment by determining the recoverable amount. *Id.* A company must recognize an impairment loss on an asset if its value, as reported in a company's financial statements, exceeds its likely recoverable amount. *Id.* Rio Tinto's Controller's Office is responsible for coordinating the impairment review process, and at all relevant times, the Controller reported to Elliott. SEC Compl. ¶¶ 35, 39. The Controller's Office also prepared papers for Rio Tinto's Audit Committee, of which the Individual Defendants were members. *Id.* ¶¶ 42–43. The Individual Defendants were also members of Rio Tinto's "Investment Committee," which made investment decisions for the company. *Id.* ¶¶ 27, 54.

In 2010, Rio Tinto identified a company called Riversdale Mining Limited ("Riversdale") as a potential acquisition target. *Id.* ¶¶ 48–53. Riversdale's principal assets were coal mining licenses for contiguously-located areas in Mozambique. *Id.* ¶ 50. These coal projects were located in areas of Mozambique believed to have large amounts of "hard coking" coal, which is

---

*See* SEC Compl., ECF No. 60-1.

2

rarer and more valuable than "thermal" coal. *Id.* ¶¶ 28, 49–50, 55.

Papers presented during an August 2010 meeting of Rio Tinto's Investment Committee estimated that Riversdale's mining licenses were worth approximately $3.4 billion, based in part on two assumptions. *Id.* ¶¶ 28–29. First, it was assumed that there was production potential of approximately 30 million tons of coal annually by 2020 and 45 million tons annually by 2030. *Id.* at 28. Second, it was assumed that sixty percent of the coal mined would be hard coking coal. *Id.* Additionally, Rio Tinto's Technical Evaluation Group ("TEG") informed the Investment Committee that same month that a central assumption was that the majority of the coal mined would be barged down the Zambezi River. *Id.* ¶ 29. TEG explained that barging is "only a concept at this stage and a number of potentially 'showstopping' unknowns exist (such as the ability to dredge and maintain an open channel over the river mouth bar, the impact of cyclones/flooding on river navigability and the ability to obtain environmental approvals)." *Id.* It was assumed that the remainder of the coal mined could be transported using existing rail infrastructure in Mozambique. *Id.* ¶ 30. In advance of a November 18, 2010 Investment Committee meeting, TEG submitted a paper observing that expanding Riversdale's coal production would be largely reliant on barging and that "significant uncertainties remain over its practical operation, permitting, feasibility and cost." *Id.* ¶ 31.

In December 2010, the Investment Committee presented a proposal to acquire Riversdale to Rio Tinto's Board of Directors (the "Board"), which also included the Individual Defendants. *Id.* ¶ 32; SEC Compl. ¶ 60. The proposal stated that the purchase would increase Rio Tinto's production of coal to more than 30 million tons annually after 2020, that coal could be transported by barging or rail, and that the value of the acquisition was $3.6 billion. SEC Compl. ¶ 60. However, the potentially "showstopping" risks associated with barging were not disclosed

to the Board. *Id.* Rio Tinto acquired Riversdale in August 2011 for approximately $3.7 billion and renamed the business "Rio Tinto Coal Mozambique" ("RTCM"). Compl. ¶¶ 4, 32.

Rio Tinto soon ran into problems with the project. First, Rio Tinto encountered problems with respect to barging. *Id.* ¶¶ 36–43. By October 2011, the Vice President of Rio Tinto's Energy Product Group ("RTE"), which is responsible for Rio Tinto's coal mining business, determined that based on the best information available, barging capacity was limited to 10 million tons annually (not 30 million) due to physical and ecological constraints. *Id.* ¶ 36. Thereafter, RTCM internally generated an updated valuation that reduced its value by approximately $2.1 billion. *Id.* ¶ 37. Moreover, barging was contingent on government approval, and in December 2011, the Government of Mozambique, in a written letter, rejected a barging proposal because of environmental concerns. *Id.* ¶¶ 39–40. By January 2012, both Individual Defendants had learned of the rejection. *Id.* ¶ 42. Rio Tinto never formally submitted a revised proposal, and was warned by the Government of Mozambique in April 2012 that if it persisted in raising the subject of barging, it risked losing its mining licenses altogether. *Id.* Rio Tinto did not publicly disclose the rejection of the barging proposal or its effect on RTCM's valuation, nor did Albanese inform the Board about it. *Id.* ¶ 43; SEC Compl. ¶¶ 89–90.

