UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANTON COLBERT, Individually and on Behalf of All Others Similarly Situated,

            Plaintiff,

-against-

RIO TINTO PLC, RIO TINTO LIMITED, THOMAS ALBANESE, and GUY ROBERT ELLIOTT,

            Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/7/2022

17 Civ. 8169 (AT) (DCF)

**ORDER**

ANALISA TORRES, District Judge:

On October 23, 2017, Plaintiff brought this putative class action against Defendants, Rio Tinto plc and Rio Tinto Limited (collectively, "Rio Tinto"), Thomas Albanese, and Guy Robert Elliott (Albanese and Elliott together, the "Individual Defendants"), alleging violations of (1) Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5, against all Defendants; and (2) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Individual Defendants. ECF No. 1. By order dated June 3, 2019 (the "June 2019 Order"), the Court granted Defendants' motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. June 2019 Order, ECF No. 79. On July 29, 2019, the Court denied Plaintiff's motion for reconsideration and for leave to file a second amended complaint, holding that Plaintiff had abandoned his claim regarding the "long-term opportunity" statement because he failed to raise it in opposition to Defendants' motion to dismiss. ECF No. 85. Plaintiff timely appealed, and on August 6, 2020, the Court of Appeals for the Second Circuit remanded the case to the Court to consider whether Plaintiff adequately pleaded his claim regarding the "long-term opportunity" statement. ECF No. 88. For the reasons stated below, Plaintiff's complaint is DISMISSED.

## BACKGROUND[1]

Rio Tinto is an international mining group that is headquartered in the United Kingdom. Am. Compl. ¶ 22, ECF No. 60. Albanese was Rio Tinto's Chief Executive Officer from May 2007 through January 2013, *id.* ¶ 23, and Elliott was Rio Tinto's Chief Financial Officer from 2002 through April 2013, *id.* ¶ 24. They were members of Rio Tinto's "Investment Committee," which made investment decisions for the company. SEC Compl. ¶¶ 27, 54, ECF No. 60-1.

In 2010, Rio Tinto identified a company called Riversdale Mining Limited ("Riversdale") as a potential acquisition target. *Id.* ¶¶ 48–53. Riversdale's principal assets were coal mining licenses for contiguously-located areas in Mozambique. *Id.* ¶ 50. In December 2010, Rio Tinto's Investment Committee presented a proposal to acquire Riversdale to Rio Tinto's Board of Directors (the "Board"), which included the Individual Defendants. Am. Compl. ¶ 32; SEC Compl. ¶ 60. The proposal stated that the purchase would increase Rio Tinto's production of coal to more than 30 million tons annually after 2020, that coal could be transported by barging or rail, and that the value of the acquisition was $3.6 billion. SEC Compl. ¶ 60. Rio Tinto acquired Riversdale in August 2011 for approximately $3.7 billion and renamed the business "Rio Tinto Coal Mozambique" ("RTCM"). Am. Compl. ¶¶ 4, 32.

Rio Tinto soon ran into problems with the project. *Id.* ¶¶ 36–43. In late 2011 and early 2012, RTCM created a "ground-up" valuation model that generated valuations ranging from approximately negative $3.45 billion to approximately negative $9 billion. *Id.* ¶ 47. However, RTCM was valued at its acquisition price—about $3.7 billion—in Rio Tinto's 2011 annual report (the "2011 Annual Report"). *Id.* ¶ 51. On August 9, 2012, Rio Tinto filed its interim financial report for half-year 2012 (the "HY 2012 Report") as an exhibit to its Form 6-K filed

---

[1] The Court presumes the parties' familiarity with the allegations in this case as set forth in the June 2019 Order.

with the SEC. *Id.* ¶ 76. The HY 2012 Report valued RTCM at more than $3 billion, and did not discuss the recent significant setbacks. *Id.* ¶¶ 76–77. On November 2, 2012, Rio Tinto filed its Form 6-K for the third quarter of 2012 with the SEC, which also did not disclose any of the severe adverse developments at RTCM. *Id.* ¶ 88.

At a November 2012 investor conference, an investor asked if barging coal down the Zambezi River was "still on the agenda or has that been given up on?" *Id.* ¶ 90 (quotation marks omitted). Albanese replied, "I think that what we would need to look at would be all the transportation options, but realistically continued upgrades of the Beira line and then looking at a transportation corridor of probably the highest probability, a sort of pathway for expansions, but again I think we need to keep in mind that any of the options should always be looked at, at different times." *Id.* At the same conference, Albanese "describe[ed] the Moatize Basin as a long-term opportunity with the potential to grow beyond 25 million tons of coal per year." *Id.* at 91.

Following a November 26, 2012 Audit Committee meeting, the head of Rio Tinto's Technology & Innovation Group ("T&I") informed Albanese that RTCM had a negative valuation. *Id.* ¶ 93. The head of T&I then bypassed the Individual Defendants and informed the Chairman of the Board about RTCM's negative valuation. *Id.* ¶ 94. At a January 15, 2013 meeting of the Board, RTCM's value was revised downward to $611 million. *Id.* ¶ 95.