Additionally, Rio Tinto had estimated at acquisition that RTCM could mine about seven billion tons of coal. Compl. ¶ 45. However, in January 2012, Rio Tinto revised its estimate downward to less than three billion tons. *Id.*

In late 2011 and early 2012, RTCM created a "ground-up" valuation model that generated valuations ranging from approximately negative $3.45 billion to approximately negative $9 billion. *Id.* ¶ 47. These models incorporated the problems about the transportation options and the coal reserves, but were still based on "aggressive" assumptions, including that

4

Rio Tinto would build a new railroad for coal transportation (and sell off excess capacity on it to other companies). *Id.* ¶ 48.

Between September and December 2011, Rio Tinto conducted its review of RTCM for impairment indicators. SEC Compl. ¶ 91. However, Defendants did not disclose the transportation problems to Rio Tinto's auditors, to the extent they were then known. Compl. ¶ 49. The auditors believed, therefore, that nothing significant had changed since acquisition and did not test for impairment. SEC Compl. ¶¶ 92, 94; Compl. ¶ 51. RTCM was valued at its acquisition price—about $3.7 billion—in Rio Tinto's 2011 annual report (the "2011 Annual Report"). Compl. ¶ 51. The Individual Defendants signed the 2011 Annual Report and certified, among other things, that it gave "a true and fair view of the assets, liabilities, financial position and profit" of Rio Tinto; that it was prepared in accordance with applicable accounting standards; and that they had taken the necessary steps to establish that Rio Tinto's auditors were aware of any relevant information. *Id.* ¶ 50.

In mid-April 2012, Elliott requested an "all hands" meeting with Albanese and RTCM representatives to discuss RTCM. *Id.* ¶ 54. Elliott asked the CEO of RTE to calculate a "net present value" of RTCM in advance of the meeting. *Id.* The meeting was held on May 11, 2012, in Brisbane, Australia (the "Brisbane Meeting"). *Id.* Elliott did not invite Rio Tinto's Controller to the Brisbane Meeting. *Id.* ¶ 55. At the meeting, RTCM and RTE management provided the Individual Defendants with certain information, including that: using the best information available, RTCM was worth negative $680 million; the coal transportation options assumed at acquisition were no longer realistic (barging had been rejected by the Government of Mozambique and, in any event, faced physical challenges); and there was a lower proportion of hard coking coal to thermal coal than had been assumed. *Id.* ¶ 56. Additionally, they informed

the Individual Defendants that the only way to deliver the necessary capacity of coal at a competitive cost was to build a new rail line (or a "greenfield" rail line) at a cost of $16 billion—however, a greenfield rail line would still not give the project a positive valuation. *Id.* At the Brisbane Meeting, Albanese rejected a proposal for Rio Tinto to build the greenfield rail line by itself because of capital constraints, but instructed RTCM to seek out potential partners to build it. *Id.* ¶ 57.

The Individual Defendants did not disclose to Rio Tinto's Controller or its auditors the severe adverse developments that the Individual Defendants had learned about at the Brisbane Meeting. *Id.* ¶¶ 58, 63, 69, 72.

On August 9, 2012, Rio Tinto filed its interim financial report for half-year 2012 (the "HY 2012 Report") as an exhibit to its Form 6-K filed with the SEC. *Id.* ¶ 76. The HY 2012 Report valued RTCM at more than $3 billion, and did not discuss the recent significant setbacks. *Id.* ¶¶ 76–77.