On February 15, 2013, Rio Tinto filed its Form 6-K announcing its financial results for 2012, which included an impairment for RTCM of $3.269 billion. *Id.* ¶¶ 105–06. The Form 6-K also reported a net loss of almost $3 billion (the first loss in Rio Tinto's history), and the same day, Rio Tinto announced a 15% increase in its full-year dividend. *Id.* Over the following days, the price of Rio Tinto's American Depositary Receipts fell by $2.51, to close at $55.26 on

February 20, 2013.  *Id.* ¶ 107.  On March 15, 2013, Rio Tinto filed its Form 20-F with the SEC, which contained its audited financial statements for 2012.  *Id.* ¶ 108.  Among other things, the audited financial statements explained the breakdown of the $3.269 billion impairment of RTCM.  *Id.*

On October 17, 2017, the SEC filed a complaint against Rio Tinto and the Individual Defendants.  *Id.* ¶ 115; *see also* SEC Compl.  By order dated March 18, 2019, the Court granted in part and denied in part Defendants' motion to dismiss the SEC's complaint, and held that the SEC had stated a claim under Section 10(b) of the Securities Exchange Act of 1934 , 15 U.S.C. § 78a *et seq.*, with respect to the "long-term opportunity" statement.  *SEC v. Rio Tinto plc*, No. 17 Civ. 7994, 2019 WL 1244933, at *15–16 (S.D.N.Y. Mar. 18, 2019) (Torres, J.).  That action remains pending before the Court.

## DISCUSSION

I. <u>Legal Standard</u>

Where a mandate from the court of appeals "limits the issues open for consideration on remand, the district court ordinarily may not deviate from the specific dictates or spirit of the mandate by considering additional issues on remand."  *Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 175 (2d Cir. 2014).  Accordingly, the Court will only consider whether the "long-term opportunity" statement is actionable.

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual allegations in the complaint that, accepted as true, "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A plaintiff is not required to provide "detailed factual allegations" in the complaint, but must assert "more than labels and conclusions[] and a formulaic recitation of the

4

elements of a cause of action." *Twombly*, 550 U.S. at 555. Ultimately, the facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level." *Id*. The court must accept the allegations in the pleadings as true and draw all reasonable inferences in favor of the non-movant. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

"To state a claim for relief under § 10(b) and Rule 10b–5, plaintiffs must allege that [defendants] (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quotation marks and citation omitted). By contrast, the SEC must only allege the first three elements. *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).

"Loss causation . . . is the proximate causal link between the alleged misconduct and the plaintiff's economic harm." *ATSI Commc'ns, Inc.*, 493 F.3d at 106. "[T]o establish loss causation, a plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." *Lentell,* 396 F.3d at 173 (quotation marks and citation omitted) (emphasis and alteration in original). In other words, a plaintiff must allege "that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id*. "It is not enough for a plaintiff to allege that the price of a security was inflated because of a misrepresentation; there must be a causal connection between the economic loss and the alleged misrepresentation." *Healthcare Fin. Grp., Inc. v.*

5

*Bank Leumi USA*, 669 F. Supp. 2d 344, 348 (S.D.N.Y. 2009). "Generally, plaintiffs sufficiently plead loss causation when they allege that their share's price fell significantly after the truth became known through an express, corrective disclosure or through events constructively disclosing the fraud like the materialization of [the] risk concealed." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) (quotation marks and citations omitted) (alteration in original).

   II.   Analysis

Because Plaintiff did not allege that his reliance on the "long-term opportunity" statement caused his injury, his Section 10(b) claim fails. Plaintiff alleges that partial disclosures occurred in January, February, and March 2013, when Rio Tinto announced that it would record a $3 billion impairment, reported a net loss of almost that amount, and published audited financial statements detailing the loss, respectively, because Rio Tinto did not receive formal approval to transport coal by barge. Am. Compl. ¶¶ 134–35, 138. However, whether express or constructive, these disclosures did not "reveal[] to the market that [Albanese's] prior statements were not entirely true or accurate." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 283 (S.D.N.Y. 2008). The disclosures did not reveal anything about Defendants' alleged fraud or suggest that the impairments should have been taken earlier. *See* Am. Compl. ¶¶ 134–35, 138. Because Plaintiff alleges that the news of the impairments caused a drop in share price, not that disclosure of the alleged fraud resulted in a drop in share price, *id.* ¶¶ 132–39, he has not adequately alleged a Section 10(b) claim regarding the "long-term opportunity" statement, *In re Gentiva Securities Litigation*, 932 F. Supp. 2d 352, 384 (E.D.N.Y. 2013) ("Of crucial importance is that loss causation is not adequately pled simply by allegations of a drop in stock price following an announcement of bad news if the news did not disclose the fraud.").

6

Accordingly, Plaintiff's Section 10(b) claim regarding the "long-term opportunity" statement is DISMISSED for failure to state a claim.

## CONCLUSION

For the reasons stated above, Plaintiff's complaint is DISMISSED.

SO ORDERED.

Dated: February 7, 2022
New York, New York

_____
ANALISA TORRES
United States District Judge