On November 2, 2012, Rio Tinto filed its Form 6-K for the third quarter of 2012 with the SEC. *Id.* ¶ 88. In its filing, Rio Tinto stated that "[d]uring the quarter, production at the Benga mine in the Moatize Basin in Mozambique continued to ramp up" and that "[w]ork is progressing to expand capacity on the Sena railway line, which remains the system bottleneck." *Id.* (alterations in original). Rio Tinto did not disclose any of the severe adverse developments at RTCM. *Id.*

At a "Metal Bulletin African Iron Ore Conference" which took place from November 6 through 8, 2012, Rio Tinto gave a presentation, during which it displayed a slide titled "Our presence in Africa is growing." *Id.* ¶ 89. The slide displayed a map of Africa and identified ten Rio Tinto projects on the continent, including RTCM. *Id.* ¶ 89.

6

At a November 2012 investor conference, an investor stated that "[i]n the past, certainly in Riversdale and then subsequently, you have talked about barging coal down the Zambezi River," and then asked, "Is that still on the agenda or has that been given up on?" *Id.* ¶ 90. Albanese replied, "I think that what we would need to look at would be all the transportation options, but realistically continued upgrades of the Beira line and then looking at a transportation corridor of probably the highest probability, a sort of pathway for expansions, but again I think we need to keep in mind that any of the options should always be looked at, at different times." *Id.*

On February 5, 2013, Rio Tinto filed a Form 8-A with the SEC to register an issuance of $3 billion in notes pursuant to an amended prospectus filed on March 16, 2012. *Id.* ¶ 92. That prospectus incorporated by reference the 2011 Annual Report. *Id.*

Following a November 26, 2012 Audit Committee meeting, the head of Rio Tinto's Technology & Innovation Group ("T&I") informed Albanese that RTCM had a negative valuation. *Id.* ¶ 93. Albanese requested confirmation, which he received in December 2012. *Id.* The head of T&I then bypassed the Individual Defendants and informed the Chairman of the Board about RTCM's negative valuation. *Id.* ¶ 94. At a January 15, 2013 meeting of the Board, RTCM's value was revised downward to $611 million. *Id.* ¶ 95. In a January 17, 2013 press release, Rio Tinto stated that it expected to impair RTCM's value by "approximately $3 billion" in its 2012 annual results. *Id.* ¶ 98; Halligan Decl. Ex. 21 at 1, ECF No. 67-21. The press release mentioned infrastructure challenges, including that barging did not receive formal approvals, as well as estimates of less hard coking coal than anticipated. Compl. ¶¶ 98, 101. The press release also announced that Albanese was stepping down as CEO, and that in total, Rio Tinto expected to recognize an impairment of $14 billion in its 2012 full year results. *Id.* ¶¶ 98,

100. In response to these and other disclosures, *see id.* ¶¶ 98–103, the price of Rio Tinto ADRs fell $0.24 to close at $54.45 that day, *id.* ¶ 104.

On February 15, 2013, Rio Tinto filed its Form 6-K announcing its financial results for 2012, which included an impairment for RTCM of $3.269 billion. *Id.* ¶¶ 105–106. The Form 6-K also reported a net loss of almost $3 billion (the first loss in Rio Tinto's history), and the same day, Rio Tinto announced a 15% increase in its full-year dividend. *Id.* Over the following days, the price of Rio Tinto ADRs fell by $2.51, to close at $55.26 on February 20, 2013. *Id.* ¶ 107.

On March 15, 2013, Rio Tinto filed its Form 20-F with the SEC, which contained its audited financial statements for 2012. *Id.* ¶ 108. Among other things, the audited financial statements explained the breakdown of the $3.269 billion impairment of RTCM. *Id.* Over the following days, the price of Rio Tinto ADRs fell by $3.30, to close at $46.50 on March 19, 2013. *Id.* ¶ 109.

Albanese left Rio Tinto on July 16, 2013. *Id.* ¶ 99. Elliott was replaced as Rio Tinto's CFO in April 2013, and retired from Rio Tinto at the end of 2013. *Id.* ¶¶ 24, 112.

On October 17, 2017, the SEC filed its complaint against Rio Tinto and the Individual Defendants. Compl. ¶ 115; *see* SEC Compl. In an opinion and order dated March 18, 2019 (the "SEC Opinion"), the Court granted in part and denied in part Defendants' motion to dismiss the SEC's complaint. *SEC v. Rio Tinto plc*, No. 17 Civ. 7994, 2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019) (Torres, J.).

## DISCUSSION

I.  Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, "state a claim to relief that is plausible on its

face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions[] and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Ultimately, the facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level." *Id*. The court must accept the allegations in the pleadings as true and draw all reasonable inferences in favor of the non-movant. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

II. Analysis

 A. Section 10(b) and Rule 10b–5 Claims

  1. Section 1658(b)'s Statute of Repose

A private action alleging fraud under the Exchange Act "may be brought not later than the earlier of[] (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b). Section 1658(b) "is not a statute of limitations," but is instead "a statute of repose, which is not a limitation of a plaintiff's remedy, but rather defines the right involved in terms of the time allowed to bring suit." *SRM Glob. Master Fund P'ship Ltd. v. Bear Stearns Cos. LLC*, 829 F.3d 173, 176 (2d Cir. 2016) (internal quotation marks and citation omitted). This distinction "carries significant practical consequences," because although a statute of limitations is "often subject to tolling principles, a statute of repose extinguishes a plaintiff's cause of action after the passage of a fixed period of time." *Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 106 (2d Cir. 2013) (internal quotation marks

and citation omitted).

"Courts in this district have . . . consistently stated that the five-year period begins to run from the time that the allegedly fraudulent representations were made." *Boudinot v. Shrader*, No. 09 Civ. 10163, 2012 WL 489215, at *4 (S.D.N.Y. Feb. 15, 2012) (collecting cases); *see also Kuwait Inv. Office v. Am. Int'l Grp., Inc.*, 128 F. Supp. 3d 792, 807 (S.D.N.Y. 2015) ("[Section 1658(b)] runs from the date of each relevant misstatement or omission."). In accordance with Section 1658(b), therefore, Plaintiff may only bring suit for alleged violations of the Exchange Act that occurred on or after October 23, 2012 (five years before bringing his complaint).

Nevertheless, Plaintiff alleges a number of misstatements and omissions before October 23, 2012. *See, e.g.*, Compl. ¶¶ 50, 73, 76, 78, 85; Pl. Mem. at 12–14, ECF No. 71. Plaintiff advances two grounds in support of his argument that these misstatements and omissions should not be dismissed as a result of Section 1658(b). First, Plaintiff argues that, although the statements were made before October 23, 2012, Defendants had a duty to correct or update their statements which continued after October 23, 2012, but that they failed to do so. Pl. Mem. at 25–27. This argument is nonsensical. If Plaintiff were correct, then Section 1658(b) would be "a nullity," and unless and until a misstatement was corrected, "the five-year deadline would not [] even beg[i]n running on the claim." *Intesa Sanpaolo, S.p.A. v. Credit Agricole Corp. & Inv. Bank*, 924 F. Supp. 2d 528, 537 (S.D.N.Y. 2013). "This could not have been the intention of Congress in drafting [Section] 1658(b)'[s] five-year deadline, which was meant to be 'an unqualified bar on actions' that 'giv[es] defendants total repose after five years,' and thereby eliminates the possibility that defendants will be 'subject[ed] to liability for acts taken long ago.'" *Id.* (third and fourth alterations in original) (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 650 (2010)). The cases Plaintiff cites do not concern statutes of repose and are inapposite.

10

*See generally* Pl. Mem. at 25–27.

Plaintiff's second argument is that the five-year period set by the statute of repose does not begin with each misrepresentation or omission, but instead begins with "plaintiff class members' class-period purchases of the Company's securities in reliance on the asserted false statement." *Id.* at 27. Because this action is brought on behalf of investors who purchased Rio Tinto securities between October 23, 2012 and March 15, 2013, Compl. ¶ 1, Plaintiff argues that Section 1658(b) does not bar his suit. In support of this proposition, Plaintiff cites *Arnold v. KPMG LLP*, in which the Second Circuit stated that the statute of repose for securities law claims "starts to run on the date the parties have committed themselves to complete the purchase or sale transaction." 334 F. App'x 349, 351 (2d Cir. 2009) (summary order) (internal quotation marks and citation omitted). Since *Arnold*, however, the Second Circuit has dismissed a complaint that "fail[ed] to allege that the defendants made any misrepresentations within five years of the filing of [the] complaint." *Bear Stearns*, 829 F.3d at 177; *see also Fogel v. Wal-Mart de México SAB de CV*, No. 13 Civ. 2282, 2017 WL 751155, at *8 n.11 (S.D.N.Y. Feb. 27, 2017) ("[I]n the years since *Arnold*, the Second Circuit has made plain its belief that it is the date of the misrepresentation, not the transaction, that matters for purposes of the . . . statute of repose."). The Court, therefore, DISMISSES all claims predicated on misrepresentations or omissions that occurred before October 23, 2012.

2. Statements Made After October 23, 2012

The Court will now consider whether Plaintiff has stated a claim based on statements made within the statute of repose period.

Count One of the complaint is brought against all Defendants for violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5. "To state a

11

claim for relief under § 10(b) and Rule 10b–5, plaintiffs must allege that [defendants] (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks and citation omitted).

In their opening brief, Defendants argue for the dismissal of all alleged misstatements or omissions in the complaint. *See generally* Def. Mem., ECF No. 66. In his opposition brief, however, Plaintiff opposes the dismissal of only four statements made on or after October 23, 2012. *See* Pl. Mem. at 34–51. Plaintiff has, therefore, abandoned his claims with respect to other statements made on or after October 23, 2012. *See DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 449 (S.D.N.Y. 2018).

Plaintiff opposes dismissal of claims predicated on the following four statements made after October 23, 2012: (1) the statement in Rio Tinto's November 2, 2012 Form 6-K that "[d]uring the [past] quarter, production at the Benga mine in the Moatize Basin in Mozambique continued to ramp up" and that "[w]ork is progressing to expand capacity on the Sena railway line, which remains the system bottleneck," without disclosing the adverse developments at RTCM, Compl. ¶ 88; (2) the use of a slide titled "Our presence in Africa is growing" at a November 6–8, 2012 "Metal Bulletin African Iron Ore Conference" that identified RTCM as a Rio Tinto project, *id.* ¶ 89; (3) Albanese's answer at a November 2012 conference to an investor's question about barging, *id.* ¶ 90; and (4) Rio Tinto's filing of a Form 8-A on February 5, 2013 to raise $3 billion in notes pursuant to an amended prospectus filed on March 16, 2012, that in turn incorporated the 2011 Annual Report, *id.* ¶ 92. For the reasons stated below, the Court dismisses the claim premised on the first and second statements for failure to allege

12

scienter, the claim premised on the third statement for failure to allege falsity, and the claim premised on the fourth statement for failure to allege both falsity and materiality.

### a. November 2012 Form 6-K and Metal Bulletin African Iron Ore Conference

Pursuant to the Private Securities Litigation Reform Act of 1995, Plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. § 78u-4(b)(2)(A), which is "to deceive, manipulate, or defraud," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (internal quotation marks and citation omitted). "The requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). In order for scienter to be imputed to a corporation, Plaintiff must allege "that an agent of the corporation committed a culpable act with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

With respect to the statement in Rio Tinto's November 2012 Form 6-K, Plaintiff argues that "Defendants were aware by November of 2012 that there was no longer any profitable way for [Rio Tinto] to exploit the mine," which renders statements in the Form 6-K "reckless at the least." Pl. Mem. at 39. With respect to the statement at the November 2012 conference, Plaintiff argues that the complaint "sets out ample basis for the Court to draw the inference that the statement regarding growth was, minimally, reckless given that [Rio Tinto's] executive management was aware at the time that growth of RTCM was permanently stymied by the inability to cheaply transport coal from the mine." *Id.* at 42. Both of these arguments fall far short of alleging "that an agent of the corporation committed a culpable act with the requisite

13

scienter." *Dynex*, 531 F.3d at 195. Indeed, Plaintiff does not allege the Individual Defendants' involvement with these statements at all, or the involvement of anyone else who could have possessed the requisite scienter. *See* Compl. ¶¶ 88–89; *see also Dietrich v. Bauer*, 76 F. Supp. 2d 312, 329 (S.D.N.Y. 1999) ("Rule 9(b) is not satisfied by a complaint in which defendants are clumped together in vague allegations." (internal quotation marks and citation omitted)). Accordingly, the § 10(b) claims predicated on these statements are DISMISSED.[2]

### b. Albanese's November 2012 Statement About Barging

The third statement which Plaintiff argues violated § 10(b) was Albanese's response to an investor's question about barging in November 2012. Compl. ¶ 90. An investor stated, "[i]n the past, certainly in Riversdale and then subsequently, you have talked about barging coal down the Zambezi River," and then asked, "Is that still on the agenda or has that been given up on?" *Id.* Albanese responded, "I think that what we would need to look at would be all the transportation options, but realistically continued upgrades of the Beira line and then looking at a transportation corridor of probably the highest probability, a sort of pathway for expansions, but again I think we need to keep in mind that any of the options should always be looked at, at different times." *Id.* Plaintiff argues that this was misleading because Albanese "was being asked about one specific option, the option that was essential to the success of the operation," but discussed other transportation options in his answer. Pl. Mem. at 44. The Court disagrees. In context, Albanese

---

[2] In *Dynex*, the Second Circuit noted that "[t]o prove liability against a corporation, of course, a plaintiff must prove that an agent of the corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation." 531 F.3d at 195. It continued by stating that "[i]n most cases, the most straightforward way to [allege this] will be to plead [scienter] for an individual defendant." *Id.* It noted, however, that there may be exceptions—for example, if a company "announced that it had sold one million SUVs in 2006, and the actual number was zero," there "would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Id.* at 195–96 (quoting *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)). No such dramatic allegations, however, are present here. Therefore, in order for Plaintiff to adequately allege corporate scienter, he must allege that an individual defendant possessed it.

did not mislead the investor into thinking that barging was a practical or realistic option at that point, and instead discussed rail transportation, which was still under consideration. *See* Compl. ¶¶ 57, 79. Accordingly, Plaintiff has not adequately alleged the falsity of this statement, and his § 10(b) claim predicated on it is DISMISSED.[3]

### c. February 2013 Form 8-A

The only remaining allegation is that Rio Tinto filed a Form 8-A on February 5, 2013 to raise $3 billion in notes pursuant to an amended prospectus filed on March 16, 2012, that in turn incorporated the 2011 Annual Report and its approximately $3.7 billion valuation of RTCM. Compl. ¶ 92. As a preliminary matter, the Court finds that Plaintiff has not alleged that the approximately $3.7 billion valuation of RTCM in the 2011 Annual Report was false when made for the reasons set forth in the SEC Opinion. *See Rio Tinto*, 2019 WL 1244933, at *8–9. Moreover, here, Plaintiff alleges that the statement incorporating the allegedly false valuation was made in February 2013—weeks after Rio Tinto announced that it expected to impair RTCM's value by "approximately $3 billion" in its 2012 annual results. Compl. ¶¶ 92, 98. Therefore, even if the incorporation of the $3.7 billion valuation was a misrepresentation, it was immaterial. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000) ("[A] misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market."). Accordingly, Plaintiff's claim predicated on this statement is DISMISSED.

### B. Section 20(a) Claims

Count Two is brought against the Individual Defendants for violations of § 20(a) of the

---

[3] The Court arrived at the same conclusion regarding this statement in the SEC Opinion. *See Rio Tinto*, 2019 WL 1244933, at *11 n.7.

Exchange Act.  Pursuant to § 20(a), "[e]very person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable," with an exception not relevant here.  15 U.S.C. § 78t(a).  Where a plaintiff fails to state a claim under § 10(b), however, "its Section 20(a) claim must also fail for want of a primary violation."  *Bear Stearns*, 829 F.3d at 177 (internal quotation marks and citation omitted).  Accordingly, because Plaintiff has not adequately alleged a claim under § 10(b), his § 20(a) claim is DISMISSED.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss the complaint is GRANTED.  The Clerk of Court is directed to terminate the motion at ECF No. 65 and close the case.

SO ORDERED.

Dated:  June 3, 2019
         New York, New York

_____
ANALISA TORRES
United States District Judge